B104
(Rev. 2/92)

# ADVERSARY PROCEEDING COVER SHEET
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |
| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |

**PARTY** (Check one box only)   ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☐ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT
(Check the one most appropriate box only.)

☒ **454** To recover money or property

☐ **435** To determine validity, priority, or extent of a lien or other interest in property

☐ **458** To obtain approval for the sale of both the interest of the estate and of a co-owner in property

☐ **424** To object or to revoke a discharge 11 U.S.C. § 727

☐ **455** To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan

☐ **426** To determine the dischargeability of a debt 11 U.S.C. § 523

☐ **434** To obtain an injunction or other equitable relief

☐ **457** To subordinate any allowed claim or interest except where such subordination is provided in a plan

☐ **456** To obtain a declaratory judgment relating to any of the foregoing of action

☐ **459** To determine a claim or cause of action removed to a bankruptcy court

☐ **498** Other (specify)

| **ORIGIN OF PROCEEDINGS** (Check one box only.) | ☐ 1 Original Proceeding | ☐ 2 Removed Proceeding | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another Bankruptcy Court | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|

| **DEMAND** | NEAREST THOUSAND $ $25 MILLION | OTHER RELIEF SOUGHT | ☐ JURY DEMAND |
|---|---|---|---|

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

## RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

**FILING FEE**   (Check one box only.)   ☐ FEE ATTACHED   ☐ FEE NOT REQUIRED   ☐ FEE IS DEFERRED

| DATE | PRINT NAME | SIGNATURE OF ATTORNEY (OR PLAINTIFF) /s/ GREGORY D. ELLIS |
|---|---|---|

B 104 Reverse
(Rev. 2/92)

## ADVERSARY PROCEEDING COVER SHEET (Reverse Side)

This cover sheet must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney) and submitted to the clerk of the court upon the filing of a complaint initiating an adversary proceeding.

The cover sheet and the information contained on it *do not* replace or supplement the filing and service of pleadings or other papers as required by law, the Federal Rules of Bankruptcy Procedure, or the local rules of court. This form is required for the use of the clerk of the court to initiate the docket sheet and to prepare necessary indices and statistical records. A separate cover sheet must be submitted to the clerk of the court for each complaint filed. The form is largely self-explanatory.

**Parties.** The names of the parties to the adversary proceeding *exactly* as they appear on the complaint. Give the names and addresses of the attorneys if known. Following the heading "Party," check the appropriate box indicating whether the United States is a party named in the complaint.

**Cause of Action.** Give a brief description of the cause of action including all federal statutes involved. For example, "Complaint seeking damages for failure to disclose information, Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq.," or "Complaint by trustee to avoid a transfer of property by the debtor, 11 U.S.C. § 544."

**Nature of Suit.** Place an "X" in the appropriate box. Only one box should be checked. If the cause fits more than one category of suit, select the most definitive.

**Origin of Proceedings.** Check the appropriate box to indicate the origin of the case:

        1.  Original Proceeding.
        2.  Removed from a State or District Court.
        4.  Reinstated or Reopened.
        5.  Transferred from Another Bankruptcy Court.

**Demand.** On the next line, state the dollar amount demanded in the complaint in thousands of dollars. For $1,000 enter "1," for $10,000 enter "10," for $100,000 enter "100," if $1,000,000, enter "1000." If $10,000,000 or more, enter "9999." If the amount is less than $1,000, enter "0001." If no monetary demand is made, enter "XXXX." If the plaintiff is seeking non-monetary relief, state the relief sought, such as injunction or foreclosure of a mortgage.

**Bankruptcy Case in Which This Adversary Proceeding Arises.** Enter the name of the debtor and the docket number of the bankruptcy case from which the proceeding now being filed arose. Beneath, enter the district and divisional office where the case was filed, and the name of the presiding judge.

**Related Adversary Proceedings.** State the names of the parties and the six digit adversary proceeding number from any adversary proceeding concerning the same two parties or the same property currently pending in any bankruptcy court. On the next line, enter the district where the related case is pending, and the name of the presiding judge.

**Filing Fee.** Check one box. The fee must be paid upon filing unless the plaintiff meets one of the following exceptions. The fee is not required if the plaintiff is the United States government or the debtor. If the plaintiff is the trustee or a debtor in possession, and there are no liquid funds in the estate, the filing fee may be deferred until there are funds in the estate. (In the event no funds are ever recovered for the estate, there will be no fee.) There is no fee for adding a party after the adversary proceeding has been commenced.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the right of the last line of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is *pro se*, that is, not represented by an attorney, the plaintiff must sign.

The name of the signatory must be printed in the box to the left of the signature. The date of the signing must be indicated in the box on the far left of the last line.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 05-63325 |
| | : | |
| CLUSTER TECHNOLOGY CORP., | : | CHAPTER 7 |
| | : | |
|     Debtor. | : | JUDGE BRIZENDINE |
| | : | |
| _____ | : | |
| | : | |
| S. GREGORY HAYS, Chapter 7 | : | |
| Trustee for Cluster | : | |
| Technology Corp., | : | ADVERSARY PROCEEDING |
| | : | |
|     Plaintiff, | : | NO. _____ |
| | : | |
| v. | : | |
| | : | |
| CARLOS BECERRA, DAVID WILLIAMS, | : | |
| ALVIN MIRMAN, RAYMONDE NARLOW | : | |
| A.K.A. RAY NARLOW A.K.A. RAYE | : | |
| NARLOWE, NORTH AMERICAN MEDICAL | : | |
| CORPORATION, CHELLO GRACE BECERRA, | : | |
| GRABALDI HOLDINGS, LLC, MANUEL | : | |
| PAREDES, FERNANDO CHAVEZ, STANLEY | : | |
| SMITH, VFINANCE INVESTMENTS, INC., | : | |
| ADAGEN MEDICAL INTERNATIONAL, INC. | : | |
| CAMBRIA 68, and C. NORMAN SHEALY, | : | |
| | : | |
|     Defendants. | : | |
| _____ | : | |

## <u>COMPLAINT</u>

COMES NOW S. Gregory Hays, the duly-appointed and acting Chapter 7 Trustee ("Trustee" or "Plaintiff") for Cluster Technology Corporation ("Cluster" or "Debtor") in the above-captioned case, by and through counsel, and for his Complaint alleges as follows:

1

**INTRODUCTION**

1.

On February 22, 2005 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (as amended, modified, or supplemented, the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "Bankruptcy Court").

2.

Plaintiff was appointed interim trustee after commencement of the Debtor's bankruptcy case.  No trustee was elected at the Section 341 meeting of creditors held on March 29, 2005 (the "341 Hearing") and, pursuant to 11 U.S.C. § 702(d), Plaintiff became the permanent trustee in the instant bankruptcy case.

**NATURE OF THE ADVERSARY PROCEEDING**

3.

This proceeding is against Carlos Becerra ("Becerra"), David Williams ("Williams"), Ray Narlow ("Narlow"), Alvin Mirman ("Mirman"), Manuel Paredes ("Paredes"), Fernando Chavez ("Chavez"), Stanley Smith ("Smith"), and Chello Grace Becerra ("C.G. Becerra") who are each former directors, officers, insiders, and/or affiliates of the Debtor, and C. Norman Shealy ("Shealy") (collectively, the "Individual Defendants"), as well as certain

2

other entities, including North American Medical Corporation ("NAM"), Adagen Medical International, Inc. ("Adagen"), vFinance Investments, Inc. ("vFinance"), Grabaldi Holdings, LLC ("Grabaldi"), and Cambria 68 ("Cambria") (collectively, the "Corporate Defendants"), each of which is an insider or affiliate of the Individual Defendants (All defendants shall be collectively referred to as the "Defendants".)

4.

Defendants:

a)   stole or otherwise converted assets of the Debtor including certain intellectual property and certain patented technology, including, without limitation, U.S. Patent No. 6,152,950 (the "950 Patent"), that technology known as or related to the "DRS System" or "DRS", licensing and manufacturing rights thereto, and related technology belonging to the Debtor (collectively the "DRS Intellectual Property Rights") and the Debtor's interest in that certain product known as "Polar Powder", including, without limitation, the trademark and any and all intellectual property rights;

b)   engaged in fraudulent transfers, made for the sole benefit of one or more of the Defendants, of certain property of the Debtor including, without limitation,

3

transfers of intellectual property, rights to intellectual property, and manufacturing rights;

c) committed fraud upon the courts, misrepresented certain transfers, and provided forged and false documents to the Court and the Trustee;

d) breached fiduciary duties owed to the Debtor;

e) committed civil conspiracy or otherwise aided and abetted each other to commit tortious acts against the Debtor;

f) wasted corporate assets of the Debtor;

g) converted certain trade secrets, including, without limitation, drawings and design issues, price lists, and part lists; and

h) engaged in avoidable transfers pursuant to provisions of the Bankruptcy Code and relevant state law.

5.

Defendants Becerra, Narlow, and Mirman breached their fiduciary duties by:

a) usurping corporate opportunities for themselves;

b) improperly disposing of, expending, or diverting the Debtor's assets while the Debtor was insolvent;

c) improperly disposing of, expending, or diverting the Debtor's assets without properly informing themselves with regard to the actions they were taking and the

4

resulting effects on the Debtor;

d)   improperly continuing the Debtor's operations up to and beyond the point of insolvency;

e)   failing to use and adhere to due care, loyalty, disclosure and good faith;

f)   dissipating, expending, or diverting assets of the Debtor for their sole benefit or for the benefit of their relatives, friends, or affiliated companies or for the benefit of certain preferred creditors;

g)   engaging in transactions with insiders that were unfair to the Debtor;

h)   making certain misrepresentations to conceal, continue, and aid and abet certain of the Defendants to allow those Defendants to continue their tortious conduct;

i)   converting or otherwise usurping certain corporate opportunities for their sole benefit, including, without limitation, that technology known generally as the 950 Patent and the DRS System;

j)   converting certain of the Debtor's intellectual property and using said intellectual property for their own personal enrichment to the detriment of the Debtor;

k)   converting certain parts and other information of the Debtor and using such items for their own personal

5

enrichment to the detriment of the Debtor;

l)    falsifying documents in order to gain an interest in property of the Debtor and the estate;

m)    concealing conduct that was deleterious to the Debtor and the estate;

n)    engaging in numerous conflicts of interest.

6.

The Trustee, in addition to other claims, seeks a judicial determination that all rights to certain intellectual property be deemed the property of, and returned to, the Debtor and the estate.

7.

Defendants Becerra and Mirman conspired and acted in concert with each other and with one or more of the other Defendants, pursuant to a common design, to accomplish the above-described breaches of fiduciary and other duties and other acts more particularly described herein, as well as to commit the theft and conversion of the Debtor's intellectual property, including, without limitation, the 950 Patent, and other trade secrets, intellectual property, and patented technology belonging to the Debtor.

8.

Defendants Becerra, Williams, Mirman, and Narlow, who each served as officers and/or directors of the Debtor, committed

6

negligence, mismanagement, and waste of corporate assets by participating in and failing to protect the Debtor from the above-described breaches of fiduciary duty and other acts more particularly described herein.

9.

In addition, Defendants NAM, Adagen, Grabaldi, and Cambria, in concert with one or more of the Defendants, conspired to convert the Debtor's assets, including, without limitation, the DRS Intellectual Property Rights and other intellectual property, trade secrets, and patented technology belonging to the Debtor.

10.

Certain of the Defendants, including, without limitation, NAM, Adagen, Grabaldi, Cambria, Narlow, Becerra, and Mirman received substantial transfers, described in further detail herein and summarized below, that constituted fraudulent conveyances or transfers or preferences under the Bankruptcy Code and/or applicable state law:

a) the transfer of some or all of the DRS Intellectual Property Rights on behalf of the Debtor to Defendant Becerra in May 2001;

b) two transfers of some or all of the DRS Intellectual Property Rights, including, without limitation, the manufacturing rights of the DRS System, on behalf of the

7

Debtor to Defendant NAM in May and June 2001;

c)    the subsequent transfer of some or all of the DRS Intellectual Property Rights, including, without limitation, the manufacturing and distribution rights of the DRS System by Defendant NAM to Defendant Adagen;

d)    the transfer of some or all of the DRS Intellectual Property Rights, including, without limitation, a cervical traction accessory for the DRS System, on behalf of the Debtor to Defendant NAM in January 2003;

e)    the transfer of some or all of the DRS Intellectual Property Rights, including, without limitation, an irrevocable license for the 950 Patent, on behalf of the Debtor to Defendant NAM in July 2003;

f)    the transfer of some or all of the Polar Powder Assets, described below, on behalf of the Debtor to Defendant Becerra in June and November 2003;

g)    the transfer of some or all of the DRS Intellectual Property Rights on behalf of the Debtor to Defendant Grabaldi in December 2003;

h)    the transfer of some or all of the DRS Intellectual Property Rights by Defendant Grabaldi to Defendant Cambria; and

i)    the further transfer of some or all of the DRS

8

Intellectual Property Rights on behalf of the Debtor to Defendant Becerra and/or one or more of the Defendants prior to and subsequent to the Petition Date.

## JURISDICTION AND PARTIES

11.

Plaintiff brings this adversary proceeding pursuant to 11 U.S.C. §§ 542, 544(b), 547(b), 548(a)(1)(A)-(B), 549(a), and 550(a), Federal Rule of Bankruptcy Procedure 7001, O.C.G.A. § 18-2-22(ii)-(iii), the Uniform Fraudulent Transfers Act under Georgia law (O.C.G.A. § 18-2-70, et seq.) and/or Florida law (F.S.A. §726.101 et seq.) (the "UFTA"), the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq., and §§ 144 and 271 of the Delaware Corporate Code, to avoid certain Transfers, described below, made on behalf of the Debtor by certain of its current and former officers and directors to one or more of the Defendants, and for the turnover by one or more of the Defendants of certain property of the Debtor.

12.

Plaintiff also brings this adversary proceeding pursuant to applicable state law to recover damages for conversion, breach of fiduciary duty, negligence, mismanagement, and waste of corporate assets, civil conspiracy/acting in concert, fraud, punitive damages, and attorney's fees from certain of the Defendants.

9

13.

As a result of the certain of the Defendants' conduct, the rights and interests of the Debtor, its shareholders, and its creditors have been harmed, giving rise to direct claims against these Defendants.

14.

This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b).

15.

Jurisdiction exists in this Court under 28 U.S.C. § 1334.

16.

Venue over this adversary proceeding resides in this Court pursuant to 28 U.S.C. § 1409.

17.

Defendant Becerra is an officer and director of Cluster. He is a resident of the state of Georgia and can be served at 940 Edgewater Court, Atlanta, Georgia 30328. Defendant Becerra is an "insider" within the meaning of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).

18.

Defendant Williams is an officer and director of Cluster. He is a resident of England and may be served pursuant to the terms of the Convention on Service Abroad of Judicial and Extrajudicial

10

Documents.   Defendant Williams is an "insider" within the meaning
of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. §
726.106(2).

19.

Defendant Mirman is a former officer and director of Cluster.
Defendant Mirman also served as an investment banker for the Debtor
through Defendant vFinance, of which he was CEO and President.
Defendant Mirman is a resident of the state of Florida and can be
served at 4183 Shell Road, Siesta Key, Florida 34242.  Defendant
Mirman is an "insider" within the meaning of 11 U.S.C. § 101(31),
O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).  Defendant vFinance
is a Florida corporation and can be served through its registered
agent, vFin Executive Services, Inc., 3010 N. Military Trail, Suite
300, Boca Raton, Florida 33431.

20.

Defendant Narlow formerly served as Secretary of Cluster.
Defendant Narlow is also the former or current President and/or a
manager of Defendant Grabaldi and is also a former officer and/or
director of Professional Distribution Systems, Inc. ("PDS"), a
subsidiary of the Debtor.   He is a resident of the State of
Florida and may be served at 436 NW 120th Drive, Coral Springs,
Florida 33071.  Defendant Narlow is an "insider" within the meaning
of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. §

11

726.106(2).

21.

Defendant NAM is an affiliated entity of Defendant Becerra. Defendant NAM is a Georgia corporation and can be served through its registered agent, Richard K. O'Donnell, at 1649 Sands Place, Suite A, Marietta, Georgia 30067. Defendant Becerra serves as Chief Executive Officer of Defendant NAM. Defendant NAM is wholly owned and controlled by Defendant Becerra. Defendant NAM is an "insider" within the meaning of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).

22.

Defendant C.G. Becerra is an officer of Defendant NAM and the wife of Defendant Becerra. She is a resident of the state of Georgia and can be served at 940 Edgewater Court, Atlanta, Georgia 30328. Defendant C.G. Becerra is an "insider" within the meaning of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).

23.

Defendant Grabaldi is a limited liability company organized under the laws of the State of Florida and is an affiliated entity of Defendant Becerra. Defendant Becerra's father-in-law, Defendant Paredes, is a current or former principal of Defendant Grabaldi. Defendant Grabaldi may be served through its registered agent,

12

Blanche Adams, at Century Village, 165 Grantham Building E, Deerfield Beach, Florida 33442. Defendant Grabaldi is an "insider" within the meaning of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).

24.

Defendant Paredes is a former or current manager of Defendant Grabaldi. He is a resident of Colombia and may be served pursuant to the terms of the Convention on Service Abroad of Judicial and Extrajudicial Documents. Defendant Paredes is Defendant Becerra's father-in-law.

25.

Defendant Chavez is a former or current manager of Defendant Grabaldi. He is a resident of the State of California and may be served at 2107 Jefferson Avenue, Redwood City, California 94062.

26.

Defendant Stanley Smith ("Smith") is a former or current manager of Defendant Grabaldi. He is a resident of the State of Florida and may be served at 2045 San Marcos Drive, Winter Haven, Florida 33880.

27.

Defendant Adagen is a Georgia corporation and, upon information and belief, an affiliated entity of Defendant NAM. Defendant Adagen is the primary, if not exclusive, distributor of

13

DRS Systems marketed and sold under the Accu-SPINA trademark.  The Accu-SPINA machine is built upon the DRS technology and the 950 Patent.  Defendant Adagen may be served through its registered agent, Terence A. Harvey, at 121 Luckie Street, Suite 200, Atlanta, Georgia 30303.

28.

Defendant Cambria, upon information and belief, is an affiliated entity of Defendant Becerra.  Defendant Cambria is an "insider" within the meaning of 11 U.S.C. § 101(31), O.C.G.A. § 18-2-71(b) and F.S.A. § 726.106(2).

29.

Defendant Shealy was one of the inventors of the DRS System. He is a resident of the State of Missouri and may be served at 5607 S. 222nd Road, Fairgrove, Missouri 65648.  Defendant Shealy was and is scientific adviser to Defendant NAM.  As recently as March of 2006, he has represented to the public that he is such an adviser.

**FACTUAL ALLEGATIONS TO ALL COUNTS**

A. Debtor's background

30.

The Debtor was incorporated in the State of Delaware in July 1985.  The Debtor is the 100% owner of Professional Distribution Systems, Inc. ("PDS"), Universal Pain Technology, Inc. ("UPT"), and Master Medical Marketing, Inc. ("MMM").

14

31.

The Debtor, together with PDS, UPT and MMM participated in the manufacture, distribution, and sale of technology known as the "DRS System" or "DRS".

32.

The patent application for the DRS System was filed on March 31, 1998, by Defendants Becerra and Shealy, Joseph Medeiros, and Charity Martin.  The patent for the DRS System, U.S. Patent No. 6,152,950 (the "950 Patent"), was issued on or about November 28, 2000.

33.

The Debtor was the exclusive owner of all rights and interest in the 950 Patent by assignment of the entire interest from the inventors (the "950 Patent Assignment"), such assignment having been duly recorded at the United States Patent and Trademark Office on March 1, 1999.  A true and correct copy of the cover page for the 950 Patent reflecting the 950 Patent Assignment is attached hereto as Exhibit "A".

34.

The primary market for the DRS System was chiropractic and pain treatment centers and physicians.

35.

The DRS System was regulated and approved by the Federal Drug

15

Administration (the "FDA"), which made the DRS System very valuable.

36.

Between May 1997 and July 1999, through a series of sales of unregistered securities, the Debtor raised capital in an amount in excess of $3.35 million. Previously, the Debtor had raised capital in an amount of approximately $971,000.00 through its initial public offering of its securities in 1986.[1]

37.

On August 26, 1997, the Debtor's Board of Directors (the "Board") held an emergency meeting to address charges by the FDA that Cluster had made misrepresentations in the sales literature related to the 950 Patent and the DRS System. Specifically, the Board determined that Becerra had been in charge of the manufacture and marketing of the DRS System. Becerra had complete responsibility to make certain that the corporation was in compliance with all federal, state and local regulations. Becerra acknowledged his obligation with regard to ensuring compliance. The Board determined that Becerra had been negligent in his duties as an employee of PDS, and negligent in his duties as a member of

_____

[1] Until March 1996, Cluster was a publicly held corporate shell seeking a business venture in which to participate.

16

the board of directors of Cluster.

38.

Notwithstanding the Board's previous findings regarding Becerra's negligent conduct, Becerra, in concert with one or more of the Defendants, continued to exert control of Cluster. On February 19, 1999, Becerra was elected to a position as CEO and General Manager of Cluster. Subsequently, Becerra was appointed to the Board.

39.

On July 30, 1999, the Debtor's Board removed Defendants Becerra and Williams as directors. The Debtor's Board then consisted of James Gibson ("Gibson"), Alvin Siegel ("Siegel"), David Yeager ("Yeager") and Defendant Mirman. Though Becerra was no longer an officer or director of the Debtor, he continued to have access to the intellectual property of the Debtor.

40.

As a result of conflict among competing groups of shareholders, on September 18, 2000, the Debtor and UPT filed petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida in Chapter 11 cases nos. 00-14507-8GI and 00-14508-8GI, respectively. In the Debtor's bankruptcy case (the "First Cluster Bankruptcy Case"), the 950 Patent was listed as an asset of the

17

estate.

41.

As of September 18, 2000, the filing date of the First Cluster Bankruptcy Case, claims in the amount of $865,495.55 were scheduled.  Scheduled assets totaled an amount of $2,065,050.00. According to the Claims Register, as of February 23, 2001, claims in the amount of $2,333,298.87 had been filed in the First Cluster Bankruptcy Case, including, a claim in the amount of $1,444,614.50 filed by or on behalf of Defendant Becerra, and a claim in the amount of $416,508.64 filed by Quaker State Leasing Company ("Quaker State").

42.

In October 2000, Defendant Mirman began working with Defendant Becerra to take control of the Debtor and to cause the transfer of the DRS Intellectual Property Rights and other intellectual property and patented technology belonging to the Debtor to Defendants Becerra, NAM, and one or more of the other Defendants.

43.

On or about January 21, 2001, during the pendency of the First Cluster Bankruptcy Case, without court authority and without the authority of the Debtor's shareholders, Defendants NAM and Adagen entered into a contract whereby Defendant Adagen would be Defendant NAM's sole distributor and sell modified DRS Systems fitted with a

18

control panel and decompression unit allegedly invented by NAM. These modified DRS Systems were marketed as Accu-SPINA Systems.

44.

On February 15, 2001, Defendant Becerra, on behalf of Cluster, advised customers and suppliers of Cluster that Cluster had not sold or transferred **any** product rights or intellectual property. A true and correct copy of the February 15, 2001 Urgent Notice letter is attached hereto as Exhibit "B". Accordingly, at least, as of the date of the Urgent Notice letters, Cluster retained ownership of all of the DRS Intellectual Property Rights, including, without limitation, the 950 Patent.

45.

Defendant Mirman, as the corporate representative of both Cluster and UPT, in a deposition taken on February 27, 2001 in UPT's bankruptcy case (the "Mirman Deposition"), testified that the intellectual property of Cluster, including the 950 Patent, had a value of somewhere between five and twenty-five million dollars. Mirman also testified that Cluster had never attempted to sell or assign the DRS Intellectual Property Rights. A true and correct copy of the relevant portion of the Mirman Deposition is attached hereto as Exhibit "C".

46.

On May 9, 2001, the U.S. Trustee in the First Cluster

19

Bankruptcy Case filed an Emergency Motion to Dismiss or Convert
Case or, in the alternative, Seeking the Appointment of a Chapter
11 Trustee (the "Motion to Dismiss") on the grounds that the
officers and directors of the Debtor had failed to seek court
authority for certain of its business activities during the
pendency of the First Cluster Bankruptcy, including, without
limitation, approving the business arrangements between the Debtor
and Defendants Becerra, NAM, and Adagen, and the unauthorized
transfer of the Debtor's assets.  A true and correct copy of the
relevant portions of the Motion to Dismiss is attached hereto as
Exhibit "D".

47.

In the Motion to Dismiss, the U.S. Trustee specifically
alleged that Defendant Adagen was misrepresenting to its customers
that the court in the First Cluster Bankruptcy Case had awarded
"all manufacturing and intellectual rights to the DRS System" to
Defendant NAM when, in fact, no such arrangement was authorized by
the court.  See Exhibit "D".

48.

Despite the U.S. Trustee's motion, Defendants Becerra and
Mirman, in concert with one or more of the Defendants, continued to
work together to use Cluster as an instrumentality to benefit
themselves, their affiliated entities, and one or more of the other

20

Defendants.

49.

On May 23, 2001, Defendant Becerra claimed in a press release to be the Spokesperson for Cluster, UPT and PDS (the "Becerra Press Release"). A true and correct copy of the Becerra Press Release is attached hereto as Exhibit "E". In the Becerra Press Release, Becerra misrepresented that Cluster and UPT would be "sharing ... the new and more advanced technology in 'decompression' developed by North American Medical Corporation over the past 18 months by NAM in Atlanta." At that time, Becerra, in concert with Defendant Mirman and one or more of the other Defendants, planned on eliminating all possible resistance to taking the technology from Cluster, and eliminating the competition that it posed for Becerra's "other" company, Defendant NAM.

50.

Then, in a letter dated May 24, 2001 from Defendant Becerra to Defendant Mirman (the "May 24, 2001 Becerra Letter"), Becerra refers to a "partnership" between himself and Mirman, the goal of which was to appropriate the Debtor's intellectual property for their sole benefit. A true and correct copy of the May 24, 2001 Becerra Letter is attached hereto as Exhibit "F".

51.

In the May 24, 2001 Becerra Letter, Defendant Becerra boils it

21

down to the ultimate breach and fraud by an executive and director of a company when he states: "I do not see why it would be difficult to justify what you are doing.  The stockholders?  Why?" See Exhibit "F".  Clearly, Becerra had a total disregard for Cluster or its shareholders.  His only interest was in lining his own pockets, as he stated: "The amount is up for me to decide." See Exhibit "F".  In the May 24, 2001 Becerra Letter, Defendant Becerra revealed that he already considered Cluster and UPT to be his.  In the letter, he represents himself as the CEO and President of Defendant NAM.  However, the letterhead also contains the logos for Cluster and UPT.  See Exhibit "F".  NAM and Cluster were (or should have been) direct competitors.

52.

Scheming together, Defendants Becerra and Mirman subsequently engineered the removal of Frank Clark ("Clark") from the Board, without any apparent reason, on May 27, 2001.

53.

Immediately thereafter, by a Resolution of the Board of Directors dated May 27, 2001 (the "May 27, 2001 Resolution"), without shareholder authority, the Debtor fraudulently transferred some or all of the DRS Intellectual Property Rights to Defendant Becerra (the "First Avoidable Transfer").  A true and correct copy of the May 27, 2001 Resolution is attached hereto as Exhibit "G".

As explained below, notwithstanding that this transfer was made during the pendency of the First Cluster Bankruptcy Case without court authority, this fraudulent transfer is void or voidable by the Trustee.

54.

Subsequently, by a May 28, 2001 Unanimous Written Consent of the Board of Directors of Cluster Technology Corp. (the "May 28, 2001 Consent"), without shareholder authority, the Debtor fraudulently transferred some or all of the DRS Intellectual Property Rights, including, but not limited to, the manufacturing rights of the DRS System, to Defendant NAM (the "Second Avoidable Transfer"), a company wholly owned and controlled by Becerra, as described in further detail below.  A true and correct copy of the May 28, 2001 Consent is attached hereto as Exhibit "H". Notwithstanding that this transfer was made during the pendency of the First Cluster Bankruptcy Case without court authority, this fraudulent transfer is void or voidable by the Trustee.

55.

Shortly thereafter, NAM transferred some or all of the manufacturing rights for the DRS System to Defendant Adagen (the "Adagen Transfer"), which began to distribute modified DRS Systems as Accu-SPINA Systems.  Notwithstanding that this transfer was made during the pendency of the First Cluster Bankruptcy Case without

23

court authority, this fraudulent transfer is void or voidable by
the Trustee.

56.

Shortly thereafter, on May 29, 2001, Defendant Mirman, in
concert with Defendant Becerra, dispatched the last remaining
impediments to their ransacking of Cluster and convinced Siegel and
Yeager to resign from the Board.

57.

The Trustee believes that Siegel, Yeager, and Clark are likely
to testify that had they been aware of the intentions of Defendants
Becerra and Mirman and the scheming that had occurred prior to
their resignations, they would have, consistent with their
fiduciary duties, taken steps to stop the conversion and
misappropriation of Cluster's assets and would have been able to
prevent the ransacking of Cluster. Siegel and Yeager stepped down
from the Board based on false representations that Becerra and
Mirman would act in the best interest of Cluster in sharing
technology with Defendant NAM. They did not.

58.

Shortly thereafter, the court having granted the U.S.
Trustee's motion to dismiss, the First Cluster Bankruptcy Case was
dismissed on June 8, 2001.

24

59.

Subsequently, on June 15, 2001, Defendant Mirman, without any authority and in violation of Cluster's bylaws, reinstated Defendants Becerra and Williams as directors.

60.

Upon the reinstatement of Defendants Becerra and Williams to the Board, Becerra and Mirman, in concert with one or more of the Defendants, continued their ransacking of Cluster, engineering further transfers of the Debtor's intellectual property for their sole benefit.

61.

On June 15, 2001, Defendant Mirman, through his company First Level Capital, Inc., the predecessor corporation of Defendant vFinance, wrote:

> "This bank has been involved in the efforts and recovery and salvage of Cluster Technology Corporation and Universal Pain Technology headed by Carlos Becerra since October 2000 . . . This financial institution has extended unsecured loans to Carlos Becerra for the salvage of the Company and anticipates the full recovery of these companies now taken out of Chapter 11 by Carlos Becerra's actions. Carlos Becerra controls North American Medical Corporation owners (sic) of the evolving

25

technology of 'decompression therapy' and recently a transaction has taken place where a substantial control block of stock is being issued to NAM North American Medical Corporation in exchange for this vital technology for use in the DRS equipment made by Cluster UPT.  It is anticipated at this time a merger of Cluster and NAM may be the end result of this association as NAM has become the actual manufacturer of the DRS product and this financial institution shall remain involved in assisting Carlos Becerra NAM and Cluster in what we anticipate will become a healthy successful enterprise.(sic)"

A true and correct copy of the letter (the "June 15, 2001 Mirman Letter") is attached hereto as Exhibit "I".

62.

The relationship between Cluster and Defendant vFinance would later be strengthened when Defendant Becerra and one or more of the other Defendants elected to obtain money through the services of Defendant vFinance.

63.

On the same date, by a June 15, 2001 Consent in Lieu of Meeting of the Board of Directors of Cluster Technology Corporation (the "June 15, 2001 Consent"), without shareholder authority, the Debtor again fraudulently transferred some or all of the DRS

26

Intellectual Property Rights, including, but not limited to, the manufacturing rights of the DRS System, to Defendant NAM (the "Third Avoidable Transfer"). A true and correct copy of the June 15, 2001 Consent is attached hereto as Exhibit "J". This fraudulent transfer, as described in further detail below, is void or voidable by the Trustee.

64.

On July 20, 2001, Defendant Becerra authored a confidential memorandum (the "July 20, 2001 Becerra Memorandum") regarding the retention of Arnall Golden Gregory and the potential for delisting Cluster. The July 20, 2001 Becerra Memorandum stated that Cluster had several hundred shareholders. It further indicated the relationship that had developed with Defendant NAM: "Then, outside of the leftover money borrowed from Dave, Marc Alvin and Ira, Cluster depends on a small float of just under $200,000 that NAM has to share with Cluster UPT." A true and correct copy of the July 20, 2001 Becerra Memorandum is attached hereto as Exhibit "K".

65.

Further cementing the his control of Cluster, on July 31, 2001, Defendant Becerra was elected President and CEO.

66.

Immediately thereafter, on August 1, 2001, the Board absolved Defendants Becerra and Williams for any acts of the Debtor, its

27

officers and directors, its employees and/or its subcontractors from July 29, 1999 through July 31, 2001, and for the acts of similar persons prior to July 29, 1999.  The Debtor received no consideration for its release of Becerra and Williams, and the self-serving resolution was a violation of Becerra's, Mirman's, and Williams' fiduciary obligations to Cluster.

67.

On September 12, 2001, Cluster and UPT initiated a state court litigation matter styled <u>Cluster Technology Corp. and Universal Pain Technology, Inc. v. James J. Gibson, Jr., Axiom Worldwide, Inc., Nicholas Exarhos, and Pain Technology Sales, Inc.</u>, Case No. 01007821, Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County (the "Gibson Litigation").  The individual defendants in the Gibson Litigation, Gibson and Nicholas Exarhos ("Exarhos") filed counterclaims against Cluster and UPT.

68.

Axiom Worldwide, Inc. ("Axiom"), Pain Technology Sales, Inc. ("PTS"), Exarhos, and Gibson also initiated litigation against Defendants Becerra, C.G. Becerra, and NAM in Case No. 01CV65210-5 in the Superior Court of Dekalb County, Georgia (the "Axiom Litigation").  With the Axiom and Gibson Litigation looming, Becerra, in concert with one or more of the other Defendants continued to ransack Cluster's assets.

28

69.

On March 11, 2002, Defendant Mirman resigned from the Board.
Shortly thereafter, Defendants Becerra and Williams authorized the
issuance of stock to Mirman in a Consent in Lieu of a Meeting of
the Board of Directors of Cluster Technology Corp. dated April 4,
2002 (the "First April 4, 2002 Consent").  A true and correct copy
of the First April 4, 2002 Consent is attached hereto as Exhibit
"L".

70.

Subsequently, in another Consent in Lieu of a Meeting of the
Board of Directors of Cluster Technology Corp. dated April 4, 2002
(the "Second April 4, 2002 Consent"), the Debtor moved forward with
the creation of a new subsidiary called Cluster Products, Inc., in
an agreement with its investment bankers, Defendant vFinance.  A
true and correct copy of the Second April 4, 2002 Consent is
attached hereto as Exhibit "M".

71.

In connection therewith, an amount of $400,000 was to be
raised from investors for this venture.  Defendant Becerra never
had any intention to use these funds to benefit Cluster and its
shareholders.  At all times, Becerra and one or more of the
Defendants intended to usurp the funds for their sole benefit.

29

72.

Subsequently, on May 8, 2002, Dr. Ronald Sheppard ("Sheppard")
joined the Board.

73.

By November 2002, Defendant Becerra realized that he would not
be able to obtain the whole $400,000 sought from investors in the
Cluster Products venture.  At that point, almost $200,000 had been
raised from investors.  Becerra used said funds solely for his
benefit or the benefit of one or more of the Defendants to fund
ongoing legal costs in those matters where Becerra and NAM were
named as defendants, and in a failed attempt to use Cluster as an
instrumentality to legitimize ongoing fraudulent transfers of its
technology and intellectual property to Becerra, NAM, Adagen, and
one or more of the other Defendants.

74.

In a Consent in Lieu of a Meeting of the Board of Directors of
Cluster Technology Corp. dated December 30, 2002 (the "December 30,
2002 Consent"), the Board recognized that Defendant Grabaldi, an
affiliated entity of Defendant Becerra managed by his father-in-
law, Defendant Paredes, had purchased a judgment against Cluster
held by Quaker State (the "Quaker State Judgment") and that the
judgment debt would now be owed to Grabaldi.  In the December 30,
2002 Consent, the Board resolved that "Grabaldi will support

30

Cluster in its recovery to oppose any litigation for the benefit of its shareholders and creditors."  A true and correct copy of the December 30, 2002 Consent is attached hereto as Exhibit "O".

75.

The Trustee believes that Sheppard and Defendant Williams are likely to testify that, consistent with their fiduciary duties, they would not have consented to the recognition of the judgment debt to Defendant Grabaldi and the creation of the relationship between Cluster and Grabaldi had they been fully aware of the intentions of Defendant Becerra and one or more of the other Defendants, and the fact that Grabaldi was an affiliate of Becerra.

76.

Defendant Becerra continued to ransack Cluster.  By a Consent in Lieu of a Meeting of the Board of Directors of Cluster Technology Corp. dated January 6, 2003 (the "January 6, 2003 Consent"), without shareholder authority, the Debtor fraudulently transferred some or all of the DRS Intellectual Property Rights, including, but not limited to, a cervical traction accessory for the DRS System, to Defendant NAM (the "Fourth Avoidable Transfer"). A true and correct copy of the January 6, 2003 Consent is attached hereto as Exhibit "P".  As described in further detail below, the Fourth Avoidable Transfer is void or voidable by the Trustee.

31

77.

In connection therewith, on February 14, 2003, Defendant Becerra executed a notice on behalf of Defendant NAM, as its president and CEO, announcing the assignment of the cervical accessory from Cluster.

78.

Meanwhile, on June 13, 2003, in the Gibson Litigation, the court entered an order granting the defendants' motion for dismissal and for sanctions for Cluster and UPT's "willful and contumacious disregard for the Court's prior orders compelling discovery" over the course of nearly two years. A true and correct copy of the order is attached hereto as Exhibit "Q". In the course of the Gibson Litigation, Defendant Becerra, in concert with one or more of the Defendants, had failed to respond to discovery requests, had given testimony contrary to sworn interrogatory answers, failed to produce documents and records, among other things.

79.

On June 30, 2003, the parties in the Gibson Litigation, along with Defendants NAM, C.G. Becerra, and Williams entered into a settlement of the Gibson Litigation and the Axiom Litigation. In connection therewith, Gibson and Exarhos were awarded judgments on their counterclaims against Cluster and UPT, in the amounts of

32

$2,000,000 and $1,000,000, respectively, which they would be entitled to executed upon in the event of a breach of the settlement agreement.

80.

With the judgments on the counterclaims of Gibson and Exarhos looming, Defendant Becerra and one or more of the other Defendants expedited their efforts to ransack Cluster.

81.

In a Consent in Lieu of Meeting of the Board of Directors of Cluster Technology Corporation dated June 17, 2003 (the "June 17, 2003 Consent"), without shareholder authority, the Debtor assigned to Becerra the royalty payments from the sales of Polar Powder product to pay off existing debt owed by Cluster to Becerra.  A true and correct copy of the June 17, 2003 Consent is attached hereto as Exhibit "R".

82.

In addition, in a letter dated June 23, 2003 from the Debtor's counsel, Stephen Dorvee, to Defendant Becerra (the "June 23, 2003 Dorvee Letter"), the attorney stated that they would be "researching the best way to move the [950 P]atent out of Cluster and into Garabaldi [sic] or to some other entity."  A true and correct copy of the June 23, 2003 Dorvee Letter is attached hereto as Exhibit "S".

33

83.

An earlier internal firm memo to Mr. Dorvee dated June 20, 2003 (the "June 20, 2003 Memo") analyzed the potential transfer of the DRS Intellectual Property Rights from the Debtor.  In the memo, the Debtor's counsel analyzed the potential for a transfer of the DRS Intellectual Property Rights to be deemed a fraudulent conveyance or fraudulent transfer under state law and reviewed potential alternatives under the circumstances to avoid such a determination.  A true and correct copy of the June 20, 2003 Memo is attached hereto as Exhibit "T".

84.

Then, by a July 30, 2003 Resolution of the Board of Directors (the "July 30, 2003 Resolution"), without shareholder authority, the Debtor fraudulently transferred some or all of the DRS Intellectual Property Rights, including, an irrevocable license for the 950 Patent, to Defendant NAM (the "Fifth Avoidable Transfer").  A true and correct copy of the July 30, 2003 Resolution is attached hereto as Exhibit "U".  The transfer was made without the knowledge of Sheppard, and the Trustee believes that Sheppard and Defendant Williams are likely to testify that they, consistent with their fiduciary duties, would not have consented to such a transfer had they been made fully aware of the intentions of the Defendant Becerra and one or more of the other Defendants.  As described in

34

further detail below, the Fifth Avoidable Transfer is void or voidable by the Trustee.

85.

Next, by a November 18, 2003 Resolution of the Board of Directors (the "November 18, 2003 Resolution"), without shareholder authority, the Debtor granted Becerra "all title and ownership of all Polar Powder product (finished or otherwise) equipment, machinery, lease(s) . . ." A true and correct copy of the November 18, 2003 Resolution is attached hereto as Exhibit "V". The Trustee believes that Sheppard and Defendant Williams are likely to testify that they, consistent with their fiduciary duties, would not have consented to such a transfer had they been made fully aware of the intentions of the Defendant Becerra and one or more of the other Defendants.

86.

Then in a December 22, 2003 Assignment of US Patent 6,152,950 and Choses in Action for Patent Infringement (the "Grabaldi Assignment"), without shareholder authority, the Debtor fraudulently transferred some or all of the DRS Intellectual Property Rights to Defendant Grabaldi (the "Sixth Avoidable Transfer"), another affiliated entity of Defendant Becerra, managed by Defendant Becerra's father-in-law, Defendant Paredes. A true and correct copy of the Grabaldi Assignment is attached hereto as

35

Exhibit "W".  The Sixth Avoidable Transfer was purportedly made in partial satisfaction of the debt owed to Defendant Grabaldi arising out of its earlier purchase of the Quaker State Judgment.  The Trustee believes that Sheppard and Defendant Williams are likely to testify that had they been given an opportunity to investigate and been fully aware of the intentions of Defendant Becerra and one or more of the other Defendants, they, consistent with their fiduciary duties, would have taken steps to block this fraudulent transfer. As described in further detail below, the Sixth Avoidable Transfer is void or voidable by the Trustee.

87.

The DRS Intellectual Property Rights would again be transferred by Defendant Grabaldi, in concert with Becerra and one or more of the other Defendants, to Defendant Cambria (the "Cambria Transfer").  As described in further detail below, the Cambria Transfer is void or voidable by the Trustee.

88.

With all of Cluster's assets dissipated and no remaining funds, Defendant Becerra, in order to further delay and hinder the enforcement remedies of Gibson and Exarhos as judgment creditors, caused Cluster to file the instant Chapter 7 case on February 22, 2005.

36

89.

Upon information and belief, even after the Petition Date, Defendant Becerra and one or more of the other Defendants continued to cause the fraudulent transfer of the DRS Intellectual Property Rights and other intellectual property and patented technology belonging to Cluster for their sole benefit and to the detriment of the Debtor, its shareholders, and its creditors.

90.

In a letter authored by Defendant Shealy dated March 22, 2006 (the "Shealy Letter"), Shealy flaunts his credentials and writes, on behalf of Defendant NAM, that the "Accu-SPINA System is the ONLY model that is built upon and continues to improve upon my work" and that he has "no financial interest in NAM but consult with only them because of their integrity." A true and correct copy of the Shealy Letter is attached hereto as Exhibit "X".

91.

Defendant Shealy has known at all times that Defendants NAM and Becerra, as well one or more of the other Defendants, have caused the fraudulent transfer of that patented technology known as the DRS System, as well as other intellectual property and patented technology belonging to the Debtor.

92.

Defendant Shealy has aided and abetted and otherwise assisted

37

Defendant Becerra, as well as one or more of the other Defendants, in the conversion of the DRS System from its rightful owner, Cluster.  Defendant Shealy has converted the DRS System, as have Defendants Becerra and one ore more of the other Defendants as described herein, to his own benefit, appearing in advertisements that appear on a continuous basis on the internet.

93.

By his statements in the Shealy Letter, Defendant Shealy has acknowledged that Defendant NAM is continuing to use patented technology and intellectual property that belongs to Cluster.  His statements show the brazenness of the fraud, described in detail below, that has been perpetrated by the Defendants upon the Debtor and the Court.

B. Avoidable Transfers of the DRS Intellectual Property Rights and Other Intellectual Property and Patented Technology

94.

As alluded to above, during the pendency of the First Cluster Bankruptcy Case, during the period prior to the filing of the Debtor's current bankruptcy case, and subsequent to the Petition Date, the DRS Intellectual Property Rights, as well as other intellectual property and patented technology belonging to Cluster, were the subject of at least eight (8) transfers, described in detail below, engineered by or on behalf of Defendants Becerra and

38

Mirman in concert with one or more of the other Defendants for
their sole benefit.  These transfers were made with the actual
intent to hinder, delay and defraud the Debtor's shareholders and
creditors to which the Debtor was liable or became indebted to.

95.

The underlying fraudulent intent of the transfers described
below is evidenced, in particular, by the efforts of Defendant
Becerra, in concert with one or more of the other Defendants, after
the filing of the Debtor's current bankruptcy case to knowingly
make false entries in the Debtor's corporate minutes in violation
of 18 U.S.C. § 152(8).

96.

As described below, Defendant Becerra, in concert with one or
more of the Defendants, submitted to the Trustee forged corporate
documents in order to fabricate transfers of some or all of the DRS
Intellectual Property Rights to him and/or one or more of the
Defendants in order to mislead and deceive the Plaintiff and the
Bankruptcy Court.

97.

The underlying fraudulent intent of these transfers is also
evidenced by the June 23, 2003 Dorvee Letter which shows that
Defendant Becerra intended to "move the [950 P]atent out of Cluster
and into Garabaldi [sic] or to some other entity" for the sole

39

benefit of one or more of the Defendants.  See Exhibit "S".

98.

The June 20, 2003 Memo also evidences the intent of Defendant Becerra and one ore more of the Defendants to fraudulently transfer the DRS Intellectual Property Rights for their sole benefit.  The Memo was provided to Defendant Becerra in the context of discussions regarding the transfer of the DRS Intellectual Property Rights.  See Exhibit "T".  The June 23, 2003 Dorvee Letter and June 20, 2003 Memo show the ultimate goal of the Defendants to transfer some of all of the DRS Intellectual Property Rights out of Cluster by any means necessary for their sole benefit.

99.

Also, the May 24, 2001 Becerra Letter evidences the intent of Defendant Becerra and one or more of the Defendants to fraudulently transfer the DRS Intellectual Property Rights for their sole benefit, regardless of the effect on the Debtor, its shareholders, and its creditors.  See Exhibit "F".

100.

In addition, the following "badges of fraud" evidence the underlying fraudulent intent of the Transfers: (a) one or more of the Transfers was made to an insider of the Debtor or to affiliates of one or more of the Defendants who are insiders of the Debtor; (b) before one or more of the Transfers, the Debtor had been sued

40

or threatened with suit; (c) the Debtor did not receive reasonably equivalent value, if any value, in exchange for one or more of the Transfers; (d) the Debtor was insolvent or became insolvent shortly after one or more of the Transfers was made; (e) one or more of the Transfers occurred shortly before or after a substantial debt was incurred; and (f) the Debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the Debtor.

101.

In addition, for each such Transfer, the Debtor received less than a reasonably equivalent value in exchange for such Transfer; and, at the time each Transfer was made, the Debtor was insolvent or became insolvent as a result of the transfer.

102.

Also, each of the Transfers constitutes a "transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest . . . "

103.

With regard to each of the Transfers, Defendants Becerra and Mirman, as directors of Cluster, failed to disclose to the Debtor's

41

Board, including, without limitation, directors Clark, Siegel, Yeager, and Sheppard, and to the Debtor's shareholders material facts regarding their relationship or interest as to the transactions.

104.

Each of the Transfers also constituted a sale, lease, or exchange of all or substantially all of the Debtor's property and assets and were made without approval of Debtor's shareholders.

## 1. The First Avoidable Transfer

105.

On May 27, 2001, during the pendency of the First Cluster Bankruptcy Case and without authority of the court or the Debtor's shareholders, some or all of the DRS Intellectual Property Rights, were transferred on behalf of the Debtor to Defendant Becerra (the "First Avoidable Transfer"). See Exhibit "G". The First Avoidable Transfer was made for the sole benefit of Defendant Becerra and one or more of the Defendants and was of no benefit to the Debtor.

## 2. The First Forged Avoidable Transfer

106.

Subsequent to the filing of the Debtor's current bankruptcy case, or in contemplation thereof, Defendant Becerra realized that the First Avoidable Transfer would be subject to avoidance by the Trustee.   Thus, in violation of 18 U.S.C. § 152(8), Becerra

42

falsified an entry in the Debtor's corporate minutes in order to mislead the Trustee and the Bankruptcy Court.

107.

In August 2000, the Debtor's Board terminated Gibson and Diane Levesque by a Resolution of the Board of Directors dated August 29, 2000 (the "Gibson Termination Resolution"). The Gibson Termination Resolution was signed by Defendant Mirman. A true and correct copy of the Gibson Termination Resolution is attached hereto as Exhibit "Y".

108.

Subsequent to the filing of the Debtor's current bankruptcy case, or in contemplation thereof, Defendant Becerra, in concert with one or more of the Defendants, extracted the signature and date lines from the Gibson Termination Resolution and combined it with the body of the May 27, 2001 Resolution, fabricating a forged document purporting to be a Resolution of the Board of Directors dated August 29, 2000 (the "Forged August 29, 2000 Resolution"), making it appear that the Debtor had transferred some or all of the DRS Intellectual Property Rights to Becerra prior to the filing of the First Cluster Bankruptcy Case (the "First Forged Avoidable Transfer"). A copy of the Forged August 29, 2000 Resolution is attached hereto as Exhibit "Z". No such transfer occurred at that time.

43

109.

At the 341 Hearing on March 29, 2005, Defendant Williams, appearing as the Debtor's corporate representative, presented to the Trustee what he purported to be all of the Debtor's corporate minutes and records.  The Forged August 29, 2000 Resolution was included, but the May 27, 2001 Resolution was not.

110.

Subsequently, the Trustee obtained a copy of the May 27, 2001 Resolution and discovered the scheme of Defendant Becerra and one or more of the Defendants to mislead him and the Bankruptcy Court regarding when the subject transfer took place.

111.

Upon inspection, it is clear that the Forged August 29, 2000 Resolution is a forgery.

112.

As discussed above, the signature and date lines of the Forged August 29, 2000 Resolution are identical to the signature and date lines of the Gibson Termination Resolution, and the body of the Forged August 29, 2000 Resolution is identical to the body of the May 27, 2001 Resolution.

113.

Moreover, the Forged August 29, 2000 Resolution is not sequentially numbered in the same manner as the remainder of the

44

Debtor's corporate minutes and records.

114.

Also, the Forged August 29, 2000 Resolution was not produced in the Gibson Litigation, where Defendant Becerra and one or more of the Defendants produced what they purported to be all of the Debtor's minutes and corporate records.

115.

In addition, the DRS Intellectual Property Rights were listed as an asset of the estate in the First Cluster Bankruptcy Case **after** the date of the Forged August 29, 2000 Resolution.

116.

Moreover, as discussed above, on February 15, 2001, Defendant Becerra, on behalf of Cluster, sent out copies of the Urgent Notice letter attached hereto as Exhibit "B" advising customers and suppliers of Cluster that Cluster had not sold or transferred **any** product rights or intellectual property.

117.

In addition, in the Mirman Deposition on February 27, 2001, subsequent to the date of the Forged August 29, 2000 Resolution, Defendant Mirman testified, as the corporate representative of both Cluster and UPT that Cluster had never attempted to sell or assign the 950 Patent.  See Exhibit "C".

45

118.

Finally, on June 25, 2004, consistent with the February 15, 2001 Letter, Defendant Becerra testified in Case No. 00-3575, styled <u>Christopher Stewart v. Universal Pain Technology, Inc.</u>, pending in the Circuit Court of Jefferson County, Alabama (the "Stewart Litigation"), that Cluster had not sold or transferred any product rights or intellectual property of any kind as of February 15, 2001. A true and correct copy of the relevant portion of the transcript of Defendant Becerra's testimony is attached hereto as Exhibit "AA".

### 3. The Second Avoidable Transfer

119.

On May 28, 2001, during the pendency of the First Cluster Bankruptcy Case and without authority of the court or Debtor's shareholders, some or all of the DRS Intellectual Property Rights, including, but not limited to, the manufacturing rights of the DRS System, were transferred on behalf of the Debtor to Defendant NAM (the "Second Avoidable Transfer"). See Exhibit "H". The Second Avoidable Transfer was made for the sole benefit of Defendant NAM and one or more of the Defendants and was of no benefit to the Debtor.

46

### 4. The Second Forged Avoidable Transfer

120.

As with the First Avoidable Transfer, subsequent to the filing
of the Debtor's current bankruptcy case, or in contemplation
thereof, Defendant Becerra realized that the Second Avoidable
Transfer would be subject to avoidance by the Trustee.  Thus, in
violation of 18 U.S.C. § 152(8), Defendant Becerra falsified an
entry in the Debtor's corporate records in order to mislead the
Trustee and the Bankruptcy Court.

121.

According to a document produced by Defendant Becerra which
purports to be a letter from the Debtor's Board dated November 23,
2000 (the "Forged November 23, 2000 Letter"), the Debtor
purportedly transferred some or all of the DRS Intellectual
Property Rights, including, but not limited to, the manufacturing
rights of the DRS System to Defendant NAM (the "Second Forged
Avoidable Transfer").  This document is a forgery.  No such
transfer occurred at that time.  A copy of the November 23, 2000
Letter is attached hereto as Exhibit "BB".

122.

On the alleged date of the Second Forged Avoidable Transfer,
the First Cluster Bankruptcy Case was still pending, and the
presiding Bankruptcy Court authorized no such transfer.

47

123.

Moreover, in the Mirman Deposition on February 27, 2001, subsequent to the alleged date of the Second Forged Avoidable Transfer, Defendant Mirman testified that as of that date, no formal agreement to transfer any rights from the Debtor to Defendant NAM had been reached.  A true and correct copy of the relevant portion of the Mirman Deposition is attached hereto as Exhibit "CC".

124.

Furthermore, Defendant Mirman testified in a deposition in AAA Case No. 33311 324 03, styled Cluster Technology Corp., et al. v. Gibson, et al. (the "Second Mirman Deposition"), that the signature on the November 23, 2000 Letter was not his.  A true and correct copy of the relevant portion of the Second Mirman Deposition is attached hereto as Exhibit "DD".

125.

In addition, in the Becerra May 24, 2001 Letter, subsequent to the alleged date of the Second Forged Avoidable Transfer, Becerra stated that an agreement had just been reached between the Debtor and Defendant NAM **one day earlier** on May 23, 2001 to transfer twelve (12) million shares of stock to NAM as compensation for a lifetime technology licensing agreement for certain components of the DRS.  See Exhibit "F".  The Becerra May 24, 2001 Letter does

48

not mention the Forged November 23, 2000 Letter or the Second Forged Avoidable Transfer.

126.

Finally, on June 25, 2004, consistent with the February 15, 2001 Letter, Defendant Becerra testified in the Stewart Litigation that Defendant NAM never acquired from the Debtor the rights referenced in the Forged November 23, 2000 Letter. Becerra also testified that Cluster had not sold or transferred any product rights or intellectual property of any kind as of February 15, 2001. See Exhibit "EE".

### 5. The Third Avoidable Transfer

127.

On June 15, 2001, contemporaneously with the reinstatement of Defendants Becerra and Williams to the Debtor's Board of Directors, without shareholder authority, some or all of the DRS Intellectual Property Rights, including, but not limited to, the manufacturing rights of the DRS System, were again transferred on behalf of the Debtor to Defendant NAM (the "Third Avoidable Transfer"). See Exhibit "J". The Third Avoidable Transfer was made for the sole benefit of Defendant NAM and one or more of the Defendants and was of no benefit to the Debtor.

49

6. The Adagen Transfer

128.

At or around the same time as the Second and Third Avoidable Transfers described above, Defendant NAM, in concert with Defendant Adagen and one or more of the other Defendants, transferred some or all of the manufacturing and distributing rights for the DRS System to Adagen (the "Adagen Transfer").

129.

Defendant Adagen subsequently distributed modified DRS Systems, which were marketed and sold by Adagen as the Accu-SPINA System.  Adagen also sold DRS Systems.

130.

The Accu-SPINA System is based upon the DRS System created by Defendants Becerra and Shealy, Joseph Medeiros, and Charity Martin and assigned to Cluster.  The Accu-SPINA System consists of a DRS System fitted with a control panel and decompression unit allegedly invented by Defendant NAM.

131.

Defendant Adagen was aware of the origins of the Accu-SPINA System and that it was based upon the DRS System at the time it began to market and sell the Accu-SPINA System.

132.

Through its connections with Defendants Becerra and NAM,

50

Defendant Adagen had intimate knowledge of the dealings and litigation between Defendant NAM and Cluster concerning the DRS Intellectual Property Rights at the time it began selling the Accu-SPINA System.

133.

In addition, Defendant Adagen has actively assisted Defendants Becerra and NAM in perpetrating the illegal transfer and taking of the DRS Intellectual Property Rights from Cluster.  In violation of 18 U.S.C. § 157(3), in an undated letter to one of its customers, Adagen misrepresented that on March 4, 2001 the Bankruptcy Court in the First Cluster Bankruptcy Case had awarded NAM all manufacturing and intellectual rights to the DRS System.   See Exhibit "D".  The Bankruptcy Court in the First Cluster Bankruptcy Case made no such award.

134.

The letter also markets the Accu-SPINA System as an improvement upon the DRS System.  The purpose of the letter is to legitimize the sales of the Accu-SPINA System by Defendants NAM and Adagen and to ensure that customers continue to buy the Accu-SPINA System from NAM and Adagen, not the DRS System.

135.

In concert with Defendants NAM, Becerra, and one or more of the other Defendants, Defendant Adagen continued to sell the Accu-

51

SPINA System for its benefit and the benefit of one or more of the Defendants.   The sale of the Accu-SPINA System, in direct competition with sales of the DRS System, has been detrimental to the Debtor, its shareholders, and its creditors.

136.

Given Defendant Adagen's complicity in the scheme of Defendants Becerra, NAM, and one or more of the other Defendants to misappropriate the DRS Intellectual Property Rights from Cluster, Adagen did not receive the DRS Intellectual Property Rights in good faith. Moreover, Adagen had knowledge of the voidability of the transfer of the DRS Intellectual Property Rights to NAM.

### 7. The Fourth Avoidable Transfer

137.

On January 6, 2003, without shareholder authority, some or all of the DRS Intellectual Property Rights, including, but not limited to, a cervical traction accessory for the DRS System, were transferred by Defendants Becerra and Mirman on behalf of the Debtor to Defendant NAM (the "Fourth Avoidable Transfer"). See Exhibit "P". The Fourth Avoidable Transfer was made for the sole benefit of Defendant NAM and one or more of the Defendants and was of no benefit to the Debtor.

### 8. The Fifth Avoidable Transfer

138.

52

As discussed above, on June 30, 2003, the parties in the Gibson Litigation entered into a settlement agreement, and in connection therewith, Gibson and Exarhos were awarded judgments against Cluster and the other plaintiffs.  Gibson and Exarhos were entitled to execute upon the judgments in the event of a breach of the settlement agreement.

139.

Shortly thereafter, on July 30, 2003, without shareholder authority, some or all of the DRS Intellectual Property Rights, including, an irrevocable license for the 950 Patent, were transferred on behalf of the Debtor to Defendant NAM (the "Fifth Avoidable Transfer").  See Exhibit "U".  The July 30, 2003 Resolution refers to the Forged November 23, 2000 Letter purporting to transfer manufacturing rights for the DRS System to Defendant NAM, but it does not reference the transfer of the manufacturing rights pursuant to the May 28, 2001 Consent.  The Fifth Avoidable Transfer was made for the sole benefit of Defendant NAM and one or more of the Defendants and was of no benefit to the Debtor.

### 9. The Polar Powder Transfers

140.

On June 17, 2003, without shareholder authority, the Debtor assigned to Becerra the royalty payments from the sales of Polar Powder products to pay off existing debt owed by Cluster to

53

Becerra.  See Exhibit "R".

141.

Subsequently, on November 18, 2003, without shareholder authority, the Debtor transferred all title and ownership of all Polar Powder products, including, without limitation, machinery and leases and the right to receive royalties, to Defendant Becerra. See Exhibit "V".

142.

These transfers of the Polar Powder Assets (the "Polar Powder Transfers") were made for the sole benefit of Defendant Becerra and one or more of the Defendants and were of no benefit to the Debtor.

### 10. The Sixth Avoidable Transfer

143.

On December 22, 2003, without shareholder authority, some or all of the DRS Intellectual Property Rights were assigned on behalf of the Debtor to Defendant Grabaldi (the "Sixth Avoidable Transfer"). See Exhibit "W". The Sixth Avoidable Transfer was purportedly made in partial satisfaction of a debt owed to Grabaldi in the amount of $532,298.04 in connection with Grabaldi's purchase of the Quaker State Judgment in December 2002. See Exhibit "W". The Sixth Avoidable Transfer was made for the sole benefit of Grabaldi and one or more of the Defendants and was of no benefit to the Debtor.

54

144.

The assignment was recorded in the U.S. Patent and Trademark Office on January 23, 2004.

145.

Given Defendant Mirman's testimony in the Mirman Deposition that the intellectual property of Cluster, including the 950 Patent, had a value between five and twenty-five million dollars, the assignment of the DRS Intellectual Property Rights in partial satisfaction the judgment debt to Defendant Grabaldi in the amount of $532,298.04 did not provide reasonably equivalent value to the Debtor.

## 11. The Cambria Transfer

146.

On March 29, 2005, at the 341 Meeting of Creditors, Defendant Williams testified that subsequent to the Sixth Avoidable Transfer, some or all of the DRS Intellectual Property Rights were assigned and/or transferred by Defendant Grabaldi, acting in concert with one or more of the Defendants to Defendant Cambria (the "Cambria Transfer").  A true and correct copy of the relevant portion of the transcript of Defendant Williams' testimony is attached hereto as Exhibit "EE".  The Cambria Transfer was made for the sole benefit of Defendant Cambria and one or more of the Defendants and was of no benefit to the Debtor.

55

## 12. The Subsequent and
## Post-Petition Avoidable Transfers

147.

Upon information and belief, some or all of the DRS Intellectual Property Rights may have been further assigned and/or transferred to Defendant Becerra and/or one or more of the Defendants prior to the Petition Date (the "Subsequent Avoidable Transfers") and/or subsequent to the Petition Date (the "Post-Petition Avoidable Transfers"). Upon information and belief, the Subsequent Avoidable Transfers and the Post-Petition Avoidable Transfers were made for the sole benefit of Defendant Becerra and one or more of the Defendants and were of no benefit to the Debtor.

## C. Unauthorized Use of Other Intellectual Property

148.

On January 10, 2006, the U.S. Patent and Trademark Office issued U.S. Patent No. 6,984,217 (the "217 Patent"). Defendant Becerra was listed among the inventors and Defendant NAM was listed as the assignee of the 217 Patent.

149.

Patents applied for by and/or issued to one or more of the Defendants, including, without limitation, the 217 Patent, and upon information and belief, other patents applied for and/or obtained in the United States and/or internationally, contain, use, and/or

are based upon drawings, diagrams, patents, and/or intellectual property which are property of the Debtor, including, without limitation, the DRS Intellectual Property Rights. These drawings, diagrams, patents, and/or intellectual property belonging to the Debtor were stolen from the Debtor and/or used without the authorization of the Debtor.

### COUNT I
**(Avoidance and Recovery of Fraudulent Transfers pursuant to 11 U.S.C. §§ 544(b) and 550(a) and O.C.G.A. §§ 18-2-22(ii) or (iii))**

150.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

151.

The First, Second, and Third Avoidable Transfers and the Adagen Transfer constitute conveyances of property of the Debtor.

152.

Defendants Becerra, Mirman, NAM, and Adagen, in concert with one or more of the Defendants, caused the Debtor to make the First, Second, and Third Avoidable Transfers and further caused the Adagen Transfer with the intention to defraud or delay creditors and shareholders of the Debtor, and Defendants Becerra, Mirman, NAM, and Adagen and/or one or more of the other Defendants knew or should have known that the First, Second, and Third Avoidable Transfers and the Adagen Transfer were made with the intention to

57

defraud or delay creditors and shareholders of the Debtor.  The aforesaid actions of these Defendants were taken in bad faith.

153.

As described above, the underlying fraudulent intent of the First, Second, and Third Avoidable Transfers and the Adagen Transfer is evidenced by the following, among other things:

a)   the First, Second, and Third Avoidable Transfers and the Adagen Transfer were made to insiders of the Debtor or affiliates of one or more of the Defendants who are insiders of the Debtor;

b)   the First and Second Avoidable Transfers were made during the pendency of the First Cluster Bankruptcy Case without court authority;

c)   subsequent to the filing of the Debtor's current bankruptcy case, Defendant Becerra, in concert with one or more of the Defendants knowingly made false entries in the Debtor's corporate minutes in violation of 11 U.S.C. § 152(8);

d)   as evidenced by the June 23, 2003 Dorvee Letter and the June 20, 2003 Memo, Defendant Becerra and one or more of the Defendants intended to transfer the DRS Intellectual Property Rights out of Cluster by any means necessary for their sole benefit;

58

e)    the Debtor did not receive reasonably equivalent value,
if any value, in exchange for the First, Second, and
Third Avoidable Transfers and the Adagen Transfer; and

f)    the Debtor was insolvent or became insolvent shortly
after the First, Second, and Third Avoidable Transfers
and the Adagen Transfer were made.

154.

In the alternative, the First, Second, and Third Avoidable
Transfers and the Adagen Transfer constituted voluntary conveyances
and were made to or for the sole benefit of Defendants Becerra,
NAM, and Adagen and/or one or more of the other Defendants.  The
Debtor did not receive valuable consideration for the First,
Second, and Third Avoidable Transfers and the Adagen Transfer.

155.

The Debtor was insolvent at the time the First, Second, and
Third Avoidable Transfers and the Adagen Transfer were made.

156.

Based upon the foregoing, the First, Second, and Third
Avoidable Transfers and the Adagen Transfer are null and void as to
the Trustee pursuant to 11 U.S.C. § 544(b) and O.C.G.A. §§
18-2-22(ii) or (iii).

157.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid

59

the First, Second, and Third Avoidable Transfers and the Adagen Transfer and recover from Defendants Becerra, NAM, and Adagen and/or one or more of the other Defendants the DRS Intellectual Property Rights to the extent they were transferred. Alternatively, the Trustee may recover the value of the DRS Intellectual Property Rights from Defendants Becerra, NAM, and Adagen and/or one or more of the other Defendants.

## COUNT II
**(Avoidance and Recovery of Fraudulent Transfers
pursuant to 11 U.S.C. §§ 544(b) and 550(a)
and F.S.A. §§ 726.105(1)(a) or (b) and 726.108)
(Alternative Count)**

158.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

159.

The First, Second, and Third Avoidable Transfers and the Adagen Transfer were made to Defendants Becerra, NAM, and Adagen and/or one or more of the other Defendants.

160.

The First, Second, and Third Avoidable Transfers and the Adagen Transfer were made with the actual intent to hinder, delay, or defraud creditors and shareholders of the Debtor.

161.

As described in further detail above, the underlying

60

fraudulent intent of the First, Second, and Third Avoidable Transfers and the Adagen Transfer is evidenced by the following, among other things:

a) the First, Second, and Third Avoidable Transfers and the Adagen Transfer were made to insiders of the Debtor or affiliates of one or more of the Defendants who are insiders of the Debtor;

b) the First and Second Avoidable Transfers were made during the pendency of the First Cluster Bankruptcy Case without court authority;

c) subsequent to the filing of the Debtor's current bankruptcy case, Defendant Becerra, in concert with one or more of the Defendants knowingly made false entries in the Debtor's corporate minutes in violation of 11 U.S.C. § 152(8);

d) as evidenced by the June 23, 2003 Dorvee Letter and the June 20, 2003 Memo, Defendant Becerra and one or more of the Defendants intended to transfer the DRS Intellectual Property Rights out of Cluster by any means necessary for their sole benefit;

e) the Debtor did not receive reasonably equivalent value, if any value, in exchange for the First, Second, and Third Avoidable Transfers and the Adagen Transfer; and

f)    the Debtor was insolvent or became insolvent shortly after the First, Second, and Third Avoidable Transfers and the Adagen Transfer were made.

162.

In the alternative, Debtor received less than reasonably equivalent value in exchange for the First, Second, and Third Avoidable Transfers and the Adagen Transfer and Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction at the time of the First, Second, and Third Avoidable Transfers and the Adagen Transfer; or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due at the time of the First, Second, and Third Avoidable Transfers and the Adagen Transfer.

163.

Based upon the foregoing, the First, Second, and Third Avoidable Transfers and the Adagen Transfer constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 544(b) and F.S.A. §§ 726.105(1)(a) or (b) and 726.108.

164.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid the First, Second, and Third Avoidable Transfers and the Adagen

62

Transfer and recover from Defendants Becerra, NAM, and Adagen and/or one or more of the other Defendants the DRS Intellectual Property Rights to the extent they were transferred. Alternatively, the Trustee may recover the value of the DRS Intellectual Property Rights from Defendants Becerra, NAM, and Adagen and/or one or more of the other Defendants.

**COUNT III**
**(Avoidance and Recovery of Fraudulent Transfers
pursuant to 11 U.S.C. §§ 544(b) and 550(a)
and O.C.G.A. §§ 18-2-74(a)(1) or (2) and 18-2-77 or
F.S.A. §§ 726.105(1)(a) or (b) and 726.108)**

165.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

166.

The Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers, were made to Defendants NAM, Becerra, Grabaldi, Cambria, and/or one or more of the other Defendants.

167.

The Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers were made with the actual intent to hinder, delay, or defraud creditors and shareholders of the Debtor.

168.

As described above, the underlying fraudulent intent of the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers is evidenced by the following, among other things:

a) the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers were made to insiders of the Debtor or affiliates of one or more of the Defendants who are insiders of the Debtor;

b) subsequent to the filing of the Debtor's current bankruptcy case, Defendant Becerra, in concert with one or more of the Defendants knowingly made false entries in the Debtor's corporate minutes in violation of 11 U.S.C. § 152(8);

c) as evidenced by the June 23, 2003 Dorvee Letter and the June 20, 2003 Memo, Defendant Becerra and one or more of the Defendants intended to transfer the DRS Intellectual Property Rights out of Cluster by any means necessary for their sole benefit;

d) the Debtor did not receive reasonably equivalent value, if any value, in exchange for the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers;

e)      the Debtor was insolvent or became insolvent shortly after the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers were made;

f)      before the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers, the Debtor had been sued or threatened with suit, including, without limitation, the Gibson and Axiom Litigations;

g)      the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers occurred shortly before or after a substantial debt was incurred, including, without limitation, the entry of judgments in favor of Gibson and Exarhos against the Debtor in the Gibson Litigation; and

h)      the Sixth Avoidable Transfer constitutes a transfer of the essential assets of the business to a lienor, Defendant Grabaldi, as holder of the Quaker State Judgment, who transferred the assets to insiders of the Debtor.

169.

In the alternative, Debtor received less than reasonably equivalent value in exchange for the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria

65

Transfers and Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of Debtor were unreasonably small in relation to the business or transaction at the time of the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers; or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due at the time of the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers.

170.

Based upon the foregoing, the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 544(b) and O.C.G.A. §§ 18-2-74(a)(1) or (2) and 18-2-77 or F.S.A. §§ 726.105(1)(a) or (b) and 726.108.

171.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers and recover from Defendants NAM, Becerra, Grabaldi, Cambria, and/or one or more of the other Defendants the DRS Intellectual Property Rights and the Polar Powder assets to the extent they were transferred. Alternatively, the Trustee may recover the value of the DRS Intellectual Property

66

Rights and the Polar Powder Rights from Defendants NAM, Becerra,
Grabaldi, Cambria, and/or one or more of the other Defendants.

### COUNT IV
**(Avoidance and Recovery of Fraudulent Transfers
pursuant to 11 U.S.C. §§ 544(b) and 550(a)
and O.C.G.A. §§ 18-2-75(b) and 18-2-77 or
F.S.A. §§ 726.106(2) and 726.108)
(Alternative Count)**

172.

Plaintiff realleges paragraphs 1 through 149 above as if fully
set forth herein.

173.

The Sixth Avoidable Transfer was made to Defendant Grabaldi,
an insider within the meaning of O.C.G.A. § 18-2-71(b) or F.S.A. §
726.106(2), for an antecedent debt.

174.

Defendant Grabaldi is a creditor of the Debtor whose claim
against the Debtor arose before the Sixth Avoidable Transfer was
made.

175.

The Debtor was insolvent at the time the Sixth Avoidable
Transfer was made.

176.

Defendant Grabaldi had reasonable cause to believe the Debtor

67

was insolvent at the time the Sixth Avoidable Transfer was made.

177.

Based upon the foregoing, the Sixth Avoidable Transfer constitutes an avoidable fraudulent transfers pursuant to 11 U.S.C. § 544(b) and O.C.G.A. §§ 18-2-75(b) and 18-2-77 or F.S.A. §§ 726.106(2) and 726.108.

178.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid the Sixth Avoidable Transfer and recover from Defendant Grabaldi the DRS Intellectual Property Rights to the extent they were transferred.  Alternatively, the Trustee may recover the value of the DRS Intellectual Property Rights from Defendant Grabaldi.

### COUNT V
**(Avoidance and Recovery of Fraudulent Transfers
pursuant to 11 U.S.C. §§ 548(a)(1)(A) or(B) and 550(a)
(Alternative Count)**

179.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

180.

The Subsequent Avoidable Transfers and the Cambria Transfer constitute transfers of an interest in property of the Debtor.

181.

The Subsequent Avoidable Transfers and the Cambria Transfer

68

were made to or for the sole benefit of Defendant Cambria and Defendant Becerra and/or one or more of the other Defendants.

182.

The Subsequent Avoidable Transfers and the Cambria Transfer were made with the actual intent to hinder, delay, or defraud an entity or entities to which the Debtor was or became, on or after the dates the Subsequent Avoidable Transfers and the Cambria Transfer were made, indebted.

183.

As described above, the underlying fraudulent intent of the Subsequent Avoidable Transfers and the Cambria Transfer is evidenced by the following, among other things:

a)   the Subsequent Avoidable Transfers and the Cambria Transfer were made to an insider of the Debtor or affiliates of one or more of the Defendants who are insiders of the Debtor;

b)   subsequent to the filing of the Debtor's current bankruptcy case, Defendant Becerra, in concert with one or more of the Defendants knowingly made false entries in the Debtor's corporate minutes in violation of 11 U.S.C. § 152(8);

c)   as evidenced by the June 23, 2003 Dorvee Letter and the June 20, 2003 Memo, Defendant Becerra and one or more of

the Defendants intended to transfer the DRS Intellectual
Property Rights out of Cluster by any means necessary for
their sole benefit;

d)     the Debtor did not receive reasonably equivalent value,
if any value, in exchange for the Subsequent Avoidable
Transfers and the Cambria Transfer;

e)     the Debtor was insolvent or became insolvent shortly
after the Subsequent Avoidable Transfers and the Cambria
Transfer were made;

f)     before the Subsequent Avoidable Transfers and the Cambria
Transfer, the Debtor had been sued or threatened with
suit, including, without limitation, the Gibson and Axiom
Litigations; and

g)     the Subsequent Avoidable Transfers and the Cambria
Transfer occurred shortly before or after a substantial
debt was incurred, including, without limitation, the
entry of judgments in favor of Gibson and Exarhos against
the Debtor in the Gibson Litigation.

184.

In the alternative, Debtor received less than reasonably
equivalent value in exchange for the Subsequent Avoidable Transfers
and the Cambria Transfer and the Debtor was insolvent, or became
insolvent, on the dates the Subsequent Avoidable Transfers and the

70

Cambria Transfer were made or as a result of the Subsequent Avoidable Transfers and the Cambria Transfer; or the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Debtor was an unreasonably small capital at the time of the Subsequent Avoidable Transfers and the Cambria Transfer; or Debtor intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured at the time of the Subsequent Avoidable Transfers and the Cambria Transfer.

185.

To the extent the Subsequent Avoidable Transfers and the Cambria Transfer occurred within one year prior to the Petition Date, based upon the foregoing, the Subsequent Avoidable Transfers and the Cambria Transfer constitute avoidable fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A) or (B).

186.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid the Subsequent Avoidable Transfers and the Cambria Transfer and recover from Defendant Cambria and Defendant Becerra and/or one or more of the other Defendants the DRS Intellectual Property Rights to the extent they were transferred. Alternatively, the Trustee may recover the value of the DRS Intellectual Property Rights from Defendant Cambria and Defendant Becerra and/or one or more of the

71

other Defendants.

## COUNT VI
### (Avoidance and Recovery of Unauthorized Postpetition Transfers pursuant to 11 U.S.C. §§ 549(a) and 550(a))

187.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

188.

The Post-Petition Avoidable Transfers were made without Court approval and were not authorized under any provisions of the Bankruptcy Code.

189.

Accordingly, Plaintiff may avoid said transfers pursuant to 11 U.S.C. § 549(a).

190.

In accordance with 11 U.S.C. § 550(a), the Trustee may avoid the Post-Petition Avoidable Transfers and recover from Defendant Becerra and/or one or more of the Defendants the DRS Intellectual Property Rights to the extent they were transferred. Alternatively, the Trustee may recover the value of the DRS Intellectual Property Rights from Defendant Becerra and/or one or more of the Defendants.

<u>**COUNT VII**</u>
**(Turnover pursuant to 11 U.S.C. § 542)**

191.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

192.

The drawings, diagrams, patents, and/or intellectual property which are contained and/or used in patents applied for by and/or issued to one or more of the Defendants, including, without limitation, the 217 Patent, and upon information and belief other patents applied for and/or granted in the United States or internationally, are property of the estate pursuant to 11 U.S.C. § 541.  One or more of the Defendants have retained possession of said drawings, diagrams, patents, and/or intellectual property despite demand for turnover.

193.

Pursuant to 11 U.S.C. § 542, the Debtor is entitled to turnover of this property of the estate.  Alternatively, the Trustee may recover the value of said drawings, diagrams, patents, and/or intellectual property, and all interest and rights thereto from one or more of the Defendants.

73

## COUNT VIII
### (Conversion by Defendants Becerra, Mirman, Narlow, NAM, Adagen, vFinance, and Grabaldi)

194.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

195.

Defendants Becerra and Mirman transferred the DRS Intellectual Property Rights, the Polar Powder Assets, and other intellectual property and patented technology belonging to the Debtor, without Debtor receiving any benefit for such transfer.

196.

Defendants Becerra and Mirman transferred such intellectual property to Defendant NAM, as well as certain other rights to Defendants Adagen, vFinance, and Grabaldi.  Defendants Becerra and Mirman each owned or controlled the various Corporate Defendants.

197.

No consideration was provided to Debtor for the transfer of the intellectual property.

198.

Debtor suffered damages that are not yet fully determined, however, based upon admissions by Defendant Mirman, the value of the stolen intellectual property and the products that are developed therefrom exceed more than $25,000,000.

74

199.

As a direct and proximate result of the conversion by these Defendants, the Debtor has suffered losses of $25,000,000.

**COUNT IX**
**(Breach of Fiduciary Duties Asserted**
**Against Becerra and Mirman)**

200.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

201.

As directors and officers of the Debtor, Defendants Becerra and Mirman owed fiduciary duties to Cluster to act with the utmost good faith, loyalty, fair dealing, and due care toward Cluster and in furtherance of the best interests of Cluster.

202.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster by failing to act in good faith, by breaching their duty of loyalty, by breaching their duty of fair dealing, by breaching their duty of due care, and by failing to act in the best interests of Cluster.

203.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster by, among other things, by rendering Cluster insolvent, by improperly disposing, dissipating, and/or diverting Cluster's

75

assets while Cluster was in the vicinity of insolvency or was insolvent, by improperly disposing, dissipating, and/or diverting Cluster's assets without properly informing themselves with regard to the actions they were taking and the resulting effects on Cluster, by breaching their fiduciary duty of loyalty by disposing, dissipating, and/or diverting Cluster's assets for the benefit of themselves or their relatives or friends or affiliated companies or for the benefit of certain preferred creditors, and by engaging in transactions with insiders that were unfair to Cluster.  By way of blatant self dealing transactions, Defendants Becerra and Mirman orchestrated a scheme to loot Cluster and its subsidiaries of their assets and caused the Debtor to release them from liability for their actions.

204.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster by taking actions which rendered Cluster insolvent.

205.

Defendants Becerra and Mirman consistently failed to develop reasonable business plans for the current and future operations of Cluster, instead, making certain only that they would personally profit.  Had they acted reasonably, and evaluated the financial condition of Cluster, it is likely Cluster would have reorganized prior to its Chapter 7 filing, thereby preserving its cash,

stemming its losses, and allowing Cluster to satisfy a greater portion of its debts otherwise.

### Diverting, Dissipating, and/or Disposing of Assets

206.

Defendants Becerra and Mirman breached their fiduciary duties by, among other things, committing the conduct described above and summarized below:

a) allowing Cluster to enter employment agreements that were not in the best interest of the company, but that only came about as a result of the self interest of these Defendants;

b) causing Cluster to issue stock to individuals, including these Defendants, when no legitimate basis existed for such issuance, nor was there any legitimate consideration for the issuance of such stock;

c) creating competing businesses;

d) Misappropriating the technology and trade secrets that were the property of the Debtor;

e) causing the DRS Intellectual Property Rights and other intellectual property belonging to the Debtor to be fraudulently transferred;

f) causing the assets of the Debtor to be fraudulently transferred;

77

g)      causing the transfer of Polar Powder trademark to a
company owned and controlled by Defendant Becerra.

207.

Defendants Becerra and Mirman breached their fiduciary duties
to Cluster by failing to investigate, consider, and assess the
prospective economic effect such diversion, dissipation, and/or
disposition of assets would have on Cluster.

208.

Defendants Becerra and Mirman, knowingly and in bad faith, and
for their own interest, assisted in the formulation and
consummation of the schemes to divert, dissipate, and/or dispose of
the assets of Cluster when they knew or were reckless in not
knowing that Cluster was insolvent or would be rendered insolvent
as a result of such diversion, dissipation, and/or disposition and
that their conduct would result in injury to Cluster.

**<u>Damages</u>**

209.

As a result of the foregoing breaches of their fiduciary
duties, Cluster was damaged in an amount not yet capable of being
precisely ascertained, but which will be proven at trial.

210.

As a result of the foregoing, Defendants Becerra and Mirman
are liable to Cluster's estate for actual damages in an amount to

be determined at trial.

## COUNT X
### (Breach of Fiduciary Duties Owed to Creditors Asserted
### Against Becerra and Mirman)

211.

Plaintiff realleges paragraphs 1 through 210 above as if fully set forth herein.

212.

By virtue of Cluster's insolvency, Defendants Becerra's and Mirman's fiduciary duties extended to, and for the benefit of, Cluster's creditors.

213.

As directors and officers of Cluster, Defendants Becerra and Mirman owed fiduciary duties to Cluster's creditors to act with the utmost good faith, loyalty, fair dealing, and due care toward the creditors and in furtherance of the best interests of the creditors.

214.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster's creditors by failing to act in good faith, by breaching their duty of loyalty, by breaching their duty of fair dealing, by breaching their duty of due care, and by failing to act in the best interests of Cluster's creditors.

79

215.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster's creditors by, among other things, by rendering Cluster insolvent, by improperly diverting, dissipating, and/or disposing of Cluster's assets while Cluster was in the vicinity of insolvency or was insolvent, by improperly diverting, dissipating, and/or disposing of Cluster's assets without properly informing themselves with regard to the actions they were taking and the resulting effects on Cluster, by breaching their fiduciary duty of loyalty by diverting, dissipating, and/or disposing of Cluster's assets for the benefit of themselves or their relatives or friends or affiliated companies or for the benefit of certain preferred creditors, and by engaging in transactions with insiders that were unfair to Cluster and rendered Cluster unable to repay its debts. By way of blatant self dealing transactions, Defendants Becerra and Mirman orchestrated the wholesale transfer of all the assets of the company and its subsidiaries and the corresponding profits and caused the Debtor to release them from liability for their actions.

## Diverting, Dissipating, and/or Disposing of Assets

216.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster's creditors by, among other things, committing the conduct described above and summarized below:

a) allowing Cluster to enter employment agreements that were not in the best interest of the company, but that only came about as a result of the self interest of these Defendants;

b) causing Cluster to issue stock to individuals, including these Defendants, when no legitimate basis existed for such issuance, nor was there any legitimate consideration for the issuance of such stock;

c) creating competing businesses;

d) misappropriating the technology and trade secrets that were the property of the Debtor;

e) causing the DRS Intellectual Property Rights and other intellectual property belonging to the Debtor to be fraudulently transferred;

f) causing the assets of the Debtor to be fraudulently transferred;

g) causing the transfer of Polar Powder trademark to a company owned and controlled by Defendant Becerra.

217.

Defendants Becerra and Mirman breached their fiduciary duties to Cluster's creditors by failing to investigate, consider, and assess the prospective economic effect such diversion, dissipation, and/or disposition of assets would have on Cluster.

81

218.

Defendants Becerra and Mirman, knowingly and in bad faith, and for their own interest, assisted in the formulation and consummation of the schemes to divert, dissipate, and/or dispose of these funds, when they knew or were reckless in not knowing that Cluster was insolvent or would be rendered insolvent as a result of such diversion, dissipation, and/or disposition and that their conduct would result in injury to Cluster.

**Damages**

219.

As a result of the foregoing breaches of their fiduciary duties, Cluster's creditors were damaged in an amount not yet capable of being precisely ascertained, but which will be proven at trial.

220.

As a result of the foregoing, Defendants Becerra and Mirman are liable to Cluster's estate for actual damages in an amount to be determined at trial.

**COUNT XI**
**(Negligence, Mismanagement, and Waste of Corporate Assets
Asserted Against Becerra, Williams, Mirman, and Narlow)**

221.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

82

222.

As officers and directors of Cluster, Defendants Becerra, Williams, Mirman, and Narlow owed Cluster a duty of due care and a duty of loyalty requiring them to act with utmost prudence in the management of the business of Cluster and its assets.

223.

Defendants Becerra, Williams, Mirman, and Narlow breached their duty of care and duty of loyalty owed to Cluster by, among other things, committing the conduct described above and summarized below:

a)  allowing Cluster to enter employment agreements that were not in the best interest of the company, but that only came about as a result of the self interest of these Defendants;

b)  causing Cluster to issue stock to individuals, including themselves, when no legitimate basis existed for such issuance, nor was there any legitimate consideration for the issuance of such stock;

c)  creating competing businesses;

d)  Misappropriating the technology and trade secrets that were the property of the Debtor;

e)  causing the DRS Intellectual Property Rights and other intellectual property belonging to the Debtor to be

83

fraudulently transferred;

f)    causing the assets of the Debtor to be fraudulently transferred;

g)    causing the transfer of the Polar Powder assets to a company owned and controlled by Defendant Becerra;

h)    engaging in self-dealing transactions which were unfair to the Debtor, including, without limitation, causing the Debtor to release one or more of the Defendants from liability for their actions.

224.

The breaches of duties, negligence, mismanagement, and other actions of Defendants Becerra, Williams, Mirman, and Narlow caused the waste of corporate assets of Cluster as alleged herein.

225.

As a direct and proximate result of such waste, Cluster was damaged in that its assets were substantially depleted and it was unable to satisfy its obligations to creditors as they came due.

## COUNT XII
### (Civil Conspiracy/Acting in Concert)

226.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

84

227.

Defendants Becerra, Mirman, and Narlow owed fiduciary obligations to Cluster.  These fiduciary obligations included duties of loyalty, due care, and full and fair disclosure.

228.

Defendants Becerra, Mirman, and Narlow breached the fiduciary obligations they owed to Cluster.

229.

As a direct and proximate result of the breaches of fiduciary duties by Defendants Becerra, Mirman, and Narlow, Cluster and its subsidiaries were damaged.

230.

Defendants Becerra, Mirman, and Narlow conspired in combination with one or more of the other Defendants another to accomplish an unlawful end or to accomplish a lawful end by unlawful means, such as breaching the fiduciary obligations Defendants Becerra, Mirman, and Narlow owed to Cluster, and perpetrating a self-dealing transaction with the diversion of funds into salaries, patent technology, usurpation of corporate opportunity.

231.

One or more of the Defendants also committed tortious acts, which were in concert with one another, or pursuant to a common

design in breaching the fiduciary duties Defendants Becerra, Mirman, and Narlow owed to Cluster.

232.

Defendants Becerra, Mirman, and Narlow recklessly breached the fiduciary duties they owed to Cluster and further conspired against Cluster with one or more of the Defendants to do so as described elsewhere herein.

233.

The conspiracy to accomplish an unlawful end, using an unlawful means or acting in concert, includes, among other things, the conduct described above and summarized below:

a) allowing Cluster to enter employment agreements that were not in the best interest of the company, but that only came about as a result of the self interest of the Defendants;

b) causing Cluster to issue stock to individuals, including Defendants Becerra, Mirman, and Narlow, when no legitimate basis existed for such issuance, nor was there any legitimate consideration for the issuance of such stock;

c) creating competing businesses;

d) misappropriating the technology and trade secrets that were the property of the Debtor;

86

e)    causing the DRS Intellectual Property Rights and other
      intellectual property belonging to the Debtor to be
      fraudulently transferred;

f)    causing the assets of the Debtor to be fraudulently
      transferred;

g)    causing the transfer of Polar Powder assets to a company
      owned and controlled by Defendant Becerra;

h)    engaging in self-dealing transactions which were unfair
      to the Debtor, including, without limitation, causing the
      Debtor to release one or more of the Defendants from
      liability for their actions.

234.

Defendants Becerra, Mirman, and Narlow and one or more of the
Defendants understood the general objectives of the conspiratorial
scheme, accepted them and agreed, either explicitly or implicitly,
to his part to further the objectives of the conspiracy or common
scheme.

235.

Defendants Becerra, Mirman, and Narlow and one or more of the
Defendants acted in concert, pursuant to a common design, and
conspired in combination with each other to accomplish, among other
things, the above-described torts and breaches.

87

236.

Cluster was damaged as a result of the acts committed in the course of the conspiracy.  The conspiracy or concerted action aggravated damages caused by the above-mentioned acts.

237.

As  a  result  of  the  foregoing  actions  and  the conspiracy/concerted action of Defendants Becerra, Mirman, and Narlow and one or more of the Defendants, Cluster was damaged in an amount not yet capable of being precisely ascertained, but which will be proven at trial.

238.

As a result of the foregoing, Defendants Becerra, Mirman, and Narlow and one or more of the Defendants are liable to Plaintiff and Cluster's estate for actual damages in an amount to be determined at trial.

239.

Plaintiff is entitled to recover pre- and post-judgment interest at the statutory rate.

240.

Defendants Becerra, Mirman, and Narlow and one or more of the Defendants recklessly, willfully, and intentionally conspired or acted in concert with each other.  Defendants Becerra, Mirman, and Narlow and one or more of the Defendants also acted with an evil

88

mind and with a callous disregard for Cluster's rights and interests. Accordingly, Cluster is entitled to punitive damages.

**<u>COUNT XIII</u>**
**(Preferences Avoidable Under 11 U.S.C. § 547(b)**
**and Recoverable Under 11 U.S.C. § 550)**
**(Alternative Count)**

241.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

242.

In the event that it is determined that the Subsequent Avoidable Transfers and the Cambria Transfer to Defendant Cambria and Defendant Becerra and/or one or more of the Defendants are not avoidable as fraudulent conveyances or fraudulent transfers (which Plaintiff would dispute), the Subsequent Avoidable Transfers and the Cambria Transfer can and should be set aside as avoidable preferences under 11 U.S.C. § 547(b).

243.

At the time of the Subsequent Avoidable Transfers and the Cambria Transfer, the funds and property transferred constituted an interest of Cluster in property.

244.

The Subsequent Avoidable Transfers and the Cambria Transfer were to or for the benefit of Defendant Cambria and Defendant

89

Becerra and/or one or more of the Defendants.

245.

In the event that it is determined that the Subsequent Avoidable Transfers and the Cambria Transfer are not avoidable as fraudulent conveyances or fraudulent transfers pursuant to 11 U.S.C. § 548 or 11 U.S.C. § 544(b) and applicable state law (which Plaintiff disputes), the Subsequent Avoidable Transfers and the Cambria Transfer were made for or on account of antecedent debt owed by Cluster before the transfers were made.

246.

The Subsequent Avoidable Transfers and the Cambria Transfer were made while Cluster was insolvent.

247.

The Subsequent Avoidable Transfers and the Cambria Transfer were made within one year before the Petition Date, and Defendant Cambria and Defendant Becerra and/or one or more of the Defendants were insiders of Cluster at the time of the Subsequent Avoidable Transfers and the Cambria Transfer.

248.

The Subsequent Avoidable Transfers and the Cambria Transfer enabled Defendant Cambria and Defendant Becerra and/or one or more of the Defendants to receive more than they would have received if the case were a case under Chapter 7 of the Bankruptcy Code.

90

249.

Accordingly, the Subsequent Avoidable Transfers and the Cambria Transfer are avoidable by Plaintiff under § 547(b) of the Bankruptcy Code.

**COUNT XIV**
**(Fraud by Defendants Becerra, Mirman, Narlow,**
**NAM, vFinance, Adagen and Grabaldi)**

250.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

251.

Defendants Becerra, Mirman, Narlow, vFinance, NAM and Grabaldi committed fraud upon Cluster in engineering the conversion of its assets.

252.

Mirman controlled vFinance; Narlow and Becerra controlled Grabaldi; Becerra controlled NAM; Adagen is an affiliate of NAM; Mirman and Becerra caused Cluster to allow assets to be drained from the Debtor. Each of these defendants participated in the making of material statements or representations that were intended to be relied upon, and reasonably were relied upon by others, which statements were reasonable on their face, and yet were intended to and did deceive.

253.

Furthermore, as a direct and proximate result of the reliance on the statements, the corporation was harmed and substantially so.

254.

The fraud was conducted with full knowledge by the Defendants of the reliance that they had created.

## COUNT XV
### (Declaratory Judgment/Unjust Enrichment against Defendants Becerra and Williams)

255.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

256.

As described above, Defendants Becerra and Williams caused Cluster to release them from liability for various conduct detrimental to the Cluster, its shareholders and its creditors.

257.

These releases were obtained without consideration paid to the Debtor.

258.

As a result, Defendants Becerra and Williams have been unjustly enriched at the expense of the Debtor, its shareholders, and its creditors.

259.

Accordingly, the Court should set aside the releases and enter a judgment declaring the releases void.

## COUNT XVI
### (Constructive Trust against all Defendants)

260.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

261.

As described above, Defendants Becerra, NAM, Adagen, Grabaldi, Cambria and one or more of the Defendants have accepted fraudulent transfers of the DRS Intellectual Property Rights, as well as other intellectual property and patented technology belonging to the Debtor, with knowledge of the underlying fraud.

262.

As a result, these Defendants have been unjustly enriched by their receipt of the DRS Intellectual Property Rights and other intellectual property and patented technology of the Debtor, and a constructive trust for the benefit of the estate has been created in the DRS Intellectual Property Rights and other intellectual property and patented technology of the Debtor received by these Defendants.

93

263.

Accordingly, the Court should set aside the Transfers described herein.

## **COUNT XVII**
**(Subordination of Claims and Interests Under 11 U.S.C. § 510(c))**

264.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

265.

The Defendants have engaged in inequitable conduct.

266.

Without authority and without consideration paid to the Debtor, the Defendants have caused the transfer of the Debtor's assets for their sole benefit to the detriment of the Debtor, its shareholders, and its creditors.

267.

Accordingly, the Court should subordinate any allowed claim or interest of the Defendants in the Debtor's bankruptcy case.

## **COUNT XVIII**
**(Accounting)**

268.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

94

269.

Defendants NAM, Adagen, Becerra, and one or more of the other Defendants have received the proceeds of improper sales of DRS Systems and Accu-SPINA Systems and other intellectual property and patented technology belonging to the Debtor.

270.

Cluster is entitled to the proceeds of these sales.

271.

The amount of the proceeds is unknown.

272.

Plaintiff requires an accounting by these Defendants in order to determine the amount of the proceeds of the improper sales DRS Systems and Accu-SPINA Systems and other intellectual property and patented technology belonging to the Debtor.

**COUNT XIX**
**(Avoidance and Recovery of Transfers in Violation of Delaware Corporate Code pursuant to 11 U.S.C. §§ 544(b) and 550(a) and 8 Del. C. §§ 144 and 271)**

273.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

274.

Each of the Transfers described above constitutes a "transaction between a corporation and 1 or more of its directors

95

or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest . . . "

275.

With regard to each of the Transfers, Defendants Becerra and Mirman, as directors of Cluster, failed to disclose to the Debtor's Board, including, without limitation, directors Williams, Clark, Siegel, Yeager, and Sheppard, and to the Debtor's shareholders material facts regarding their relationship or interest as to the transactions.

276.

Accordingly, under Del. C. § 144, the Transfers are avoidable and recoverable by Plaintiff pursuant to 11 U.S.C. §§ 544(b) and 550(a).

277.

In the alternative, each of the Transfers also constituted a sale, lease, or exchange of all or substantially all of the Debtor's property and assets and were made without approval of Debtor's shareholders.

278.

Accordingly, under Del. C. § 271, the Transfers are avoidable and recoverable by Plaintiff pursuant to 11 U.S.C. §§ 544(b) and

550(a).

**COUNT XX**

**(Unfair Competition and Deceptive Trade Practices
pursuant to O.C.G.A. §§ 10-1-373
against Defendants NAM, Adagen, and Shealy)**

279.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

280.

The Debtor is a "person" within the meaning of O.C.G.A. § 10-1-371(5).

281.

Defendants NAM, Adagen, and Shealy, in concert with one or more of the Defendants, have engaged in conduct, described in further detail above, in violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, et seq., including, without limitation:

a) marketing and selling the Accu-SPINA System as an improvement upon the DRS System;

b) claiming that the Accu-SPINA system is the only authorized machine based upon the 950 Patent; and

c) using the DRS Property Rights without authorization.

282.

Defendants NAM, Adagen, Shealy, and one or more of the other

Defendants have knowingly, willfully, intentionally, recklessly, negligently, wrongfully, fraudulently, and/or maliciously engaged in the conduct described above knowing it to be deceptive.

283.

As a direct and proximate result of the conduct of Defendants NAM, Adagen, Shealy, and one or more of the other Defendants, the Debtor has been damaged and injured in an amount to be proven at trial.

284.

As a direct and proximate result of the conduct of Defendants NAM, Adagen, Shealy, and one or more of the other Defendants, the Debtor has suffered and continues to presently suffer and sustain certain immediate and possibly irreparable damage, injury and harm as described herein.  Unless Defendants NAM, Adagen, Shealy, and one or more of the other Defendants are restrained and enjoined from continuing the conduct described above, the Debtor will continue to suffer additional, certain, immediate and possibly irreparable damage, injury and harm.  Furthermore, Defendants NAM, Adagen, Shealy, and one or more of the other Defendants should be restrained and enjoined from continuing the conduct described above because the Debtor is without a plain, adequate and complete remedy at law for the damage, injury and harm still to be sustained by the Debtor because of the difficulty and possible impossibility of

accurately calculating those future damages and injuries because monetary damages do not satisfy all losses sustained by the Debtor.

## **COUNT XXI**
### **(Punitive Damages)**

285.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

286.

The conduct of the Defendants was intentional and done with full knowledge that it would cause financial harm and devastation to Debtor.

287.

The Defendants were reckless, and wanton in their conduct, and such conduct should not be condoned in a civilized society.

288.

The Defendants' conduct caused damage to Plaintiff, and should be punished and Plaintiff is entitled to an award of punitive damages.

## **COUNT XXII**
### **(Attorneys' Fees Asserted Against All Defendants)**

289.

Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

99

290.

Defendants have acted in bad faith and have caused unnecessary trouble and expense.  Therefore, Plaintiff is entitled to recover from Defendants their attorneys' fees and expenses.

291.

Plaintiff reserves the right to amend this Complaint to bring additional counts relating to infringement of the 950 Patent by one or more of the Defendants, and any other parties who have participated in the infringement of the 950 Patent, including, without limitation, officers and directors of the various corporate Defendants, pursuant to 35 U.S.C. § 271.

WHEREFORE, Plaintiff respectfully requests relief as follows:

(a)   under Count I, pursuant to 11 U.S.C. §§ 544(b) and 550(a) and O.C.G.A. §§ 18-2-22(ii) or (iii), that the Court adjudge the First, Second, and Third Avoidable Transfers and the Adagen Transfer void and order Defendants Becerra, NAM, Adagen and/or one or more of the Defendants to return the DRS Intellectual Property Rights to the Debtor to the extent they were transferred, or in the alternative, award Plaintiff judgment against Defendants Becerra, NAM, Adagen and/or one or more of the Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights together with

100

applicable pre-judgment interest from the dates of the First, Second, and Third Avoidable Transfers and the Adagen Transfer and applicable post-judgment interest;

(b)     under Count II, in the alternative and only to the extent that relief is not granted under Count I, pursuant to 11 U.S.C. §§ 544(b) and 550(a) and F.S.A. §§ 726.105(1)(a) or (b) and 726.108, that the Court avoid the First, Second, and Third Avoidable Transfers and the Adagen Transfer and order Defendants Becerra, NAM, Adagen and/or one or more of the Defendants to return the DRS Intellectual Property Rights to the Debtor to the extent they were transferred, or in the alternative, award Plaintiff judgment against Defendants Becerra, NAM, Adagen and/or one or more of the Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights together with applicable pre-judgment interest from the dates of the First, Second, and Third Avoidable Transfers and the Adagen Transfer and applicable post-judgment interest;

(c)     under Count III, pursuant to 11 U.S.C. §§ 544(b) and 550(a) and O.C.G.A. §§ 18-2-74(a)(1) or (2) and 18-2-77 or F.S.A. §§ 726.105(1)(a) or (b) and 726.108, that the Court avoid the Fourth, Fifth, Sixth, and Subsequent

101

Avoidable Transfers and the Polar Powder and Cambria Transfers and order Defendants Becerra, NAM, Grabaldi, Cambria and/or one or more of the Defendants to return the DRS Intellectual Property Rights and the Polar Powder assets to the Debtor to the extent they were transferred, or in the alternative, award Plaintiff judgment against Defendants Becerra, NAM, Grabaldi, Cambria and/or one or more of the Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights and the Polar Powder assets together with applicable pre-judgment interest from the dates of the Fourth, Fifth, Sixth, and Subsequent Avoidable Transfers and the Polar Powder and Cambria Transfers and applicable post-judgment interest;

(d)   under Count IV, in the alternative and only to the extent that relief is not granted under Count III with respect to the Sixth Avoidable Transfer, pursuant to 11 U.S.C. §§ 544(b) and 550(a) and O.C.G.A. §§ 18-2-75(b) and 18-2-77 or F.S.A. §§ 726.106(2) and 726.108, that the Court avoid the Sixth Avoidable Transfer and order Defendant Grabaldi and/or one or more of the Defendants to return the DRS Intellectual Property Rights to the Debtor to the extent they were transferred, or in the alternative, award

102

Plaintiff judgment against Defendant Grabaldi and/or one or more of the Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights, to the extent they were transferred together with applicable pre-judgment interest from the date of the Sixth Avoidable Transfer and applicable post-judgment interest;

(e)   under Count V, in the alternative and only to the extent that relief is not granted under Count III with respect to the Subsequent Avoidable Transfers and the Cambria Transfer, pursuant to 11 U.S.C. §§ 548(a)(1)(A) or (B) and 550(a), that the Court avoid the Subsequent Avoidable Transfers and the Cambria Transfer, to the extent they occurred within one year prior to the Petition Date, and order Defendant Cambria and Defendant Becerra and/or one or more of the other Defendants to return the DRS Intellectual Property Rights to the Debtor to the extent they were transferred, or in the alternative, award Plaintiff judgment against Defendant Cambria and Defendant Becerra and/or one or more of the other Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights together with applicable pre-judgment interest from the dates of

103

the Subsequent Avoidable Transfers and the Cambria
Transfer and applicable post-judgment interest;

(f) under Count VI, pursuant to 11 U.S.C. §§ 549 and 550(a),
that the Court avoid the Post-Petition Avoidable
Transfers and order Defendant Becerra and/or one or more
of the Defendants to return the DRS Intellectual Property
Rights to the Debtor to the extent they were transferred,
or in the alternative, award Plaintiff judgment against
Defendant Becerra and/or one or more of the Defendants in
an amount to be determined at trial for the value of the
DRS Intellectual Property Rights together with applicable
pre-judgment interest from the dates of the Post-Petition
Avoidable Transfers and applicable post-judgment
interest;

(g) under Count VII, pursuant to 11 U.S.C. § 542, that the
Court order one or more of the Defendants to immediately
turnover any and all drawings, diagrams, patents, and/or
intellectual property contained and/or used in patents
applied for by and/or issued to one or more of the
Defendants, including, without limitation, the 217 Patent
and other patents applied for and/or granted in the
United States or internationally based upon the DRS
Systems and/or other intellectual property or patented

104

technology belonging to the Debtor, or in the alternative, award Plaintiff judgment against Defendants in an amount to be determined at trial for the value of the drawings, diagrams, patents, and/or intellectual property contained and/or used in patents applied for by and/or issued to one or more of the Defendants, including, without limitation, the 217 Patent and other patents applied for and/or granted in the United States or internationally based upon the DRS Systems and/or other intellectual property or patented technology belonging to the Debtor, together with applicable pre-judgment and post-judgment interest;

(h)     under Count VIII, that the Court enter judgment for special damages in favor of Plaintiff and against Defendants Becerra, Mirman, Narlow, NAM, Adagen, vFinance, and Grabaldi, and each of them, in an amount to be proven at trial and for general damages in favor of Plaintiff and against Defendants Becerra, Mirman, Narlow, NAM, Adagen, vFinance, and Grabaldi in an amount to be proven at trial;

(i)     under Count IX, that the Court enter judgment for special damages in favor of Plaintiff and against Defendants Becerra and Mirman, and each of them, in an amount to be

105

proven at trial and for general damages in favor of Plaintiff and against Defendants Becerra and Mirman in an amount to be proven at trial;

(j)    under Count X, that the Court enter judgment for special damages in favor of Plaintiff and against Defendants Becerra and Mirman, and each of them, in an amount to be proven at trial and for general damages in favor of Plaintiff and against Defendants Becerra and Mirman in an amount to be proven at trial;

(k)    under Count XI, that the Court enter judgment for special damages in favor of Plaintiff and against Defendants Becerra, Mirman, Williams, and Narlow, and each of them, in an amount to be proven at trial and for general damages in favor of Plaintiff and against Defendants Becerra, Mirman, Williams, and Narlow in an amount to be proven at trial;

(l)    under Count XII, that the Court enter judgment for special damages in favor of Plaintiff and against the Defendants, and each of them, in an amount to be proven at trial and for general damages in favor of Plaintiff and against the Defendants in an amount to be proven at trial;

(m)    under Count XIII, in the alternative and only to the

106

extent that relief is not granted under Counts III or V with respect to the Subsequent Avoidable Transfers and the Cambria Transfer, pursuant to 11 U.S.C. §§ 548(a)(1)(A) or (B) and 550(a), that the Court avoid the Subsequent Avoidable Transfers and the Cambria Transfer, to the extent they occurred within one year prior to the Petition Date, and order Defendant Cambria and Defendant Becerra and/or one or more of the Defendants to return the DRS Intellectual Property Rights to the Debtor to the extent they were transferred, or in the alternative, award Plaintiff judgment against Defendant Cambria and Defendant Becerra and/or one or more of the Defendants in an amount to be determined at trial for the value of the DRS Intellectual Property Rights together with applicable pre-judgment interest from the dates of the Subsequent Avoidable Transfers and the Cambria Transfer and applicable post-judgment interest;

(n)    under Count XIV, that the Court enter judgment for special damages in favor of Plaintiff and against Defendants Becerra, Mirman, Narlow, NAM, vFinance, Adagen and Grabaldi, and each of them, in an amount to be proven at trial and for general damages in favor of Plaintiff and against Defendants Becerra, Mirman, Narlow, NAM,

107

vFinance, Adagen and Grabaldi in an amount to be proven
at trial;

(o) under Count XV, that the Court set aside the Debtor's
releases of Defendants Becerra and Williams and enter a
judgment declaring the releases void;

(p) under Count XVI, that the Court adjudge the Avoidable
Transfers described herein void and order Defendants to
return the DRS Intellectual Property Rights, the Polar
Powder assets, and any other intellectual property and
patented technology belonging to the Debtor to the extent
they were transferred, or in the alternative, award
Plaintiff judgment against the Defendants in an amount to
be determined at trial for the value of the DRS
Intellectual Property Rights, the Polar Powder assets,
and any other intellectual property and patented
technology belonging to the Debtor transferred to
Defendants together with applicable pre-judgment interest
from the dates of the Avoidable Transfers described
herein and applicable post-judgment interest;

(q) under Count XVII, pursuant to 11 U.S.C. § 510(c), that
the Court subordinate any allowed claim or interest of
the Defendants in the Debtor's bankruptcy case;

(r) under Count XVIII, the Court order Defendants NAM,

108

Adagen, Becerra, and one or more of the other Defendants
to make an accounting of all sales of the DRS System and
the Accu-SPINA System and other intellectual property and
patented technology belonging to the Debtor and that the
Court enter judgment against Defendants NAM, Adagen,
Becerra, and one or more of the other Defendants in favor
of Plaintiff in the amount thereof for improper sales of
the DRS System and the Accu-SPINA System and other
intellectual property and patented technology belonging
to the Debtor;

(s)    under Count XIX, pursuant to 11 U.S.C. §§ 544(b) and
550(a) and Del C. §§ 144 and 271, that the Court adjudge
the Avoidable Transfers void and order the Defendants to
return the DRS Intellectual Property Rights, the Polar
Powder assets, and any other intellectual property and
patented technology belonging to the Debtor to the extent
they were transferred, or in the alternative, award
Plaintiff judgment against the Defendants in an amount to
be determined at trial for the value of the DRS
Intellectual Property Rights, the Polar Powder assets,
and any other intellectual property and patented
technology belonging to the Debtor together with
applicable pre-judgment interest from the dates of the

109

Avoidable   Transfers   and   applicable   post-judgment
interest;

(t)   under Count XX, pursuant to O.C.G.A. §§ 10-1-373, that
the Court enter preliminary and permanent injunctions
enjoining Defendant NAM, Adagen, Shealy, and one or more
of the Defendants from continuing to unfairly and
deceptively market and sell Accu-SPINA machines and from
using the DRS Intellectual Property Rights in their
entirety;

(u)   that the Court enter judgment for punitive damages in an
amount to be proven at trial in favor of Plaintiff and
against the Defendants, and each of them;

(v)   that the Court award to Plaintiff his reasonable
attorneys' fees and expenses of litigation against
Defendants in bringing this action; and

(w)   that the Court award such other and further relief as may
be just and proper.

**[CONTINUED ON NEXT PAGE]**

110

**[COMPLAINT**
*HAYS V. BECERRA, ET AL.***]**

Respectfully submitted, this 16th day of June 2006.

                     LAMBERTH, CIFELLI, STOKES
                         & STOUT, P.A.
                     Attorneys for Plaintiff


                     By:  /s/ Gregory D. Ellis
                         Gregory D. Ellis
                         Georgia Bar No. 245310
                         gellis@lcsslaw.com
                         Robert B. Campos
                         Georgia Bar No. 107357
                         rcampos@lcsslaw.com
3343 Peachtree Road, N.E.
East Tower, Suite 550
Atlanta, Georgia   30326-1022
(404) 262-7373
(404) 262-9911 (facsimile)

111

**EXHIBIT "A" FOLLOWS**

US006152950A

# United States Patent [19]

## Shealy et al.

[11] **Patent Number:** **6,152,950**

[45] **Date of Patent:** **Nov. 28, 2000**

[54] **APPARATUS FOR THERAPEUTIC TREATMENT OF LOW BACK PAIN**

[75] Inventors: **C. Norman Shealy**, Fairgrove, Mo.; **Carlos Becerra**, Atlanta, Ga.; **Joseph Medeiros**, Lantana, Fla.; **Charity Martin**, Douglasville, Ga.

[73] Assignee: **Cluster Technology Corp.**, Tampa, Fla.

[21] Appl. No.: **09/052,665**

[22] Filed: **Mar. 31, 1998**

[51] Int. Cl.[7] .................................................. **A61F 5/00**

[52] U.S. Cl. ................... **606/243**; 606/242; 606/241

[58] Field of Search ............................ 606/243, 240, 606/241, 242, 244, 245, 148, 151; 602/32, 33, 35; 5/611, 610, 617, 618, 621, 622, 624, 607; 73/862.041, 849, 828, 821; 128/845

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 780,988 | 1/1905 | Gorham . |
| 1,213,373 | 1/1917 | Hollowell . |
| 2,774,349 | 12/1956 | Judovich ................................. 606/243 |
| 2,787,262 | 4/1957 | Warner ................................... 606/243 |
| 2,787,506 | 4/1957 | Travisano ............................... 601/24 |
| 2,861,565 | 11/1958 | Lapierre ................................. 606/243 |
| 2,873,457 | 2/1959 | Joy ......................................... 5/83.1 |
| 2,910,061 | 10/1959 | Rabjohn . |
| 3,060,929 | 10/1962 | Zivi . |
| 3,527,202 | 9/1970 | Donzelle ................................. 600/21 |
| 3,709,217 | 1/1973 | Powers . |
| 3,771,518 | 11/1973 | Greissing .............................. 606/243 |
| 3,888,243 | 6/1975 | Powlan . |
| 4,002,165 | 1/1977 | Lind . |
| 4,236,265 | 12/1980 | Carradine . |
| 4,432,356 | 2/1984 | Sarrell et al. . |
| 4,579,109 | 4/1986 | Lundblad . |
| 4,602,619 | 7/1986 | Wolf et al. . |
| 4,627,422 | 12/1986 | Bates . |
| 4,627,423 | 12/1986 | Kampner . |
| 4,672,697 | 6/1987 | Schurch ................................. 5/62 |
| 4,686,968 | 8/1987 | Scherger . |
| 4,700,696 | 10/1987 | Schoffstall . |
| 4,930,524 | 6/1990 | Van Zuilichem ..................... 128/896 |

| | | |
|---|---|---|
| 4,951,654 | 8/1990 | Gambale et al. . |
| 4,991,572 | 2/1991 | Chases . |
| 4,995,378 | 2/1991 | Dyer et al. . |
| 5,024,214 | 6/1991 | Hayes . |
| 5,092,322 | 3/1992 | Gantz .................................. 602/35 |
| 5,094,228 | 3/1992 | Reinert . |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1065270 | 5/1954 | France . |
| 2269978 | 12/1975 | France . |

OTHER PUBLICATIONS

C. Norman Shealy, MD, PhD, and Vera Borgmeyer, RN, MA, *Emerging Technologies: Preliminary Findings, Decompression, Reduction, and Stabilization of the Lumbar Spine: A Cost–Effective Treatment for Lumbosacral Pain*, American Journal of Pain Management, vol. 7, No. 2, Apr. 1997.

*Primary Examiner*—Justine R. Yu
*Attorney, Agent, or Firm*—Allen,Dyer,Doppelt,Milbrath & Gilchrist,P.A.

[57] **ABSTRACT**

A therapeutic traction table for the treatment of low back pain includes a bed pivotable from a vertical to a horizontal position for facilitating the placement of a person in a horizontal position on the bed. An upper body harness and underarm supports anchor the upper body of the person to the bed. A lower body harness is attached to the lower body pelvic portion of the person, and includes an inflatable air bladder for positioning within the posterior cavity of the lumbar spine formed between the lower back of the person and the bed for relaxing low back muscles during a pulling force on the spine. A traction unit includes a strap connected to the lower body harness for providing a pulling force between the upper body and the lower body. The traction unit is vertically movable from a position generally along an axis of the spine to a vertically displaced position for pulling at a pre-selected and measurable angle to the axis of the spine and isolating the pulling force to a preselected portion of the spine during a programmable back treatment protocol.

**35 Claims, 13 Drawing Sheets**



**EXHIBIT "B" FOLLOWS**



# CLUSTER
TECHNOLOGY CORP.

## URGENT
# IMPORTANT NOTICE
### February 15th 2001

Dear Customer:

Please be informed that while our company is under re organization via the courts, due to former mismanagement, we HAVE NOT SOLD OR ANY WAY TRANSFERRED, our product rights or intellectual property of any kind.

Nobody has authority to speak for the Company or its subsidiary other than the undersigned. We are manufacturing and operating interim management from our new base in Atlanta. We operate under our own name Cluster-UPT-PDS. You may contact us at the address noted below.

We are getting feed back from various sources where people are told that former employees or contractors of our Company purchased the rights to our DRS System. The people involved in the former management have been terminated in all positions.

Do you have questions? Please contact me, or Cluster's Chairman Al Mirman at First Level Capital 1-800 600 8588 Ext 106. Specifications of DRS and DRS System are private property of our company.

Thank you,

Carlos Becerra, for Cluster Technology Corporation and UPT-
Telephone 770 541 0012 – Please note our new mailing address:

Cc: Melody Derington Denson, Attorney for Cluster
Alvin Mirman, Chairman for Cluster

750 International Parkway – Suite 200 – Heathrow, Florida 32746 – 407-829-2000 – 408-829-3833 FAX



EXHIBIT
12

Mirman

Mirman 283

# UNIVERSAL PAIN TECHNOLOGY, INC.

UPT, INC. IS A WHOLLY-OWNED SUBSIDIARY OF CLUSTER TECHNOLOGY CORP., A PUBLIC COMPANY, TRADING SYMBOL CLTT.



EXHIBIT

Mirman B 2/27/01

# URGENT
# IMPORTANT NOTICE

### February 15ᵗʰ 2001

**Dear Supplier:**

**Please be informed that while our company is under re organization via the courts, due to former mismanagement, we HAVE NOT SOLD. OR ANY WAY TRANSFER, our product rights or intellectual property of any kind. Nobody has authority to speak for the Company or its subsidiary other than the undersigned. We are manufacturing and operating with interim management from our new base in Atlanta. We operate under our own name Cluster-UPT-POS, and WE ARE NOT CREATING ANOTHER COMPANY TO OPERATE WITH. You may contact us at the address noted below.**

**We are experiencing inquiries from suppliers being called by Aida Rodriguez seeking to purchase OUR DRS COMPONENTS and parts. The following people were fired or terminated from the Company August 29ᵗʰ 2000: Aida Rodriguez, Diane Lavesque Jim Gibson and Nick Exarhos.**

**Other than myself, or our former engineer Joseph Madeiros nobody else is authorized to purchase components using our designs and specifications. If you have any questions, please contact me, or the Chairman of the Company Alvin Mirman at First Level Capital 1-800 600 8588 Ext 106. All specifications of DRS and SRS System are private property of our Company.**

**Thank you.**

**Carlos Becerra,** for Cluster Technology Corporation and UPT-
Telephone 770 541 0012 – Please note our new mailing address:

**CLUSTER/UPT/POS**
**Management Company**
**3350 Riverwood Parkway**
**Suites 1900/1917**
**Atlanta, Georgia 30339**

**Mirman 284**

**EXHIBIT "C" FOLLOWS**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ORIGINAL

IN RE:,
**UNIVERSAL PAIN TECHNOLOGY**
DEBTOR,

VS.                                    CASE NO.   00-14508-8GI
_____/


DEPONENT:        ALVIN MIRMAN

DATE:            FEBRUARY 27TH, 2001

PLACE:           FORIZ AND DOGALI, PA
                 600 N. WESTSHORE BLVD.
                 SUITE 502
                 TAMPA, FL 33609

TAKEN:           PURSUANT TO NOTICE

TIME:            BEGAN:  10:15 A.M.
                 ENDED:   5:25 P.M.

REPORTED BY:     PHILIP RYAN, RPR
                 NOTARY PUBLIC
                 STATE OF FLORIDA AT LARGE


*THE REPORTERS GROUP, INC.*

1      Q.      WOULD YOU SELL THE INTELLECTUAL

2   PROPERTY RIGHTS FOR A MILLION BUCKS?

3      A.      I THINK WE COULD BUILD A VERY

4   SUCCESSFUL COMPANY, PAY BACK THE CREDITORS, AND

5   PAY BACK THE SHAREHOLDERS.

6      Q.      I UNDERSTAND BUT IF SOMEONE CAME UP

7   TO YOU AND OFFERED YOU A MILLION BUCKS IN CASH,

8   WOULD YOU SELL THE INTELLECTUAL PROPERTY RIGHTS

9   FOR A MILLION DOLLARS?

10      A.      I DON'T TEND TO THINK SO.

11      Q.      I AM GOING TO SAY SOMETHING ABSURD.

12   50 MILLION BUCKS?

13      A.      50 MILLION?  DEFINITELY.

14      Q.      WOULD 25 MILLION BE AN ABSURD NUMBER?

15      A.      I THINK THAT WOULD PROBABLY BE MORE

16   REALISTIC.

17      Q.      SO YOU BELIEVE THAT IT'S WORTH

18   SOMEWHERE IN THE RANGE, GIVE OR TAKE, OF FIVE

19   MILLION BUCKS?

20      A.      IT IS ONLY WORTH THAT AS A GOING

21   CONCERN, THE ABILITY, YOU KNOW, TO USE IT TO

22   GENERATE A FUTURE REVENUE PROFIT STREAM.

23      Q.      BUT IF SOME COMPANY HAD THE

24   MANUFACTURING CAPABILITY TO MANUFACTURE THESE?

25      A.      I'M SURE THE BOARD WOULD ENTERTAIN

*THE REPORTERS GROUP, INC.*

1    ANY AND ALL OFFERS.

2         Q.     SURE.  I KNOW.

3              WHAT I AM JUST TRYING TO GET AT IS

4    WHEN I UNDERSTAND YOU KIND OF SAY THE BALL PARK

5    25, I WANT TO GIVE YOU A LOT OF LEEWAY.  THAT'S

6    WHY I SAY FIVE MILLION BUCKS EITHER WAY.  I WILL

7    EVEN GIVE YOU 10 MILLION BUCKS EITHER WAY.  WOULD

8    YOU SELL?

9         A.     I THINK IN THE LONG RUN, THE

10   SHAREHOLDERS WOULD MAKE MORE, CREDITORS WOULD DO

11   BETTER.  WELL, CERTAINLY, THE SHAREHOLDERS WOULD

12   MAKE MORE BY RETAINING IT.

13        Q.     OKAY.  THAT MIGHT BE TRUE.

14        A.     YEAH.

15        Q.     I AM NOT GOING TO ARGUE.  I AM TRYING

16   TO FIND OUT YOUR OPINION.  BUT IF SOMEONE

17   APPROACHED YOU WITH AN OFFER BETWEEN 10 AND 35

18   MILLION DOLLARS?

19        A.     I WOULD HAVE TO SPEAK TO THE BOARD.

20   I CAN'T ACT ON MY BEHALF.

21        Q.     THAT IS NOT SOMETHING THAT, AS A

22   CHAIRMAN, WOULD YOU RECOMMEND THAT?

23        A.     I WOULD HAVE TO REALLY THINK ABOUT

24   IT.

25        Q.     IF SOMEONE ONLY OFFERED YOU 2 MILLION

*THE REPORTERS GROUP, INC.*

1      BUCKS, YOU PROBABLY WOULD SAY NO, WOULDN'T YOU?

2           A.    PROBABLY.   ARE YOU WRITING A CHECK?

3           Q.    I WISH I HAD $10 MILLION.   I WISH I

4      HAD $2 MILLION.

5           A.    SO YOU ARE NOT FIRM ON YOUR BID?

6                 MS. GENSON:   HIS BID IS DEFINITELY

7           NOT FIRM.

8      BY MR. WAHL:

9           Q.    I AM TRYING TO GET A FIGURE, OR A

10     FEEL FOR -- I UNDERSTAND YOU RECOGNIZE THAT, THAT

11     THOSE INTELLECTUAL PROPERTY RIGHTS NEED TO BE

12     INCLUDED IN THE DISCLOSURE STATEMENT.   NOW YOU

13     RECOGNIZE THAT CLUSTER OWNS THE PATENT.   THAT FOR

14     A CREDITOR TO ANALYZE THIS DISCLOSURE STATEMENT,

15     IT NEEDS TO KNOW THE VALUE OF THE ASSETS.   SO I AM

16     TRYING TO GET A FEEL FOR WHAT THE VALUE, AT LEAST

17     FROM THE DEBTORS' PERSPECTIVE, WHAT THE VALUE IS

18     OF THE INTELLECTUAL PROPERTY RIGHTS BECAUSE THAT

19     APPEARS TO BE ONE OF THE LARGEST ASSETS THE BETTER

20     HAS.

21                DO YOU AGREE WITH THAT?

22          A.    WELL THAT MAKES THE COMPANY A VIABLE

23     COMPANY.   WITHOUT IT, THE COMPANY WOULD PROBABLY

24     NOT BE VIABLE.   WITH IT, IT IS CERTAINLY VIABLE.

25     WHAT IT'S WORTH, I JUST, YOU KNOW, BEING

                    *THE REPORTERS GROUP, INC.*

EXHIBIT "D" FOLLOWS

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

CLUSTER TECHNOLOGY CORP.                    Case No. 00-14507-8G1

                    Debtor.

_____/

## CERTIFICATION OF NECESSITY OF
## REQUEST FOR EMERGENCY HEARING ON
## THE UNITED STATES TRUSTEE'S EMERGENCY
## MOTION TO DISMISS OR CONVERT CASE OR, IN THE
## ALTERNATIVE, SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

I HEREBY CERTIFY, as a member of the Bar and attorney practicing before this

Court, that I have carefully examined the matter under consideration and to the best of my

knowledge, information and belief formed after reasonable inquiry, all allegations are well

grounded in fact and all contentions are warranted by existing law or a reversal of existing

law can be made, that the matter under consideration is not interposed for any improper

purpose, such as to harass, to cause delay, or to increase the cost of litigation, and there is

just cause to request a consideration of the matter on an emergency basis.

I CERTIFY FURTHER that there is a true necessity for an emergency hearing,

specifically, because the Debtor has transferred property previously in the possession and

control of the Debtor to persons not entitled to such property, who appear to be handling

the property in a manner likely to cause harm to the estate.

I CERTIFY FURTHER that the necessity of this emergency hearing has not been

caused by any lack of due diligence on my part, but has been brought about by

circumstances beyond my control, and is filed with full understanding of

Bankruptcy Rule 9011 and the consequences of noncompliance with the same.

DATED this 9th day of May, 2001.

Respectfully submitted,

C. DAVID BUTLER
United States Trustee
Region 21

By: _____
T. Patrick Tinker
FBN: 0064874
501 E. Polk St., Ste. 1200
Tampa, FL 33602
(813) 228-2000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing certification

has been furnished by telefax to the Debtor's counsel and by United States Mail this 9th

day of May, 2001 to the Debtor and its counsel at the following addresses:

Cluster Technology Corp.
1991 Main St., Suite 1-115
Sarasota, FL 34236

Melody Genson, Esq.
3665 Bee Ridge Road, Suite 316
Sarasota, FL 34233
Fax: (941) 927-6477

T. Patrick Tinker

2

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

CLUSTER TECHNOLOGY CORP.,                    Case No. 00-14507-8G1

Debtor.
_____/

## UNITED STATES TRUSTEE'S
## EMERGENCY MOTION TO DISMISS
## OR CONVERT CASE OR, IN THE ALTERNATIVE,
## SEEKING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

The United States Trustee moves this Court to dismiss or convert this case

pursuant to 11 U.S.C. § 1112(b), and seeks in the alternative an Order directing

the appointment of a Chapter 11 trustee under 11 U.S.C. § 1104, for the following

reasons:

### BACKGROUND

1. On September 18, 2000, Cluster Technology Corp. ("Cluster") filed a

voluntary Chapter 11 petition.

2. Cluster is the sole stockholder of Universal Pain Technology, Inc. ("Universal

Pain") and Professional Distribution Systems, Inc. On the same date that Cluster

commenced its case, Universal Pain also filed its own Chapter 11 petition, Case No. 00-

14508-8G1.

3. Although Cluster is the holding company of Universal Pain as a matter of

corporate formality, testimony at the Section 341 meeting of creditors indicated that the

business affairs of the two debtors were commingled to a significant degree.  For example, some of the scheduled creditors of Cluster may be creditors of Universal Pain, and vice versa.

4.  Prior to the commencement of their bankruptcy cases, Cluster and Pain had been engaged in the manufacture, sale and distribution of medical equipment for the treatment of back problems.  The technology is designed to provide "decompression, reduction and stabilization" of the lumbar spine, hence its being named the "DRS System."  The debtors closed their business operations pre-petition.

5.  Although there was initially some confusion in the case regarding which of the three related entities owned the intellectual property rights for the debtors' DRS System, the debtors are now taking the position that the rights are owned by Professional Distribution Systems, Inc., i.e. the non-debtor subsidiary of Cluster and the sister corporation of Universal Pain.

6.  As of the date of this motion, the Debtor has filed a plan and disclosure statement.  The disclosure statement has not been finally approved, and no plan solicitation has presumably been commenced.

## DEBTOR'S UNAUTHORIZED TRANSFER OF ASSETS TO NORTH AMERICAN MEDICAL CORPORATION

6.  In the disclosure statements filed by the two related debtors, they acknowledge that they have entered into a contractual arrangement with Carlos Becerra, North American Medical Corporation and an entity called "Cluster, UPT and PDS

2

Manufacturing Company."  Pursuant to this unapproved arrangement, the debtors had moved all of their assets post-petition from Clearwater to Atlanta, Georgia, where all of the assets are now asserted to be under the supervision of Mr. Becerra.  Mr. Becerra is not an officer of the debtors, but is a former insider and a current shareholder of Cluster. Pursuant to the debtors' arrangement, North American Medical Corporation will manufacture equipment to be sold on the debtors' behalf.  Mr. Becerra's other entity, "Cluster, UPT and PDS Management Co.," will "manage" the business operations on behalf of the debtors.  The debtors will not have any operations themselves except for receiving a portion of the proceeds from sales made by Mr. Becerra's companies.

7.  The debtor's disclosure statements assert that, pursuant to the contractual arrangement with Mr. Becerra and his corporations, DRS units will be sold for an expected price of $85,000.00 per unit.  North American Medical Corporation will be paid $45,000.00 for manufacturing each DRS unit that is sold.  Sales commissions of approximately $15,000.00 per unit will be paid to sales personnel.  In addition, the management company will be paid $10,000.00 per month for its services, with projected sales of one machine per month beginning July 1, 2001.  Based on these projections, the debtor would have no manufacturing or sales operations whatsoever, but would receive $15,000 per month for the use of its technology and assets by Mr. Becerra and his corporations in manufacturing and selling DRS units.

3

8.  The debtors' disclosure statements contain no disclosure that North American Medical Corporation is now manufacturing equipment that competes with the DRS System in the same market. This equipment is called the "Spina System." Adagen Medical International, Inc. ("Adagen") is North American Medical Corporation's selling agent for such equipment. *See* **EXHIBIT A.**

**ADAGEN'S SALES EFFORTS AND ITS
MISREPRESENTATION REGARDING COURT APPROVAL**

9.  Adagen appears to be marketing North American Medical Corporation's "Spina System" as an improved version of the DRS System previously manufactured by the Debtor. A copy of the contents of Adagen's website is attached as **EXHIBIT B.** When the reader clicks onto the DRS "spinal decompression" weblink, the following two paragraphs appear at the top of the page:

"The Spina System and the DRS System offer today's physician two of the most powerful options for the treatment of low back pain on the market. The DRS System has been on the market for over four years. Clincial(sic) studies have shown an 86% success rate.

In 2001, the Spina System was introduced to the market. This system offers the same results as the DRS System but also offers the treating physician the option of six additional decompression programs - truly bringing this treatment into the 21st century. Other innovations to follow include a digital touch

4

screen as well as other enhancements to keep the Spina System the leader in

Spinal Decompression."[1/]

These paragraphs are followed by a report of research into the purported benefits of the

DRS methodology for spinal decompression.

10. In an undated letter from Adagen to an apparent customer, Adagen states that

it is the selling agent for North American Medial Corporation. *See* **EXHIBIT A.** The

correspondence further states as follows:

"North American Medical headed by Carlos Becerra presented a plan to the court

in order for the DRS System to survive. On March 4, 2001, the Florida

Bankruptcy court awarded North American Medical all manufacturing and

intellectual rights to the DRS System."

11. The Adagen correspondence demonstrates a misrepresentation by Adagen that

this Court has already approved the DRS arrangement with North American Medical

Corporation when, in actuality, the Debtor has continuously violated 11 U.S.C. Section

363 and as well as a Court order requiring the Debtor to seek the appropriate Court

authority under that statute. The Court has given no authority for business activities

taken outside of the ordinary course of the Debtor's historical business operations, and

the Debtor has thus failed to meet its affirmative obligation to seek such authority *prior* to

taking such action, as required under 11 U.S.C. Section 363. In addition, creditors of the

---

[1/]Adagen's correspondence attached as **EXHIBIT A** contains similar statements.

5

Debtor have been deprived of notice and opportunity to object to such use pursuant to Federal Rules of Bankruptcy Procedure 2002(a)(2) and 6004(a), and Local Bankruptcy Rule 2002-1. Finally, the transfer of the assets appears to be an unauthorized post-petition transfer subject to avoidance under 11 U.S.C. § 549.

12. The Debtor's failure to seek Court authority is compounded by the fact that Debtor's counsel was notified by the United States Trustee of the deficiency on a couple of occasions *prior* to the Court's hearing on the United States Trustee's first motion seeking dismissal or conversion of the case. At that hearing, the Court addressed the failure to seek Court authority for the Debtor's actions and provided the Debtor with ten days from entry of the Order in which to comply with the statute. The Court's directive is expressly set forth in the March 28, 2001 Order. In sum, irrespective of being informed of the problem on several occasions, the Debtor has consistently failed to seek the requisite Court authority and is operating in violation of both the bankruptcy laws and this Court's Order.

13. In sum, even if Adagen's misrepresentation regarding the Court's authorization were the result of an innocent misunderstanding, the attached correspondence and website pages demonstrate the problems posed by the unauthorized transfer of the Debtor's assets under no Court supervision: Adagen is selling a competing product of North American Medical Corporation as an improved version of the DRS System, which presumably will adversely affect sales of the DRS System while

6

encouraging potential customers with knowledge of the DRS System to purchase the competing item. This is purportedly being done under the imprimatur of this Court.

## THE DEBTOR HAS STILL FAILED TO FILE PROPER FINANCIAL REPORTS

14. In its March 28, 2001 Order, the Court also directed the Debtor to file the required monthly financial reports. The Debtor has not filed any monthly reports since the report for December, 2000.

15. The Debtor has submitted some reports to the United States Trustee, but not filed them with the Court. These documents may be labeled "monthly financial reports," but they are not the reports required to be filed by the Debtor. Specifically, the Debtor has submitted to this Office very abbreviated reports designated solely for use by individuals. The reports are not even signed by the publicly traded corporation, but are signed only by an individual in his personal capacity. The reports do not contain any statement under penalty of perjury regarding the multitude of items required for any business, e.g. a report regarding accounts receivables, account payables, a delineation of tax obligations, etc.... Although the Debtor apparently has few cash receipts and disbursements, the longer form is required for a full understanding of the Debtor's current financial condition made under penalty of perjury. If the Debtor has no accounts payable, etc.., then the business reports should, of course, have been extremely easy to complete.

15. By transferring operations outside of the corporate entity *and* simultaneously failing to file the required reports, the Debtor is effectively foreclosing any adequate

7

supervision of the financial aspects of this case by the United States Trustee, creditors, and this Court.

## CONCLUSION

16. The above-described circumstances demonstrate unreasonable delay that is prejudicial to creditors, a likely loss or diminution of the estate, absence of a reasonable likelihood of rehabilitation, and continued violation of the bankruptcy laws and this Court's March 28, 2001 Order.

WHEREFORE, the United States Trustee moves this Court pursuant to 11 U.S.C. § 1112(b) to either dismiss the Chapter 11 case or convert the case to one under Chapter 7. In the alternative, the United States Trustee respectfully requests an Order directing the appointment of a Chapter 11 trustee under 11 U.S.C. § 1104. The United States Trustee further requests such other relief as the Court may deem appropriate given the circumstances in this case.

Respectfully submitted,

C. DAVID BUTLER
United States Trustee, Region 21

By: _T. Patrick Tinker_
T. Patrick Tinker
501 E. Polk Street, Suite 1200
Tampa, FL 33602
(813) 228-2000

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing emergency

motion has been furnished by facsimile copy to Debtor's counsel and by United States

Mail on the following persons, on this _9th_ day of May, 2001.

Cluster Technology Corp.
1991 Main St., Suite 1-115
Sarasota, FL 34236

Melody Genson, Esq.
3665 Bee Ridge Road, Suite 316
Sarasota, FL 34233
Fax: (941) 927-6477

T. Patrick Tinker

9

# EXHIBIT  A

# ADAGEN Medical International Inc.

250 10th Street Suite 2120
Atlanta, GA 30309
1.866.4ADAGEN
1.866.423.2436
fax 404.879.0671
www.adagen.com

Dear Dr. Bonta,

I am writing today to let you know about some recent changes with Cluster Technology the manufacturer of the DRS System. As you may know, Cluster Technology filed for bankruptcy in early September 2000. For a period of approximately 5 months, operations had ceased. North American Medical headed by Carlos Becerra presented a plan to the court in order for the DRS System to survive. On March 4, 2001, the Florida Bankruptcy court awarded North American Medical all manufacturing and intellectual rights to the DRS System.

Along with the DRS System, North American Medical is also manufacturing the Spina System™. The Spina System looks similar to the DRS System, but this is where the comparison ends. With the addition of 8 additional decompression programs, the Spina System now offers the treating physician even more treatment options for their patients. Other upgrades to follow will include a digital touch screen, the new Spina Vision™, which will add video fluoroscopy to the system as well as a new gel bed, which will greatly add to the coefficient of friction (COF) and will stabilize the patient even greater.

The Spina System and DRS System are in full production guaranteeing that there will be no delays in getting the required units for your practices. In addition, North American Medical will be the service arm for your current DRS Systems as well as the new Spina System.

Adagen Medical International, Inc. is the selling agent for North American Medical. With the current set-up, North American Medical is only a manufacturing company. Adagen Medical International will sell the DRS System as well as the new Spina System.

We thank you for your support and know that there have been some concerns with sales and sales support of the DRS System. Please do not to hesitate call me with any questions or concerns you may have regarding any of the above.

Best regards,

David

David Oldfield
Vice President of Sales
Adagen Medical International, Inc.
www.adagen.com
1 810.659.1805

# EXHIBIT  B











# ADAGEN Medical International, Inc.

home        company        pro



The Spina System and the DRS System offer today's physician two of the most powerful options for the treatment of low back pain on the market. The DRS System has been on the market for over four years. Clincial studies have shown an 86% success rate.

In 2001, the Spina System was introduced to the market. This system offers the same results as the DRS System but also offers the treating physician the option of six additional decompression programs-truly bringing this treatment into the 21st century. Other inovations to follow include a digital touch screen as well as other enhancements to keep the Spina System the leader in Spinal Decompression.



## PAIN MANAGEMENT

A Practical Guide for Clinicians
FIFTH EDITION Chapter 20:
New Concepts in Back Pain Management: Decompression, Reduction, and Stabilization
C. Norman Shealy, M.D., Ph.D., F.A.C.S. Pierre L. Leroy, M.D., F.A.C.S.
Volume 1
St. Lucie Press Boca Raton, Florida

**TOPICS**
Contents
Abstract
Introduction
Types of Low Back Pain
Principles of Bio Mechanics
History of Traction
The DRS System
Clinical Results
Conclusion

Table of Contents
Introduction xi
Preface xiii
Editor's Note xv

Editorial Advisory Board xvii
Contributors xix Peer Reviewers xxvii
Chapter Consultants xxix
VOLUME I Pain Management: Decompression, Reduction, and Stabilization C Norman Shealy, M.D.,
Ph.D.,
F.A.CS. Pierre L. LeRoy, M.D., F.A.CS.

## ABSTRACT

A thorough evaluation of previous traction techniques reveals no consistent pattern in prior literature.
We have evaluated a variety of devices and found that seven major factors are important in achieving
optimal clinical results. These include:
(1) split table design to minimize effects of gravity;
(2) flexion of the knees for hip relaxation;
(3) controlled flexion of the lumbar spine during treatment which alters the location of distraction
segmentally;
(4) comfort and nonslippage of the pelvic restraining belt;
(5) comfort and nonslippage of the chest restraint;
(6) concomitant use of TENS, heat, ice, and myofascial release; and
(7) a graduated limbering, strengthening, and stabilization exercise program.

Using this system, successful pain control was achieved in 86% of patients studied with ruptured
intervertebral discs and
75% of those with facet arthrosis.

## INTRODUCTION

New advances centering on the use of specific segmental distraction as an adjunct to managing low
back pain with and without neuropathic sciatica are reported here. These should be of special interest to
both primary
care and multidisciplinary medical specialists when symptoms persist despite comprehensive
management of acute back pain.

The utility of physical modalities has been well established in many forms (Wall & Melzack, 1984);
however, the use of
traction techniques has been largely empirical. Relatively few studies have specifically discussed
ergonomics and the biomechanics of spinal pathology as it relates to practical clinical outcomes
employing powered or weight distraction forms
of therapy.

Previous outcome studies have lacked the applied principles of quantifications and biomechanics that
correlated clinical data with a specific diagnosis resulting from structural abnormalities such as discal
herniation, lumbar facet arthropathy, foraminal stenosis, and motion segment abnormality syndromes or
their comorbid combinations (Anderson, Schultz, & Nachemson, 1968; Lind, 1974; Bettmann, 1957;
Binkley, Strafford, & Gill, 1995). Anatomically, the low back is relatively clinically inaccessible.

A reevaluation of mechanical therapy is needed since the various etiologies have overlapping features.
Different symptom complexes associated with dysfunction due to complex ipsilateral, contralateral, and
segmental neural networking, as well as combined somatic and autonomic neural interactions,, may
serve to confound the clinician.

A novel approach to mechanotherapy is presented to review these six considerations:
(1) outcomes validation,
(2) relative safety,
(3) ease of use by the patient or healthcare professional,
(4) introduction of new principles of treatment,
(5) appropriate utilization, and

(6) cost effectiveness resulting in shortened morbidity with optimal improvement.

## TYPES OF LOW BACK PAIN

Classically, there are four broad categories of low back pain syndrome, each requiring different treatment pathways
(O'Brien, 1984; Bogduk, 1987):
1. Acute muscular- low back pain which is usually self-limiting;
2. Acute low back pain involving sciatic radiation: With neurological dysfunction Without neurological dysfunction;
3. Chronic low backpain which has recurring symptoms modified by therapy;
4. Neoplastic low back pain syndrome which is recurring, but eventually becoming progressive, constant, and intractable.

Each type of low back pain syndrome has common features which vary with the intensity of symptoms:
(1) regional pain,
(2) impairment and mechanical dysfunction exacerbated by activities of daily living, and
(3) mood and behavioral changes.
All need to be addressed for overall successful outcome.

## PRINCIPLES OF BIOMECHANICS

Mechanical traction is the technique of applying a distracting force to produce either a realignment of a structural
abnormality or to relieve abnormal pressure on nociceptive receptor systems (Colachis & Strohm, 1969; Cyriax,
1950; Gray & Hosking, 1963; Judovich, 1954; Nachemson, 1966). Frequently, both problems co-exist in differing combinations, which generates a number of clinical concerns. Should treatment be constant or intermittent? What is the reasonable duration of treatment? Should gravity or a weight formula based on the patient's weight be utilized to determine
the amount of force for the treatment? Can both mechanoreceptors and chemoreceptors that produce unwanted symptoms
be integrated and harmonized?

It has been previously described that the distracting force must be greater than the specific pathophysiology causing
symptoms, and these mechanisms must be individualized for each patient (Judovich, 1995). Caution not to exacerbate symptoms should always be exercised. The old maxim "no pain, no gain" is both passe and disingenuous. The magnitude
of the force correlates with the amount of distraction and must be closely monitored. At what force do we obtain better and more successful results, while reducing costs and morbidity? Katz et al. (1986) reported that 25% of the body weight as a traction force applied to 15 degrees positive elevation from the parallel prone plane for a 14-day series was found to be effective. We differ in our findings, as will be reported below (Katz et al., 1986).

When successful, the patient clinically reports symptomatic improvement of well-being and objective clinical verification of
(1) improved range of motion,
(2) reduction of verifiable regional muscle spasm,
(3) improvement in regional tenderness by evaluating health professionals, and
(4) improved neuropathic signs when compared to pretreatment findings.
How can there be more individualized bioclinical integration?

Pathophysiology of regional low back pain syndromes varies on a highly personal, individualized basis in such factors as etiology, causation, resulting activity dysfunction, and psychopathological considerations. These factors must not be

overlooked or underestimated in prescribing treatment.

## HISTORY OF TRACTION

A review of the "Annotated Bibliography on the History of Traction" (Appendix A) summarizes 41 articles, from Neuwirth, Hilde, and Campbell in 1952 to Engel, Von Korff, and Katon in 1996. The reader is referred to Appendix A for a review
from medieval times to the present. A summary of this bibliography leads to the following conclusions:
1. Clinical outcomes are highly variable.
2. There are different types of traction techniques, such as intermittent or constant.
3 . Variable angles of traction i-nay be applied.
4. Differing weight sequences may be utilized..Suspension devices are useful.
5. Time-scheduled sequences are described, but without specific guidelines and with many variables.

The present chapter is not intended to criticize the previous authors or data presented, but demonstrates that many variables being considered lack quantification. Neurological surgeons have gained extensive experience dealing with and managing problems of intracranial pressure using methods of quantification and have now applied those principles to the intradiscal pressure manometry for clinical correlation of low back pain syndrome.

The first application of quantification by relatively recent studies of quantitative intradiscal pressure changes has been
reported by Ramos and Martin (1994). By cannulizing the nucleus pulposus of L4-5 and monitoring intradiscal pressure
via a pressure transducer, three patients were observed to have lowered pressures below I 00 mm Hg as a result of
traction technique.

Other methods employing visualization were advanced by Gray (Gray et al., 1968). Radiological assessment of the
effect of body traction was reported by Gray et al. (1968). Using only the body's weight with a thoracic restraint and
only a 12-degree incline, significant lengthening of the spine occurred within 5 minutes and even more significantly after this modified gravity reduction traction for 25 minutes.

Combined studies by Anderson, Schultz, and Nachemson (1968) of intervertebral disc pressures during traction
demonstrated by radiographic studies concluded that disc space increases in height and lumbar disc protrusion can
be reduced during traction. Myelographic evidence of disc herniation was found to disappear after traction (Anderson,
Schultz, & Nachemson, 1968).

Shealy and Borgmeyer (1997) introduced a new biomedical application device that can apply all these positive effects to individual disc levels. To clinically document improvement, clinical data combined with radiofluoroscopy was employed.
This new approach delivers precise treatment to decompress the lumbar disc space and then stabilize once asymptomatic through
a program of physical rehabilitation.

## THE DRS SYSTEM

The major goal of the DRS System is decompression, reduction, and stabilization of the lumbar spine. In a series of 50
patients with chronic pain, 23 having ruptured intervertebral disc and 27 with facet joint pain. it was noted that conventional spinal traction was less effective and biomechanically insufficient for optimal therapeutic outcome. Extensive observations

led to the conclusion that five major factors were important for lumbar traction efficacy:
1 . Separation of the lumbar component of the joint
2. Flexion of the knees
3. Flexion of the lumbar spine by raising the angle of distraction
4. Comfort and nonslippage of the pelvic belt
5. Comfort and nonslippage of the chest restraint

X-rays confirmed that significant distraction of the lumbar vertebrae required a weight of at least 50% of the patient's
body weight. Thus, we have set the parameters of distraction to build up to 50% of the patient's body weight plus 10 pounds. The knees are flexed over a comfortable bolster that gives optimal relaxation. When the major focus of the patient's pain is at the L5-S1 intervertebral disc, no elevation of the pelvis is necessary. At L4-5, optimal focus of the distraction is obtained by raising the angle of distraction 10 degrees. For L3-4 or L2-3, an elevation of 20 degrees is generally optimal. There is enough variation in the normal lumbar lordotic curvature that manual palpation of the tension on the lumbar spine, as well as the patient's assessment of the focus of distraction, can help in making minor adjustments to these angles. With the DRS System, the distraction angle is accurately determined via a laser pointer to give precise angulation. The table on which the patient lies is divided with a smooth hydraulic component to separate the lumbar division as traction/distraction is applied. The traction/ distraction is achieved with a computerized device that allows gradual build-up over a 2-minute period to the desired distraction force. Automatically, the optimal distraction weight is maintained for I minute, and then the pressure is reduced to 50 pounds for 20 seconds before the process repeats itself. The entire treatment process requires 30 minutes.

To minimize muscle spasm during the treatment, heat and a mechanical myofascial-release device providing alternating vacuum pressure to the muscles of the lumbar spine is applied for 30 minutes prior to the treatment. Imm-iediately following the procedure, a cold pack is applied to the lower back for 30 minutes. The patient is then instructed in the use of a TENS unit applied to specific anatomical points to be used at home throughout the entire waking day until returning the following day for the next sequential treatment. The initial 2 weeks of this treatment program are done daily, Monday through Friday, followed by three times per week, for a total of 20 sessions.

Patients who are improving adequately by the end of the second week are instructed in a standard series of exercises for limbering, stretching, and stabilizing the lumbosacral and pelvic musculature. These exercises include a modified Williams' flexion exercise which involves raising actively the legs with the knees flexed and the hips abducted, flexing the ankle as far as comfortable toward the pelvis and the chest, alternately on each side. Fig. 2. MRI, patient A, showing large ruptured intervertebral disc and L5-S1, pretreatment. Fig. 3. MRI, patient A, after 4 weeks of DRS. The ruptured intervertebral disc is approximately 50% reduced. Patient is free of pain and has marked improvement in mobility. Fig. 4. Lateral lumbar x-ray, patient B, neutral position. Fig. 5. Patient B, with traction-decompression, one-half body weight plus 10 pounds, knees bent. Fig. 6. Patient C, neutral position, no traction, decompression. Fig. 7. Patient C, 30 degrees flexion, one-half body weight traction, decompression, resulting in increased widening of disc space, most prominent at L2-3 and L3-4.48 are instructed in active exercises to rotate the left knee outward, while pulling it as strongly as comfortable toward the right axilla, then alternatively pulling the right knee toward the left axilla. At the maximum point of the exercise, the patient holds the described position for 30 slow breaths. Instruction is provided for exercises performed while supported on the elbows and simultaneously raising the extended legs 8 inches off the floor, followed by hip abduction,

The DRS System For Low Back Pain

adduction, back to neutral,
and finally lowering the legs to the floor. Patients start with I to 3 such exercises and build to 50
repetitions. When patients
are capable of perfön-ning 50 repetitions, they begin slow sit-ups with their knees bent, starting with I to
3 repetitions and building up to 50 repetitions. Patients continue using the TENS device throughout the
4-week period. After the active
treatment phase, patients are encouraged to continue with the TENS unit for an additional 3 months as
they complete the limbering, strengthening, and stabilization exercises. The complete protocol for
selection and exclusion criteria regarding
patients is included in Appendix B.

## CLINICAL RESULTS

In our study, 19 of 23 patients (86%) with ruptured intervertebral discs were markedly improved, and
75% of those
with facet arthrosis (20 of 27) similarly reported a 50% reduction in pain. These results are based upon a
pain
analog scale with patient evaluation before and no later than 1-4 weeks after completion of therapy. All
patients with pain reduction of 50-100% showed improvement in flexibility and total physical activity.

## CONCLUSION

A thorough evaluation of the literature reveals no clinical outcomes to correlate with different
techniques. In our review and experience, no single device incorporates all seven major factors that are
important in achieving clinical results. These include:
(1) split table separation;
(2) flexion of the knees;
(3) flexion of the lumbar spine to raise the angle and distraction segmentally;
(4) comfort and nonslippage of the pelvic restraining belt;
(5) comfort and nonslippage of the chest restraint;
(6) concomitant use of TENS, heat, ice, and myofascial release; and
(7) a graduated limbering, strengthening, and stabilization exercise program.

Using this system, successful pain control is achieved in 86% of patients with ruptured
intervertebral discs and 75% of those with facet arthrosis. Because of space constraints, we did not
discuss the psychological and psychiatric management of pelvic pain technique, and the reader is
referred to other sources.

It is worthwhile to consider also that by alternating the pathophysiology of the
macro-mechanoreceptor-pain pathway,
we may secondarily affect the chemoreceptors as well as reduce noxious stimuli of the richly enervated
somatoautonomic lumbar spine, thereby reducing the chronicity of activity-related lumbar pain
syndrome. This benefit may also reduce
need for medications. The new DRS System is a welcome addition to the problematic low back pain
syndrome.

The DRS System appears to be cost effective it merits more widespread utilization and awaits
additional
ergonomic studies. This approach can provide pain relief, and physicians are invited to take
advantage of this gratifying treatment approach.

---

# Emerging Technologies:

Preliminary Findings

## DECOMPRESSION, REDUCTION, AND STABILIZATION OF THE LUMBAR SPINE: A COST-EFFECTIVE TREATMENT FOR LUMBOSACRAL PAIN

### C. Norman Shealy, MD, PhD, and Vera Borgmeyer, RN, MA

American Journal of Pain Management 1997;7:63-65.

C.Norman Shealy MD, PhD, is Director of The Shealy Institute for Comprehensive Health Care and Clinical Research and Professor of Psychology at the Forest Institute of Professional Psychology. Vera Borgmeyer is Research Coordinator at the Shealy Institute for Comprehensive Health Care and Clinical Research. Address reprint requests to: Dr. C. Norman Shealy, The Shealy Institute for Comprehensive Health Care and Clinical Research, 1328 East Evergreen Street, Springfield, MO 65803.

American Journal of Pain Management

# INTRODUCTION

Pain in the lumbosacral spine is the most common of all pain complaints. It causes loss of work and is the single most common cause of disability in persons under 45 years of age (1). Back pain is the most dollar-costly industrial problem (2). Pain clinics originated over 30 years ago, in large part, because of the numbers of chronic back pain patients. Interestingly, despite patients' reporting good results using "upside-down gravity boots," and commenting on how good stretching made them feel, traction as a primary treatment has been overlooked while very expensive and invasive treatments have dominated the management of low back pain. Managed care is now recognizing the lack of sufficient benefit-cost ratio associated with these ineffective treatments to stop the continued need for pain-mitigating services. We felt that by improving the "traction-like" method, pain relief would be achieved quickly and less costly.

Although pelvic traction has been used to treat patients with low back pain for hundreds of years, most neurosurgeons and orthopedists have not been enthusiastic about it secondary to concerns over inconsistent results and cumbersome equipment. Indeed, simple traction itself has not been highly effective, therefore, almost no pain clinics even include traction as part of their approach. A few authors, however, have reported varying techniques which widen disc spaces, decompress the discs, unload the vertebrae, reduce disc protrusion, reduce muscle spasm, separate vertebrae, and/or lengthen and stabilize the spine (3-12).

Over the past 25 years, we have treated thousands of chronic back pain patients who have not responded to conventional therapy. Our most successful approach has required treatment for 10-15 days, 8 hours a day, involving physicians, physical therapists, nurses, psychologists, transcutaneous electrical nerve stimulator (TENS) specialists, and massage therapists in a multidisciplinary approach which has resulted in 70% of these patients improving 50-100%. Our program has been recognized as one of the most cost-effective pain programs in the US (13). The average cost of the successful pain treatment has been cited as less than half the national average (13).

Our protocol combined traditional, labor-intensive physical therapy techniques to produce mobilization of the spinal segments. This, combined with stabilization, helped promote healing. In addition we used biofeedback, TENS, and education to reinforce the healing processes. We wanted to produce a simpler and more cost-effective protocol that could be consistently reproduced. The biofeedback and education could be easily replicated. The problem was producing spinal mobilization to the decree that we could decompress a herniated nucleus and relieve pain. Stabilization would come after pain relief.

The DRS System was developed specifically to mobilize and distract isolated lumbar segments. Using a specific combination of lumbar positioning and varying the degree and intensity of force, we produced distraction and decompression. With fluoroscopy, we documented a 7-mm distraction at 30 degrees to L5 with several patients. In fact, we observed distraction at different spinal levels by altering the position and degree of force.

We set out to evaluate the DRS system with outpatient protocols compared to traditional therapy for both ruptured lumbar discs and chronic facet arthroses.

Subjects. Thirty-nine patients were enrolled in this study. There were 27 men and 12 women, ranging, in age from 31 to 63.

Twenty-three had ruptured discs diagnosed by MRI. Of these, all but four had significant sciatic radiation, with mild to moderate L5 or S 1 hyperalgesic. All had symptoms of less than one year.

The facet arthrosis patients also underwent MRI evaluations to rule-out ruptured discs or other major pathologies. They had experienced back pain from one to 20 years. Six had mild to moderate sciatic pain with significant limitations of mobility.

# METHODOLOGY

Patients were blinded to treatment and were randomly assigned to traction or decompression tables. Traction patients were treated on a standard mechanical traction table with application of traction weights averaging-one-half body weight plus 10 pounds, with traction applied 60-seconds-on and 60-seconds off, for 30 minutes daily for 20 treatments. Following the traction, Polar Powder" ice packs and electric stimulation were applied to the back for 30 minutes to relieve swelling and spasm, and patients were then instructed in use of a standard TENS use to be employed at home continuously when not sleeping-. After two weeks, the patients received a total of three sessions with an exercise specialist for instruction in and supervision of a limbering/strengthening exercise program. They were re-evaluated at five to eight weeks after entering the program.

Decompression patients received treatment on the DRS System-n, designed to accomplish optimal decompression of the lumbar spine. Using the same 30 minute treatment interval, the patients were given the same force of one-half the body weight plus 10, but the decree of application was altered by up to 30 degrees. The effect was to produce a direct distraction at the spinal segment with minimal discomfort to the patient.

Eighty-six percent of ruptured intervertebral disc (RID) patients achieved "good" (50-89% improvement) to "excellent" (90-100% improvement) results with decompression. Sciatica and back pain were relieved. Only 55% of the RID patients achieved "good" improvement with traction, and none excellent."

Of the facet arthrosis patients, 75% obtained "good" to excellent" results with decompression. Only 50% of these patients achieved "good" to "excellent" results with traction.

Table 1. Patient assessment of pain relief secondary to decompression and to traction.

**RID  Facet arthrosis**

Decompression
Excellent 7 (50%) 2 (25%)
Good 5 (36%) 4 (50%)
Poor 2 (14%) 2 (25%)
Traction
Excellent 0 2 (25%)
Good 5 (55%) 2 (25%)
Poor 4 (45%) 4 (50%)

Excellent = 90 - 100% improved

Good = 50 - 89% improved

Poor = < 50% improved

# DISCUSSION

Since both traction and decompression patients received similar treatment (except for the differences in the traction table versus the decompression table) with similar weights, ice packs, and TENS, the results are quite enlightening. The decompression system is encouraging and supports the considerable evidence reported by other investigators stating that decompression, reduction, and stabilization of the lumbar spine relieves back pain. The computerized DRS System appears to produce consistent, reproducible, and measurable non-surgical decompression, demonstrated by radiology

Of equal importance, the professional staff facilities required, as well as the time and cost, are all significantly reduced. Since the more complex treatment program of the last 25 years has already been shown to cost 60% less than the average pain clinic, the cost of this simpler and more integrated treatment program should be 80% less than that of most pain clinics-a most attractive solution to the most costly pain problem in the US. In addition, patients follow a 30-day protocol that produces pain relief yet allows them to continue daily activities and not lose workdays.

## SUMMARY

We have compared the pain-relieving results of traditional mechanical traction (14 patients) with a more sophisticated device which decompresses the lumbar spine, unloading of the facets (25 patients). The decompression system gave "good" to "excellent" relief in 86% of patients with RID and 75 % of those with facet arthroses. The traction yielded no "excellent" results in RID and only 50% "good" to "excellent" results in those with facet arthroses. These results are preliminary in nature. The procedures described have not been subjected to the scrutiny of review nor scientific controls. These patients will be followed for the next six months, at which time outcome-based data can be reported. These preliminary findings are both enlightening and provocative. The DRS system is now being evaluated as a primary intervention early in the onset of low back pain–especially in workers' compensation injuries.

## *REFERENCES*

1. Acute low back problems in adults: assessment and treatment. US Department of Health and Human Services; 1994 Dec; Rockville, MD.

2. Snook, Stover. The costs of back pain in industry. occupational back pain, State-of-art review. Spine 1987; 2(No. 1): 1-4. 3. Gray FJ, Hoskins MJ. Radiological assessment of effect of body weight traction on lumbar disk spaces. Medical Journal of Australia 1963;2:953-954.

4. Andersson GB, Gunnar BJ, Schultz, AB, Nachemson AL. Intervertebral disc pressures during traction. Scandinavian Journal of Rehabilitation Medicine 1968; (9 Supplement): 8891.

5. Neuwirth E, Hilde W, Campbell R. Tables for vertebral elongation in the treatment of sciatica. Archives of Physical Medicine 1952; 33

(Aug):455-460.

6. Colachis SC Jr, Strohm BR. Effects of intermittent traction on separation of lumbar vertebrae. Archives of Physical Medicine & Rehabilitation 1969; 50 (May):251-258.

7. Gray FJ, Hosking HJ. A radiological assessment of the effect of body weight traction on the lumbar disc spaces. The Medical Journal of Australia 1963; (Dec 7):953-955.

8. Gupta RC, Ramarao MS. Epidurography in reduction of lumbar disc prolapse by traction. Archives of Physical Medicine & Rehabilitation 1978; 59 (Jul):322-327.

9. Cyriax J. The treatment of lumbar disc lesions. British Medical Journal 1950; (Dec 23):1434-1438.
10. Lawson GA. Godfrey CM. A report on studies of spinal traction. Medical Services Journal of Canada. 1958; 14 (Dec):762-77 1.
11. Cyriax JH. Discussions on the treatment of backache by traction. Proceedings of the Royal Society of Medicine 1955; 48:805-814.
12. Mathews JA. Dynamic discography: a study of lumbar traction. Annals of Physical Medicine 1968; IX (No.7):265279.
13. Managed Care Organization Newsletter (American Academy of Pain Management). July 1996.

**For more information, contact ADAGEN Medical International, Inc. directly.**

**EXHIBIT "E" FOLLOWS**



*A public company, trading symbol CLTT*

ANOUNCEMENT

This 23rd day of May, made at 4:45 P.M

This afternoon at a court hearing held in Tampa Florida at 4P,M. Cluster Technology Corporation and Universal Pain Technology Corporation our Attorney Melody Derington Genson of 3665 Bee Ridge Road, Suite 316 Sarasota, Florida 34233 telephone 941 927 6377 Fax 927 6477, requested and was granted by the Federal Court Judge a dismissal of the bankruptcy protection filed with the Court back in September 2000.

Eliminating the Court protection became important because all negotiations that needed to be worked out were concluded and completed as agreed. Coming off Chapter 11th regulations is good because Cluster UPT was restricted in their best marketing and business efforts by an uncooperative trustee of the Court.

Under the bankruptcy protection of the Court, the recovery efforts for lost assets and more particularly certain disappeared DRS machines worth an estimated value of 1'3 million dollars were simply much more cumbersome and costly to the Company, therefore the Company expects faster results now.

Cluster & UPT are now completing a formal commercial arrangement to warrant sharing of the new and more advanced technology in "decompression" developed by North American Medical Corporation over the past 18 months by NAM in Atlanta. At the pilot clinic, advanced medical billing techniques are in being tested by knowledgeable professional established by the prestigious Dunwoody Medical Center in Atlanta.

NAM has dedicated medical and business professionals working in the validation and establishment of patient collation data for purposes of future outcome studies that prove the medical beneficial differences existing in using "pure" decompression therapy with machines like: DRS, SPINA, or the original but now obsolete VAX D technology, versus, ordinary traction machines as well as "bogus" decompression ones.

The work being performed at the pilot operational clinic is the tarmac upon which North American Medical And Cluster Plan a roll out its new patent pending Spina Vision Video Fluoroscopy expected to be in the market for sale by March 2002. Attachment annexes will be available for the Spina Medic and DRS.

We are pleased to be able to make this announcement earlier than we had anticipated, and expect to come back very soon with significant greater development that we think you may agree will improve billing for decompression without the existing barriers and hurdles of the commencement period in decompression therapy market in the USA.

Thank you

Carlos Becerra.

Spokesperson for
Cluster UPT & PDS.

EXHIBIT "F" FOLLOWS

May 24th 2001
Alvin Mirman, Cluster Technology Corporation ( sent via fax)

Dear Alvin:
This is to once again reaffirm in written form the agreement we made yesterday about the majority block of stock to me if I would take care of paying Cluster's legal bills and save Cluster. Marc was not sure about the amount needed, neither was I.

The agreement is that you and the Board of Directors issue NAM a block of unrestricted shares of common stock in Cluster of 12 or 15 million shares, (Marc suggestion at my request for his opinion) to North American Medical. The block of shares must be over the amount of issued voting stock that you apparently totals 20'00 (million) shares.

Your request of this morning for you and Marc keeping 5' million shares is not agreed. You said you are not reneging on the deal made by you and Marc over the telephone yesterday afternoon, and that you will honor it and will execute all paperwork today.

I want to go on record to avoid any misunderstanding and as per our conversation of this morning where you confirmed drafting of all documents today and issue me the block of shares as a majority block of stock. I do not see why will it be difficult to justify what you are doing. The stockholders? Why? I have saved the company already more than once form liquidation. Yesterday I sold an asset at stupid price to meet the sudden pay demand from John Anthony.

You state that your keeping a block of shares will keep you helping, raising money from money markets and basically remain as my partners. I welcome your renewed interest from yesterday afternoon when things were looking so ugly. I like that thought Alvin.

Recapping our agreement that you said you will honor: NAM shall receive those shares of unrestricted common stock in Cluster in exchange for the rights to have and use the electronic components and new technology developed by NAM for the SPINA Medic Decompression machine. Made compatible by me to save DRS. Also, in exchange for use of the Tork Mattrixx decompression device without which Cluster could not exist or sell DRS. Both of these devices are property of NAM. I think you have good justification. The Henley decompression computer is not longer available after the total Chapter 7 business liquidation of Henley Health Systems last April 9th 2001.

I feel honored today that you & Marc want to remain partners with me. Thanks you I welcome your sentiments. As agreed at our last call 9:30 this morning, an extra stock block of shares for you and Marc will be issued later when I clean up Cluster. The amount is up for me to decide. The only problem I see left is that if there 20 million shares out, 12 million shares would be is less than 51%. How do you fix that?

Carlos Becerra, President & CEO

Cc: Attorney Melody Derington Genson And Attorney John Anthony




**EXHIBIT "G" FOLLOWS**

**Cluster Technology**
**1991 Main Street**
**Suite 1-115**
**Sarasota, FL 34236**

## Resolution of the Board of Directors

The proposed herein attached resolution as a method to salvage Cluster from total liquidation after Gibson dismantled the Cluster and UPT going and growing enterprise is voted on and adopted immediately approved and adopted as noted. The board herein rights perpetual rights to Carlos Becerra and to any designated company of his choice for contracting by way of an assignment of manufacturing permits at a reduced wholesale value to allow Cluster to sell as if it were a distributor purchasing as an OEM. Perpetual permission is herein granted to use any method or technique to lower costs without creating an liability potential for patent infringement against Cluster's intellectual rights held in said patent or patents.

For a $1,000.00 one time fee Cluster herein issues absolute rights to use as reference the DRS product developed by Carlos Becera during his employment at PDS Cluster Technology Corporation and for which Becera was not paid his salary and bonuses. The board also agrees to convey the existing rights held by the company in his 510 FDA authority and make those available to Carlos Becerra designated fabrication or MFG company to cover any product reasonably Described as a "derivative of the DRS", as per Carlos Becerra's stipulation.

Director of Cluster Technology, Inc

May 27 / 01

5/27/01

1

# EXHIBIT "H" FOLLOWS

## UNANIMOUS WRITTEN CONSENT
## OF THE
## BOARD OF DIRECTORS
## OF
## CLUSTER TECHNOLOGY CORP

The undersigned board of directors of Cluster Technology Corp herein agrees to issue as emergency measure and to keep the ability to sell product under its own name gives now Manufacturing rights herein issued to North American Medical Corporation by Cluster Technology Corporation board of directors as follows:

**Whereas, t**he board herein authorizes Nam North American Medical Corporation to use any designed part or component now existing from the original design and patent of the DRS machine to reproduce machines to labeled DRS or to make others similar in order to obtain lower costs of manufacturing for any machine like the DRS.

**Whereas**, Cluster herein gives to Nam in perpetuity authority and agrees never to sue Nam now or in the future for any perceived or real patent trespass because this it is known to be based in Nam trying to help and assist on a best effort only basis for Cluster to maintain its product viability in the market place considering its manufacturing capacity was dismantled by James Gibson its former President and director along with its appointed Secretary Diane Lavesque treasurer, resulting in this board being forced to stop operations at the Tampa factory place of Cluster & UPT now placed by the board in chapter 11 reorganization.

Whereas the board hopes but is uncertain to this board that Cluster may be salvaged and that it may eventually survive this last damaging turn of events from the inside of the company.

**Whereas,** the intent of the board is to keep manufacturing ability via this specific agreement, without transferring the patent. And, that it is not the intention of the board to by this eternal authority to prevent any other future manufacturing rights from Cluster, however understanding the certain new technology sues are simply licensed from Nam at this time and are not the property of Cluster.

**And**, that North American Medical Corporation owns improved designs that may have or not advanced the state of the art, but that such changes or advances are the property of Nam and Cluster agrees not to have said improvements reproduced with any third aparty without express authority of Nam.

Alvin Mirman

_____ May 28th 2001

Chairman of Cluster Technology Corporation and Universal Pain Technology Corporation

**EXHIBIT "I" FOLLOWS**

# FIRST LEVEL CAPITAL, INC.
## MERCHANT & INVESTMENT BANKING

June 15, 2001

To Whom it may Concern:

This bank has been involved in the efforts and recovery and salvage of Cluster Technology Corporation and Universal Pain Technology headed by Carlos Becerra since October 2000 when those companies were unexpectedly sent into bankruptcy by actions of its former management.

This financial institution has extended unsecured loans to Carlos Becerra for the salvage of the Company and anticipates the full recovery of these companies now taken out of chapter 11 by Carlos Becerra's actions.

Carlos Becerra controls North American Medical Corporation owners of the evolving technology of "decompression therapy" and recently a transaction has taken place where a substantial control block of stock is being issued to NAM North American Medical Corporation in exchange for this vital technology for use in the DRS equipment made by Cluster UPT.

It is anticipated at this time a merger of Cluster and NAM may be the end result of this association as NAM has become the actual manufacturer of the DRS product and this financial institution shall remain involved in assisting Carlos Becerra NAM and Cluster in what we anticipate will become a healthy successful enterprise.

Sincerely,

Alvin Mirman
Chief Executive Officer

---

1991 Main Street  Suite 1-115 • Sarasota, FL 34236 • 941·308·0123 • Fax: 941·308·0127

# EXHIBIT "J" FOLLOWS

CONSENT IN LIEU OF MEETING OF
THE BOARD OF DIRECTORS
CLUSTER TECHNOLOGY CORPORATION
June 15th 2001

**Whereas**, the undersigned persons are all directors of the above named corporation and hereinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**Whereas**, this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**Resolved** that by way of letter dated June 15th, 2001 from First Level Capital Inc. (copy attached) the Corporation has ceased to manufacture the DRS system and shall issue an exclusive manufacturing purchase contract to North American Medical to whom it warrants the manufacturing rights until a further Board resolution states otherwise.

**Effective** as of the day and year first written above, this 15th day of June 2001

Alvin Mirman
Chairman of the Board.

Minute N° 06/01

EXHIBIT "K" FOLLOWS

CONFIDENTIAL

July 20th 2001
To:
Alvin Mirman. Director
Dave Williams. ~~Director~~
From Carlos Becerra
Memorandum about the status of Cluster

I have selected the reputable firm of Arnall Golden Gregory to identify and correct the problems presently existing with Cluster as a public entity. They must get a handle on SEC matters. Cluster has not made periodic filings other than one Form 10Q filed in August 2000. They need to determine if an exemption from filing was available due to the bankruptcy filing. We must legally define if Cluster met the requirements for the exemption. If not, Cluster would have to file their periodic reports late.

I think Cluster has less than 500 stockholders. There is an SEC rule permitting de-registration under that have less than 500 and less than $10million on sales at the end of its last three years. If Cluster meets the asset test, we may want to de-register Cluster. Certainly, with the company having been left without assets other than the intangible one and still being under attack by the former employees, it makes sense to get capital or drop as many activities as we can until we recover some financially.
The certificate of Incorporation does provide for the issuance of up to 1 million shares of preferred stock. The issuance would have to be approved by the board.

The cost of these services will be in the area of $9,000.00 including a $5,000 retainer deposit required. I plan to spend this money as soon as I get more sales. The sales activity is slowly accumulating and could be accelerated, if we had some capitalization. Since Cluster has so many legal money demands, any earnings made in sale of machines is not accumulated. Each dime earned has various persons name of it. Then, outside of the left Over money borrowed from Dave, Marc Alvin and Ira, Cluster depends on a small float of just under $200,000 that Nam has to share with Cluster UPT.

In closing I want to mention I got a phone call from David Yaeger offering me his support and offering thanks for the effort we have made to save the company. He said he would like to see us recover some of the estimated 10 or more DRS machines we calculate were sold via the back door of Cluster with PTS Nick Exharos & Gibson.

Carlos Becerra for Cluster



EXHIBIT "L" FOLLOWS

**Board of Directors**
*April 4th, 2002*

## CONSENT IN LIEU OF A MEETING OF
## THE BOARD OF DIRECTORS
## CLUSTER TECHNOLOGY CORP.

**WHEREAS**, the undersigned persons are all of the directors of the above-named coporation , hereinafter referred to as the "Corporation", and

**WHEREAS**, this consent is being executed in accordance with the provisions of Section 141(f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of directors may be taken by written consent setting forth the actions taken and signed by all of the directors.

**THE UNDERSIGNED**, by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED**  that the 1,000,000 shares of Common Stock issued to Alvin Mirman on the 2001, be cancelled immediately, and be returned to Treasury.

**FURTHER RESOLVED** that upon receipt of these shares by the Corporation, that the Corporation issue to Alvin Mirman an Marc Seigel each the total of 500,000 shares of Common Stock of the Company in recognition of the direct time, effort and experience given to the Company over the past 18 months.

**FURTHER RESOLVED**, that the executive officers of the Corporation are authorized and directed to take all actions on behalf of the Corporation and prepare, sign, deliver and file any and all documents that may be required to effectuate the foregoing resolutions and the transactions contemplated thereby.

**EFFECTIVE** as of the day and year first above written.

Carlos Becerra                                                David Williams

# EXHIBIT "M" FOLLOWS

FROM : Panasonic FAX SYSTEM    PHONE NO.    11 Apr. 2002 10:13PM P4

**Board of Directors**
*April 4th, 2002*

### CONSENT IN LIEU OF A MEETING OF
### THE BOARD OF DIRECTORS
### CLUSTER TECHNOLOGY CORP.

**WHEREAS**, the undersigned persons are all of the directors of the above-named coporation , hereinafter referred to as the "Corporation", and

**WHEREAS**, this consent is being executed in accordance with the provisions of Section 141(f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of directors may be taken by written consent setting forth the actions taken and signed by all of the directors.

**THE UNDERSIGNED**, by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED** that the Directors of the Corporation in agreement with the Investment Bankers (v Finance) who are preparing the necessary documentation to raise the sum of $400,000 form a new wholly owned subsidiary Corporation to be named Cluster Products Inc., to promote and sell products other than the D.R.S System or it's derivatives

**FURTHER RESOLVED** that the whole net proceeds from the current raise as agreed with the Investment Bankers is to be loaned (interest free) from Cluster Technology to the newly formed subsidiary, specifically to assist in the manufacture and launch of Polar Powder and further future products..

**FURTHER RESOLVED**, that the executive officers of the Corporation are authorized and directed to take all actions on behalf of the Corporation and prepare, sign, deliver and file any and all documents that may be required to effectuate the foregoing resolutions and the transactions contemplated thereby.

**EFFECTIVE** as of the day and year first above written.

**Carlos Becerra**                              **David Williams**

**EXHIBIT "O" FOLLOWS**

FILE

December 30th, 2002

## CONSENT IN LIEU OF MEETING OF
## THE BOARD OF DIRECTORS
## CLUSTER TECHNOLOGY CORPORATION

**WHEREAS**, the undersigned persons are all directors of the above named corporation and hereinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**WHEREAS**, this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**THE UNDERSIGNED**, by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED**, that Cluster recognizes the that debt in excess of $600,000 owed to Quaker State Leasing Company by Cluster has been purchased by Grabaldi Holdings and that Cluster will pay back this Assignment of Judgement made with Grabaldi Holdings over the next 5 years with the maximum interest rate permitted.

**FURTHER RESOLVED**, that Grabaldi will support Cluster in its recovery to oppose any litigation for the benefit of its shareholders and creditors.

**FURTHER RESOLVED**, the Directors of the corporation are hereby elected and shall serve for a period of one year or until the next annual meeting of stockholder.

**EFFECTIVE** as of the day and year first above written.

Carlos Becerra
Director, President & C.E.O.

Dave Williams
Director & Acting Chairman

R.C. Sheppard
Director

Minute No. 09/02

December 30th, 2002

## CONSENT IN LIEU OF MEETING OF
## THE BOARD OF DIRECTORS
## CLUSTER TECHNOLOGY CORPORATION

**WHEREAS**, the undersigned persons are all directors of the above named corporation and herinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**WHEREAS**, this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**THE UNDERSIGNED**, by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED**, that Cluster recognizes the that debt in excess of $600,000 owed to Quaker State Leasing Company by Cluster has been purchased by Grabaldi Holdings and that Cluster will pay back this Assignment of Judgement made with Grabaldi Holdings over the next 5 years with the maximum interest rate permitted.

**FURTHER RESOLVED**, that Grabaldi will support Cluster in its recovery to oppose any litigation for the benefit of its shareholders and creditors.

**FURTHER RESOLVED**, the Directors of the corporation are hereby elected and shall serve for a period of one year or until the next annual meeting of stockholder.

**EFFECTIVE** as of the day and year first above written.


---
Carlos Becerra
Director, President & C.E.O

---
R.G. Sheppard
Director

---
Dave Williams
Director & Acting Chairman

Minute No. 9/02

(For Readability)

**EXHIBIT "P" FOLLOWS**

Board of Directors
January 6, 2003

CONSENT IN LIEU OF A MEETING OF
THE BOARD OF DIRECTORS
CLUSTER TECHNOLOGY CORP.

WHEREAS, the undersigned persons are the directors of the above-named corporation, hereinafter referred to as the "Corporation," and

WHEREAS, this consent is being executed in accordance with the provisions of Section 141(f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of directors may be taken by written consent setting forth the actions taken and signed by all of the directors,

THE UNDERSIGNED, by execution hereof, hereby consent to the actions set forth below.

RESOLVED to irrevocably transfer by assignment to NAM (North American Medical) from our wholly-owned subsidiary PDS, a division of Cluster, a document herein noted as K990811. This document is to certify that a cervical traction accessory for the DRS System is hereby irrevocably assigned to North American Medical Corporation to be used in the SPINA and Accu-SPINA system.

FURTHER RESOLVED, that the executive officers of the Corporation are authorized and directed to take all action reasonably required to effectuate the foregoing resolution.

EFFECTIVE as of the day and year first above written.

Carlos Becerra
Director

David Williams
Director

1/03

**EXHIBIT "Q" FOLLOWS**

IN THE CIRCUIT COURT FOR THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

CLUSTER TECHNOLOGY CORP. and
UNIVERSAL PAIN TECHNOLOGY, INC.,

               Plaintiffs,                          Case No. 01007821

vs.                                         Division: J

JAMES J. GIBSON, JR., AXIOM WORLDWIDE,
INC., a Florida corporation, NICHOLAS EXHAROS,
and PAIN TECHNOLOGY SALES, INC., a
Florida corporation,

               Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTIONS FOR DISMISSAL AND SANCTIONS

    This matter came on to be heard on June 5, 2003 on Defendants' Motion to Compel and Request for Sanctions, Defendants' Motion to Compel Reimbursement of Copy Costs and Telephone Charges, Defendants' Motion for Contempt, Sanctions and Dismissal, and Defendants' Third Motion to Compel and Request for Sanctions. The Court, having reviewed the pleadings, heard argument of counsel and being otherwise fully advised in the premises finds that:

    1.    The Verified Complaint was filed in this matter on September 12, 2001.

    2.    Trial was initially set by agreement of the parties, and has been reset on two occasions as a result of Plaintiffs' motions for continuances.

    3.    The Defendants have been forced to file eleven (11) motions to compel discovery in this matter, and each were granted by this Court.

    4.    On April 7, 2003 this Court found that Plaintiffs had demonstrated a willful and contumacious disregard for the Court's prior orders compelling discovery. The Court imposed sanctions of reasonable attorneys' fees and costs against the Plaintiffs, and again ordered that all responsive discovery be produced to the Defendants by a date certain. These sanctions were imposed because, among other things, Carlos Becerra, one of the principals for the Plaintiffs, testified in April 2003 directly contrary to a sworn interrogatory answer in March 2002 relating to the Plaintiffs' possession, custody, and control of documents responsive to Defendants' October 2001 discovery requests.

**EXHIBIT E**

5.     The Defendants have been attempting to ascertain the basis for Plaintiffs' claim for damages since October 23, 2001 when an interrogatory was propounded to Plaintiffs regarding Plaintiffs' allegations in the Verified Complaint as to damages. Plaintiffs' initially failed and refused to answer the interrogatories. After being ordered by this Court to serve an answer, the answer was insufficient and the Court entered at least two additional orders compelling answers to these interrogatories. The supplemental answers provided by Plaintiffs are evasive and fail to answer the basic question regarding Plaintiffs' claim for damages.

6.     Plaintiffs have failed to produce to Defendants computer disks containing the financial records for Plaintiffs despite being ordered by this Court on at least two separate occasions to do so.

7.     For approximately twenty (20) months, Plaintiffs have effectively thwarted any efforts by Defendants to discover the basis for Plaintiffs' damages claim, and the discovery deadlines and trial are only weeks away.

8.     Plaintiffs have asserted a misappropriation of trade secrets claim since the inception of this case yet failed and refused to identify the trade secrets allegedly misappropriated and failed and refused to produce documents related to the alleged trade secrets despite this Court's multiple orders to do so.

9.     Plaintiffs admittedly redacted documents produced to Defendants, but failed to produce any privilege logs. After this Court found a waiver of the claimed privileges, Plaintiffs failed and refused to produce unredacted copies of the responsive documents despite being ordered to do so.

10.    Despite the Court's several orders compelling the production of discovery and imposing lesser sanctions, the Plaintiffs again, willfully and callously, disregarded this Court's orders and the Florida Rules of Civil Procedure by, among other things which are clearly a part of the record:

      a.   failing to produce responsive documents which Plaintiffs testified to having in their possession;

      b.   failing to depose witnesses on agreed dates, which inability to previously depose witnesses was asserted as a basis for a second continuance;

      c.   taking steps to cause a nonparty witness not to appear at a duly subpoenaed and noticed deposition;

      d.   failing to file answers to expert interrogatories;

      e.   failing to supplement answers to interrogatories as ordered;

    f.   renewing objections to answering interrogatories which this Court previously expressly overruled;

    g.   failing to notarize sworn interrogatory answers;

    h.   failing to respond to Defendants' request for production of documents; and

    i.   failing to take any steps to move this matter towards resolution after receiving two (2) continuances and after being expressly instructed by this Court to do so.

11.    Lesser sanctions have proven to be ineffective with the Plaintiffs in the past, and would not deter the Plaintiffs' total disregard for the judicial process in the future.

12.    Plaintiffs have failed to take steps to move this case productively towards trial since the lawsuit was filed in September 2001. Moreover, there has been a deliberate attempt on the part of the Plaintiffs to absolutely inhibit and prohibit Defendants from conducting necessary discovery relative to their Counterclaims against Plaintiffs.

13.    Plaintiffs have used this lawsuit to attempt to gain a competitive edge in the marketplace by publishing select papers to Defendants' prospective customers, which sworn papers Plaintiffs later admitted contained inaccuracies.

14.    Defendants have been prejudiced by Plaintiffs' dilatory tactics and refusals to follow the simplest rules of civil procedure and mandates of this Court. At the time of the instant hearing, the pending trial was approximately four (4) weeks away, and Defendants had not received basic discovery necessary to prosecute their Counterclaims and to address Plaintiffs' affirmative defenses.

15.    On the morning of the hearing on Defendants' motions to compel, and Motion for Contempt, Sanctions and Dismissal, and with Defendants' Motion for Partial Summary Judgment as to Plaintiffs' claim for Misappropriation of Trade Secrets pending, the Plaintiffs voluntarily dismissed their claims which initiated this litigation on or about September 12, 2001.

16.    Plaintiffs' affirmative defenses to Defendants' Counterclaims are largely dependent upon Plaintiffs' allegations of Defendants' wrongdoings. The discovery Plaintiffs have refused to provide goes to the heart of Plaintiffs' claims and Defendants' ability to confront Plaintiffs' affirmative defenses. Plaintiffs' willful disregard for the Florida Rules of Civil Procedure and this Court's orders have prevented Defendants from obtaining this critical discovery despite the fact that this matter has been pending in this Court since September 2001 and trial, at the time of the hearing, was only four (4) weeks and three (3) days away.

17.    The Plaintiffs' have shown gross indifference to this Court's *repeated* orders, and the Court is unable to fashion a lesser sanction that would deter the Plaintiffs from further abuse of the judicial process.

18.     The Court finds that under the authority of <u>Mercer v. Raine,</u> 443 So.2d 944 (Fla. 1983), the repeated, deliberate and callous disregard for the Court's authority by the litigants themselves justifies application of the severest of sanctions.  <u>See also</u> <u>Mahmoud v. International Islamic Trading, Ltd.</u>, 572 So.2d 979 (Fla. 1st DCA 1990).  Accordingly it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel and Request for Sanctions, Defendants' Motion to Compel Reimbursement of Copy Costs and Telephone Charges, Defendants' Motion for Contempt, Sanctions and Dismissal, and Defendants' Third Motion to Compel and Request for Sanctions be **GRANTED; Plaintiffs' Answer to Defendants' Counterclaims and Affirmative Defenses are hereby stricken, and Defendants James J. Gibson, Jr. and Nicholas Exarhos are entitled to judgment as to liability on each of their respective Counterclaims against the Plaintiffs Cluster Technology Corp., and Universal Pain Technology;** the Court reserves jurisdiction to determine the amount of damages at jury trial scheduled for July 7, 2003; the parties are ordered to mediate prior to the July 7, 2003 trial; Defendants shall be entitled to reasonable attorneys' fees and costs associated with Defendants' motions to compel granted by the Court over the course of this litigation; and the Court reserves jurisdiction for any and all such further matters as justice so requires.

**DONE AND ORDERED** in chambers in Tampa, Hillsborough County, Florida this ___ day of June, 2003.

ORIGINAL SIGNED

JUN 1 9 2003

GREGORY P. HOLDER
CIRCUIT JUDGE

_____
Gregory Holder
Circuit Court Judge

Conformed copies to:
Craig Rothburd
L. Joseph Shaheen, Jr.

**EXHIBIT "R" FOLLOWS**

June 17, 2003

# CONSENT IN LIEU OF MEETING OF
# THE BOARD OF DIRECTORS
# CLUSTER TECHNOLOGY CORPORATION

**WHEREAS,** the undersigned persons are all directors of the above named corporation and hereinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**WHEREAS,** this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**THE UNDERSIGNED,** by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED,** that due to the lack of performance by Adagen Healthcare Products Inc. in the sale and distribution of Polar Powder, the agreement referred to in Minute No. 18/01 dated December 12th, 2001 be rescinded in its entirety immediately.

**FURTHER RESOLVED,** that further to the Corporation Agreement with Healthmark Corporation Inc. regarding the manufacture and distribution of Polar Powder (Minute No. 8/02 dated November 5th, 2002) and due to the continued financial indebtedness of the Corporation to Mr. Carlos Becerra, it is agreed and approved that all royalty payments referred to in Minute No. 8/02 dated November 5th, 2002 be paid directly to Mr. Becerra until such time as the whole balance of money due to Mr. Carlos Becerra from the Corporation has been fully discharged.

EFFECTIVE as of the day and year first above written.

Mr. Carlos Becerra
Director, President & C.E.O

Mr. Dave Williams
Director & Acting Chairman

Dr. R. G. Sheppard
Director & Secretary

Minute No. 7/03

June 17, 2003

# CONSENT IN LIEU OF MEETING OF
## THE BOARD OF DIRECTORS
## CLUSTER TECHNOLOGY CORPORATION

**WHEREAS**, the undersigned persons are all directors of the above named corporation and hereinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**WHEREAS**, this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**THE UNDERSIGNED**, by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED**, that due to the lack of performance by Adagen Healthcare Products Inc. in the sale and distribution of Polar Powder, the agreement referred to in Minute No. 18/01 dated December 12th, 2001 be rescinded in its entirety immediately.

**FURTHER RESOLVED**, that further to the Corporation Agreement with Healthmark Corporation Inc. regarding the manufacture and distribution of Polar Powder (Minute No. 8/02 dated November 5th, 2002) and due to the continued financial indebtedness of the Corporation to Mr. Carlos Becerra, it is agreed and approved that all royalty payments referred to in Minute No. 8/02 dated November 5th, 2002 be paid directly to Mr. Becerra until such time as the whole balance of money due to Mr. Carlos Becerra from the Corporation has been fully discharged.

**EFFECTIVE** as of the day and year first above written.

Mr. Carlos Becerra
Director, President & C.E.O

Mr. Dave Williams
Director & Acting Chairman

Dr. R. G. Sheppard
Director & Secretary

Minute No. 7/03

# EXHIBIT "S" FOLLOWS



**Arnall**
**Golden**
**Gregory** LLP

Direct phone: 404.873.8680
Direct fax: 404.873.8681
E-mail: stephen.dorvee@agg.com
www.agg.com

June 23, 2003

Mr. Carlos Becerra
Cluster Technology Corporation
3350 Riverwood Parkway
Suite 1900/19017
Atlanta, Georgia  30339

Re:    Cluster Technology Corp. and Universal Pain Technology  v.
James J. Gibson, et al.

Dear Carlos:

Enclosed are our bills dated May and June which are for the months of April and May, 2003.  Our records were unclear as to whether you ever received the May bill for April time.  If there was a foul-up, I apologize.  As you can see, during April, the total fees and expenses were $7,778.80 and there was a prior balance on this account of $322.86.   Therefore, the total owed as of the May 20th statement was $11,001.66.  The $10,000.00 that you sent us recently has been applied to this bill.

The June 20th, 2003 invoice covers the $1,001.66 remaining from the May plus current charges of $11,302.19 for a total of $12,303.85.  This is what was owed for time through the end of  May.  During April and May of 2003, Cluster has incurred approximately $18,000.00 in fees or $9,000.00 per month.

Obviously, with our representation of you in the case now pending in Florida, the "burn rate" for cash will increase.  I should have a bill for the first nine days of June available for you next week.   From that point on, we will be able to bill you weekly.

I am very cognizant of your desire to keep legal fees and expenses down. Therefore, we are doing what is necessary to prepare for your defense in Florida plus necessary to handle the other issues you have asked us to handle (i.e. draft a complaint to be filed in the federal court including the recently dismissed state court claims and researching the best way to move the patent out of Cluster and into Garibaldi or to some other entity).

**Arnall
Golden
Gregory LLP**

Mr. Carlos Becerra
June 23, 2003
Page 2

     With regard to preparing your defense, we are not spending a tremendous amount of time on this but are reviewing the pleadings in the case as well as the depositions.   Reviewing these pleadings and depositions has three purposes (a) it familiarizes us with specific facts in the case, including testimony, (b) we are learning the facts we are preparing cross-examinations to be used in the damages trial in Florida  (whether Craig or we handle this trial, these cross-examinations will be useful), and (c) we are incorporating these facts into the federal court complaint and will build the federal case based upon these facts.

     Please contact me if you have any questions on this matter.   Kindest regards.

Very truly yours,

ARNALL GOLDEN GREGORY LLP

Stephen M. Dorvee

SMD/bho
Enclosure
cc:    Ashley M. Steiner, Esq.

1628378v1

# EXHIBIT "T" FOLLOWS



**Arnall
Golden
Gregory** LLP

# Memorandum

TO:      Stephen M. Dorvee

FROM:    Edward A. Marshall

DATE:    June 20, 2003

RE:      Protecting Cluster Technology, Corp.'s Patent and Choses in Action from Levy;
         Transfer of Patent and Choses in Action to Garibaldi, L.L.C., Judgment Creditor

---

### Issues Presented

Given the pending counterclaims and impending judgment in the Florida action between Cluster Technology Corp. ("Cluster") and Axiom Worldwide, Inc. et al. ("Axiom"), whether Garibaldi, L.L.C. ("Garibaldi"), a Florida limited liability company and the assignee of a foreign judgment against Cluster, make take steps to ensure the receipt of assets in satisfaction of its judgment, including, *inter alia*, choses in action held by Cluster against Axiom, and a patent for a device being infringed by the latter. Specifically:

I.      Whether the patent and choses in action may be obtained by Garibaldi and/or Axiom through execution, or equitable proceedings ancillary thereto;

II.     Whether the patent and choses in action are amenable to assignment by Cluster to Garibaldi;

III.    Whether Cluster or the transferee may be subject to liability and/or having the transfer set aside on the basis of fraudulent conveyance; and

IV.     What process is most likely to ensure that the patent and choses in action are not obtained by Axiom, but are instead used to satisfy the prior judgment assigned to Garibaldi?

### Brief Answers

I.      Although patents and choses in action are not subject to execution at law, unless voluntarily relinquished by the debtor, various equitable proceedings and/or alternative writs are available to permit a judgment creditor to obtain such assets. It is unclear, however,

Memo to Stephen M. Dorvee
June 20, 2003
Page 2

whether the courts in Georgia or Florida would employ such alternative mechanisms to effectuate a transfer of a patent.

II.      Patents are subject to assignment, and federal courts in other jurisdictions have stated that such assignments may also confer claims for past acts of infringement. Moreover, with the exception of claims for personal torts, choses in action are amenable to assignment in both Florida and Georgia.

III.     In Georgia and Florida, courts have the authority to set aside transfers designed to thwart the collection of creditors, and to impose liability on parties for engaging in "fraudulent conveyances." Moreover, while the statutes are not entirely clear, it appears that even court-ordered assignments are not immune from being set aside as "fraudulent conveyances," although there is authority suggesting that a transfer of property to judgment creditor with lien priority may not be considered "fraudulent."

IV.     See *infra* Part IV. for a discussion of alternatives available to Cluster and Garibaldi.

**Discussion**

I.     **Acquisition of Patent and Choses in Action through Judgment Collection Mechanisms.**

As a general rule, absent voluntary relinquishment, choses in action and patents cannot be reached through execution "at law." See Ager v. Murray, 105 U.S. 126, 131 (1881) ("The debtor's interest in the patent-rights is property, assignable by him, and which cannot be taken on execution at law."); O.C.G.A. § 9-13-57 (2002) ("Choses in action are not liable to be seized and sold under execution, unless made so specially by statute."); Harris v. Smith, 7 So.2d 343, 346 (Fla. 1942) ("Choses in action are subject to execution only when made so by statute or are voluntarily given up to be sold on execution.") (emphasis omitted); see also John Gladstone Mills et al., PATENT LAW FUNDAMENTALS § 18:120 (2d ed. 2003) ("patent rights and contract rights have traditionally been unavailable to a judgment creditor upon simple execution unless a judgment debtor volunteers their availability"). Nevertheless, certain alternative mechanisms, usually proceedings in equity, have been held susceptible to compel the effective execution and sale of such assets.

Memo to Stephen M. Dorvee
June 20, 2003
Page 3

A.      **Choses in Action.**

As it relates to choses in action, generally, Florida permits a judgment creditor (e.g.,

Axiom) to reach such assets through "proceedings supplementary to execution"—the modern

and more efficient equivalent of a creditor's bill, which is brought in equity after an

unsuccessful attempt at execution upon the judgment debtor's property. See FLA. STAT. ANN. §

56.29 (West 2003) (authorizing equitable proceedings to reach judgment debtor's assets;

"[w]here any . . . entity holds an unsatisfied execution and has delivered a writ of execution to

any sheriff, the plaintiff in execution may file an affidavit so stating and that the execution is

valid and outstanding and thereupon is entitled to these proceedings supplementary to

execution"); Craft v. Craft, 757 So.2d 571, 572 (Fla. Dist. Ct. App. 2000) ("Ordinarily, a

judgment debtor's choses in action may be reached by supplementary proceedings. Narrow

exceptions to the broad requirements of this statute and its predecessors were initially drawn in

the area of suits for so-called 'personal torts,' i.e., those for personal injuries such as suits for

assault and battery, slander and similar cases.").

In Georgia, the absence of a "proceeding supplementary" procedure[1] makes the

acquisition of choses in action by a judgment creditor (e.g., Garibaldi) more complex. Prior

decisions by the Georgia courts, while acknowledging the statutory prohibition against

execution upon choses in action, have identified garnishment as the proper remedy for a

judgment creditor to acquire debts owed the judgment debtor. See Kilgore v. Buice, 192

S.E.2d 256, 258 (Ga. 1972) ("a chose in action is a right to recover a debt through an action in

court . . . and the proper way to get at a chose in action is by garnishment"); see also Rose

Marine, Inc. v. Dixie Power Sys., 203 B.R. 511, 514 (S.D. Ga. 1996) (holding that claim was

chose in action, and that judgment creditor, by not filing summons of garnishment, remained

---

[1]      The only discussion of "proceedings supplemental" by the Georgia courts deals with post-judgment
discovery in aid of execution, O.C.G.A. § 9-11-69 (2002). See also Ponderosa Granite Co. v. First Nat'l Bank,
Elberton, 325 S.E.2d 591, 594-95 (1984) (holding that the post-judgment discovery statute does not authorize trial
court to order transfer of property to lien holder).

Memo to Stephen M. Dorvee
June 20, 2003
Page 4


unsecured and could not reach the judgment proceeds). This method of judgment collection,
however, is not available to garnish assets in the hands of a tort defendant, such as Axiom,[2]
until a final judgment is rendered in the underlying litigation. See Metropolitan Prop. & Cas.
Ins. Co. v. Crump, 513 S.E.2d 33, 35 (Ga. Ct. App. 1999) (stating that "[t]he defendant in an
action for a tort is not subject to garnishment [until] final judgment is recovered.") (quoting
Brenau College v. Mincey, 61 S.E.2d 301 (Ga. Ct. App. 1950)); but see Jefferson Ins. Co. of
N.Y. v. Dunn, 482 S.E.2d 383 (Ga. Ct. App. 1997) (implying that judgment creditor could have
acquired judgment debtor's bad faith suit against insurance company through garnishment),
rev'd on other grounds in 496 S.E.2d 696 (Ga. 1998). Assuming that garnishment is
unavailable to acquire any rights of action Cluster may have against Axiom in the instant case,
the relevant choses in action may be subject to acquisition through a creditor's petition—the
precursor to the equitable "proceedings supplemental" procedure discussed supra. See
O.C.G.A. § 23-2-95 (2002) ("Creditors' petitions may be filed at the instance of any creditor,
the privilege being extended to all to appear and become parties within a reasonable time.");
Prodigy Centers/Atlanta v. T-C Assocs., 501 S.E.2d 209, 523 & n.3 (Ga. 1998) ("In order to
reach the property of the debtor in . . . choses in action, some . . . proceeding [other than
execution] is necessary to fix the lien of such judgments. It must be reached either by process
of garnishment or by some collateral proceeding instituted for the purpose of impounding it so
that it can be applied in satisfaction of the judgment.") (emphasis added; brackets omitted)
(quoting Fidelity & Deposit Co. of Maryland v. Exchange Bank of Macon, 28 S.E. 393 (1897));
see also McGough & Crews v. The Ins. Bank of Columbus, 1847 WL 1252, at *3 (Ga. 1847)
(holding that judgment creditor cannot utilize creditor's petition—which is equitable in nature—
unless garnishment, a remedy at law, would not furnish relief).

---

[2]    Conferencing with the members of the firm's Intellectual Property group revealed that patent infringement
actions—like the majority of the other claims previously asserted by Cluster in the Florida action—are considered to
sound in tort.


1628525v1

Memo to Stephen M. Dorvee
June 20, 2003
Page 5

### B.    Patent.

There is surprisingly little guidance regarding the amenability of a patent to judicially compelled acquisition by a judgment creditor. See Cherie L. Lieurance, *Judgment Creditors' Access to Intellectual Property Rights—Is Simple Execution in Sight?*, 7 WHITTIER L.R. 375, 375 (1985). Nevertheless, it appears that equitable and/or alternative remedies may similarly permit Garibaldi to reach the patent and achieve a result analogous to execution, despite the Supreme Court's previous declaration that a patent could not be subjected to execution at law. Id. As an initial matter, the Supreme Court in Ager v. Murray held that a patent, irrespective of its immunity from legal execution, could be reached by a judgment creditor through a creditor's bill. 105 U.S. 126, 132 (1881). It reasoned that a valid, written instrument of transfer could be ordered by a court sitting in equity, thereby satisfying the assignment mandates of the Patent Act, and therefore could cure the defects inherent in simple execution. Id. The Ager decision has since been extended in isolated opinions by the lower courts, which have held that an order by a court in "proceedings supplementary"—the modern equivalent of a creditor's bill—or a writ of *fi. fa.* may be employed to accomplish the same result. See Coldren v. American Milling Research & Dev. Inst., Inc., 378 N.E.2d 870, 872 (Ind. Ct. App. 1978) ("In summary then, while patent and contract rights have traditionally been unavailable to a judgment creditor upon simple execution unless the judgment debtor volunteers their availability, they are available to satisfy the judgment through proceedings supplementary to execution."); McClaskey v. Harbison-Walker Refractories Co., 138 F.2d 493, 499-500 (3rd Cir. 1943) (holding that patent may be transferred through court-ordered writ of *fi. fa.* obtained by judgment creditor).

Given this extension of the Ager holding, it would appear that Cluster's patent may be reached by a judgment creditor in either Georgia or Florida. In Georgia, such a creditor, after showing that execution at law was unsuccessful to satisfy its judgment, might proceed through a creditor's bill to reach the patent. See O.C.G.A. § 23-2-95 (2002); Ager, 105 U.S. at 132. In Florida, upon making a similar showing, a judgment creditor might be able to effectively seize

Memo to Stephen M. Dorvee
June 20, 2003
Page 6


and execute upon the patent through proceedings supplementary. <u>See</u> FLA. STAT. ANN. § 56.29
(West 2003); <u>Coldren</u>, 378 N.E.2d at 872.  At the same time, however, the aforementioned
equitable proceedings have never been employed in either state to reach a judgment debtor's
patent, and, consequently, it is difficult to state with certainty whether the Georgia or Florida
courts would be willing to apply the equitable remedies in this fashion.  <u>C.f.</u> <u>McClaskey</u>, 138
F.2d at 495-499 (analyzing Pennsylvania law to determine whether courts of that State would
permit obtainment of a patent through writ of *fi. fa.*).

It should be noted that, in any event, the ability of a judgment creditor to reach a chose
in action or a patent does not ensure that the creditor will be able to retain the assets following
the proceeding.  The equitable remedies discussed *supra*, while requiring a showing that
execution at law was or would be unsuccessful to reach the targeted property, appear to have
essentially the same effect as levy and execution—the property becomes subject to a public
sale, with the judgment creditor retaining only the proceeds of the sale, unless it is also the
highest bidder.[3] <u>See</u> O.C.G.A. § 9-13-160; FLA. STAT. ANN. § 45.031; <u>see also</u> Lieurance,
*supra*, at 376 (stating that the "alternative methods [for a judgment creditor to acquire a patent]
. . . have the same result as a simple execution.").

**II.      Amenability of Patent and Choses in Action to Assignment.**

As an alternative to judicially compelled transfer, a patent or chose in action may also
be assigned by a patentee or (potential) plaintiff.  The Patent Act clearly permits assignment of
patents to someone other than the inventor, and, while recognizing that state law may have
bearing on the effectiveness on the transfer, the federal courts have also stated that a patentee
may transfer actions for preexisting acts of infringement along with the patent so long as that
intent is clearly manifested.  <u>See, e.g.</u>, <u>Procter & Gamble Co. v. Paragon Trade Brands, Inc.</u>,
917 F. Supp. 305, 309 (D. Del. 1995) ("The general rule is that a party seeking money damages

---

[3]      My research did not uncover any Georgia or Florida authorities directly addressing the ability of a
judgment creditor to be the purchaser of the assets at a judicial sale.  General treatises, however, indicate that such a
result is permissible.  <u>See</u> 33 C.J.S. *Execution* § 222 (1998).  Guidance of local counsel may also be beneficial in
determining the contours of permissible execution under Florida law.

Memo to Stephen M. Dorvee
June 20, 2003
Page 7


for patent infringement must have held legal title to the patent during the time of the
infringement. [Cit.]  When, however, an assignment of a patent is coupled with an assignment
of a right of action for past infringements, then the assignee may bring a claim against past
infringers [so long as such an intention is clear and the transfer occurred prior to the initiation
of the action in the name of the assignee]."); Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d
1574, 1579 (Fed. Cir. 1991) (stating that assignment of patent may be in conjunction with
assignment of claims for prior infringement, although "the latter assignment must be express,
and can not be inferred from an assignment of the patent itself."). If such a transfer occurs prior
to the initiation of suit, and the assignment is of all rights in the patent, then the assignee may
bring the suit in its name alone as the FED. R. CIV. P. 17 real party in interest. See 4 JAMES WM.
MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 17.11[4] (3d ed. 2003). If, on the other hand, the
transfer occurs after the suit for infringement has begun, any substitution of the assignee as the
real party in interest lies with the discretion of the court, although if permitted, venue and
jurisdiction are not affected. See 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 25.30
through 25.36 (3d ed. 2003).

     Similarly, both Georgia and Florida permit assignment of choses in action. See
O.C.G.A. §§ 44-12-22 & 44-12-24; Jet Air, Inc. v. Nat'l Union Fire Ins. Co., 375 S.E.2d 873,
876 (Ga. Ct. App. 1989); Ginsberg v. Lennar Fla. Holdings, Inc., 645 So.2d 490, 496 (Fla. Dist.
Ct. App. 1994) ("Initially, we note that assignability of a cause of action is the rule rather than
the exception.") (quoting Selfridge v. Allstate Ins., 219 So.2d 127, 128 (Fla. 1969)). Indeed, the
only express prohibition against such assignment under either states' law is for actions based
upon personal injury, such as claims for slander, battery, or, at least in Georgia, for fraud. See
O.C.G.A. § 44-12-24; Ginsberg, 645 So.2d at 496. Consequently, it appears that all the
subject interests and choses in action may be transferred to Garibaldi in exchange for, inter
alia, a release of its judgment against Cluster, and that the former may pursue any such actions
and/or interests ancillary to the assets received in federal court, assuming jurisdictional
prerequisites are satisfied.

Memo to Stephen M. Dorvee
June 20, 2003
Page 8

### III.    Fraudulent Conveyance and Creditor's Remedies.

Assuming that the transfer of Cluster's patent and choses in action to Garibaldi would leave the company without sufficient assets to satisfy any judgment entered in favor of Axiom, it is possible that the conveyance could be deemed fraudulent, and thus, that a court would set aside the transfer and/or impose liability upon either Cluster or the transferee. The analysis of the issue is somewhat complex, however, given the multiple sources of law proscribing such transfers in both Florida and Georgia.[4]  An overview of potentially applicable statutory provisions is set forth below:

In Florida, a unique potential basis for setting aside a fraudulent transfer is the "proceedings supplementary" statute, discussed *supra*.  According to subsection (6) of that statute:

> (a) When, within 1 year before the service of process on him or her, defendant has had title to, or paid the purchase price of, any personal property to which the defendant's spouse, any relative, or any person on confidential terms with defendant claims title and right of possession at the time of examination, the defendant has the burden of proof to establish that such transfer or gift from him or her was not made to delay, hinder, or defraud creditors.
>
> (b) When any gift, transfer, assignment or other conveyance of personal property has been made or contrived by defendant to delay, hinder or defraud creditors, the court shall order the gift, transfer, assignment or other conveyance to be void and direct the sheriff to take the property to satisfy the execution.  This does not authorize seizure of property exempted from levy and sale under execution or property which has passed to a bona fide purchaser for value and without notice.  Any person aggrieved by the levy may proceed under §§ 56.12-56.20.

FLA. STAT. ANN. § 56.29(6).  Despite the historical prohibition on the seizure of patents and choses in action through execution, it is unlikely that the limitation found in subsection (b), i.e., that a court is not authorized to "seiz[e] property exempted from levy and sale under execution[,]" would divest a court of the ability to set aside the proposed transfer in the instant

---

[4]    The discussion here centers around state-law prohibitions against fraudulent transfers, and does not include an analysis of prohibitions imposed by federal bankruptcy law.

Memo to Stephen M. Dorvee
June 20, 2003
Page 9

case if it were found to be fraudulent.  Indeed, the Florida courts have interpreted the general

grant of authority under the statute—that "[t]he judge may order any property of the judgment

debtor, *not exempt from execution*, in the hands of any person or due to the judgment debtor

to be applied toward the satisfaction of the judgment"—as permitting the court-ordered transfer

and sale of choses in action.  See Craft, 757 So.2d at 572; Puzzo v. Ray, 386 So.2d 49, 51 (Fla.

Dist. Ct. App. 1980).

In Georgia, there are two unique statutes that may serve as the basis for setting aside a

fraudulent transfer by a corporation, although neither has been frequently invoked.  First, under

O.C.G.A. § 18-2-21, "[c]reditors may attack as fraudulent a judgment, conveyance, or any

other arrangement interfering with their rights, either at law or in equity."  This statute,

however, appears to merely serve as an introduction to Georgia's more intricate fraudulent

conveyance statute,[5] and has rarely served as an independent grounds for awarding relief to a

judgment creditor.  Second, O.C.G.A. § 18-2-41 provides that "[a]ny corporation . . . may

make an assignment for the benefit of creditors; but no such corporation shall be allowed in

such assignment to prefer any creditor or class of creditors, except creditors who have debts

entitled to priority by law."  Although infrequently serving as an independent grounds for relief,

the statute has been used to impose liability on a corporation's sole director who seized all of

the corporation's assets to repay a corporate debt owed to himself, while leaving the

corporation with no assets to repay its other, similarly unsecured creditors.  See Fountain v.

Burke, 287 S.E.2d 39, 41 (Ga. Ct. App. 1981).

Finally, both Florida and Georgia have adopted the Uniform Fraudulent Transfer Act

(the "Act"), which appears to be the primary vehicle[6] employed by judgment creditors to attack

---

[5]    Prior to enacting the Uniform Fraudulent Transfer Act in 2002, this statute was the introduction to a three section chapter relating to fraudulent conveyance.  The remaining provisions of the chapter were repealed upon adoption of the Uniform Act, discussed *infra*.

[6]    Florida adopted the Act in 1987, while Georgia adopted it in 2002.  Consequently, the majority of the case law discussed *infra* comes from the Florida courts; the overwhelming majority of Georgia's fraudulent conveyance precedent discusses the application of now repealed sections of the Code.

1628525v1

Memo to Stephen M. Dorvee
June 20, 2003
Page 10

allegedly fraudulent conveyances. See O.C.G.A. §§ 18-2-70 to 18-2-79; FLA. STAT. ANN. §§

726.101 to 726.112. Pursuant to the Act, a transfer is fraudulent, both as to present and future

creditors, if it was made:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

> (b) Without receiving a reasonably equivalent value in exchange for the transfer
> or obligation, and the debtor[, inter alia,] . . . [i]ntended to incur, or believed or
> reasonably should have believed that he or she would incur, debts beyond his
> or her ability to pay as they became due.

O.C.G.A. § 18-2-74; FLA. STAT. ANN. § 726.105(1). The inquiry into whether a transfer was

made with fraudulent intent remains amorphous, with potentially relevant factors including,

inter alia:[7] (1) that "[t]he transfer or obligation was to an insider[,]" defined to include, in the

context of corporations, "[a] relative of a general partner, director, officer, or person in control

of the [corporation]"; (2) that "[t]he transfer or obligation was disclosed or concealed"; (3) that

"[b]efore the transfer was made or obligation was incurred, the debtor had been sued or

threatened with suit"; (4) that "[t]he transfer was of substantially all of the debtor's assets"; (5)

that "[t]he value of the consideration received by the debtor was reasonably equivalent to the

value of the asset transferred or the amount of the obligation incurred"; (6) that "[t]he debtor

was insolvent or became insolvent shortly after the transfer was made or the obligation was

incurred"; (7) that "[t]he transfer occurred shortly before or shortly after a substantial debt was

incurred"; and (8) that "[t]he debtor transferred the essential assets of the business to a lienor

who transferred the assets to an insider of the debtor." O.C.G.A. §§ 18-2-71(7)(B)(vi) & 18-2-

74(b); FLA. STAT. ANN. §§ 726.102(7)(b)(6) & 726.105(2).

Given the broad range of considerations pertinent to the evaluation of fraudulent intent,

it is likely that any conveyance which leaves a creditor without adequate recourse could be

---

[7]    FLA. STAT. ANN. § 726.105(2) contains a list of eleven non-exclusive factors that may be considered by a
court in making the "intent" determination.

Memo to Stephen M. Dorvee
June 20, 2003
Page 11

subject to a viable attack[8] under the Act.  Moreover, the definition of "transfer" under the Act is conspicuously broad, and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.C.G.A. § 18-2-71(12); FLA. STAT. ANN. § 726.102(12).  Consequently, it is unlikely that a transfer effectuated through judicial process, such as through execution or similar devices, without more, would shield a contemplated transfer from being deemed fraudulent, and thus, being set aside or serving as the basis for liability.  See O.C.G.A. § 18-2-77; FLA. STAT. ANN. § 726.108 (enumerating remedies of aggrieved creditors).  Also significant is that an action under the aforementioned provisions of the Act may be brought up to four years after the allegedly fraudulent conveyance.  See O.C.G.A. § 18-2-79; FLA. STAT. ANN. § 726.110.

Although the breadth of the Act makes it virtually impossible to shield any transfer from being set aside pursuant to its provisions (or unique sections of either states' Code), there appear to be two methods by which a judgment debtor could transfer assets to a preexisting judgment creditor while greatly reducing the probability that its transfer would be subsequently voided by the courts.  First, and perhaps most obvious, the judgment creditor could, in addition to releasing the judgment debtor from the judgment, pay additional consideration to compensate for any disparity between the value of the assets received and the value of the prior judgment.  As an initial matter, payment of reasonable consideration is a factor (although not a conclusive factor) in determining whether the judgment debtor acted with fraudulent intent.  See O.C.G.A. § 18-2-74(b)(8); FLA. STAT. ANN. § 726.105(2)(h); Jacksonville Bulls Football, Ltd. v. Blatt, 535 So.2d 626, 628 (Fla. Dist. Ct. App. 1988) ("[I]f a judgment debtor disposes of assets for adequate cash, the transaction will not be considered fraudulent in the

---

[8]    Although FLA. STAT. ANN. § 726.109 provides certain "defenses" to liability, few would seem to have any application in the instant case, and the few that may be beneficial turn on the amorphous inquiry of the transferee's "good faith."

Memo to Stephen M. Dorvee
June 20, 2003
Page 12

absence of a showing that the debtor intended to give the funds received to other than existing creditors.  Otherwise stated, it is *not* fraudulent to give the funds to some but not all existing creditors, even though the effect might be to injure or prejudice an existing creditor who has not chosen to receive the debtor's largesse.  These so-called preferential transfers are not deemed fraudulent even though their natural effect is to hinder or delay the non-preferred creditors.  [Cits.]  A creditor may properly accept a preference even if the creditor knows that the debtor is making a 'calculatedly preferential transfer' for the purpose of disfavoring other creditors.") (emphasis in original; interpreting Florida's proceedings supplementary statute).  More importantly, however, if the amount of monetary consideration received by the debtor was sufficient to satisfy the subsequent creditor's judgment, the subsequent creditor would not have occasion to argue that the transfer in fact deprived it of the relief ordered by the court.

Second, the prior judgment creditor could take steps to ensure that its judgment had priority over the subsequent judgment creditor's judgment.  Initially, the Florida courts have held that, at least with respect to the fraudulent conveyance provisions of the proceedings supplementary statute, relying on the priority of one's judgment over subsequent creditors does not constitute fraud.  See Blatt, 535 So.2d at 630 (holding that judgment debtor did not engage in wrongful conduct by satisfying domestic consent judgment which took priority over domesticated foreign judgment due to domestic judgment creditor's prompt filing of writ of execution during 30-day "waiting period" applicable to the foreign judgment).  Moreover, having judgment priority would appear to avoid violating the provisions of Georgia's corporate preference Code Section, which provides that "no . . . corporation shall be allowed in . . . assignment to prefer any creditor or class of creditors, *except creditors who have debts entitled to priority by law*.")  O.C.G.A. § 18-2-41 (emphasis added).

Finally, it is at least arguable that satisfying a judgment with priority cannot be the subject of an attack under the Uniform Fraudulent Transfer Act despite the Act's otherwise expansive scope.  According to the Act, only the fraudulent transfer of an "asset" may subject the transfer to being set aside.  See O.C.G.A. § 18-2-71(12); FLA. STAT. ANN. § 726.102(12)

Memo to Stephen M. Dorvee
June 20, 2003
Page 13

(defining transfer as a mode of disposing of or parting with an "asset or an interest in an asset").
An "asset," in turn, is defined *not* to include "property to the extent it is encumbered by a valid
lien[,]" whereas a "valid lien" is defined as "a lien that is effective against the holder of a
judicial lien subsequently obtained by legal or equitable process or proceedings." O.C.G.A. §
18-2-71(2) & (13); FLA. STAT. ANN. § 726.102(2) & (13). To the extent "valid lien" can be
interpreted to include a judgment lien with priority over subsequent judgments, establishing
the priority of the prior judgment creditor over the subsequent judgment creditor may shield
the transfer from being set aside.

In Georgia, priority of judgments is determined by seniority, although judgments
entered in the same term of court are considered to be of equal preference. O.C.G.A. §§ 9-21-
87 & 44-14-323. With respect to domesticated judgments, however, the date of domestication
controls—not the date the judgment was originally entered in the foreign jurisdiction.
NationsBank, N.A. v. Gibbons, 487 S.E.2d 417, 419 (Ga. Ct. App. 1997). Moreover, to
achieve priority, the judgment, once domesticated, should be entered in the General Execution
Docket.

Florida's priority rules are somewhat more complex. As a general rule, priority is
established not when the judgment is entered, but when the writ of execution is delivered to
the sheriff in the county where the property is located. Blatt, 535 So.2d 626, 630-31. When a
foreign, domesticated judgment is at issue, no such writ may be issued during a thirty-day
waiting period following the mailing of the clerk's notice of domestication. See id.; FLA. STAT.
ANN. §§ 55.505 to 55.509. However, in instances where the judgment debtor's assets are not
reachable at law—i.e., can only be reached through equitable proceedings, such as
proceedings supplementary—then the first judgment creditor to initiate the equitable
proceedings and bring the assets into equity takes priority. See Salina Manuf. Co. v. Diner's
Club, 382 So.2d 1309, 1311 (Fla. Dist. Ct. App. 1980); see also Lamchick Glucksman &
Johnston, P.A. v. City Nat'l Bank of Florida, 659 So.2d 1118, (Fla. Dist. Ct. App. 1995) ("In the
context of personal property, . . . the efforts of the party responsible for making such assets

Memo to Stephen M. Dorvee
June 20, 2003
Page 14

available should be rewarded, and . . . it would be inequitable to permit others to reap the benefits of the diligent creditor's labors.").

## IV.   Alternative Courses of Action.

Given the dearth of authority regarding the transfer of patents and choses in action to a creditor in satisfaction of a judgment, it is difficult to identify and evaluate the various alternatives available to the parties under these circumstances. Nevertheless, the alternatives of assignment and judicial process, as well as certain derivations thereof, are discussed *infra*.

### A.   Assignment.

The parties' first available course of action is assignment. As discussed previously, both choses in action (other than personal torts) and patents are subject to being assigned in the relevant jurisdictions, and the process of assignment has the advantage of being less burdensome and time-consuming than employing judicial process. Conversely, an outright assignment would likely be subject to much closer scrutiny by the courts in a fraudulent conveyance or equitable proceeding, and a valuation of the patent and choses in action prior to an exchange is essential if the conveyance is to survive judicial review.

Assuming, however, that the value of the patent (including licensing fees) and the choses in action (taking into account probability of success and transaction costs, such as attorneys' fees) exceeded the value of the existing judgment, and that Garibaldi has the funds necessary to cover the disparity between the judgment and the assets' worth, it would also be possible to transfer the patent and claims in exchange for a release and cash. If the cash given was sufficient to cover any judgment obtained by Axiom against Cluster, or at least likely to be accepted by Axiom in pre- or post-judgment settlement of the claims, then the transfer may avoid judicial scrutiny, as Axiom would not have been prejudiced thereby.

### B.   Proceeding in Execution and Equity.

Second, Garibaldi may wish to proceed through judicial process to obtain the patent and choses in action. While a more expensive alternative, and one that would likely result in the public sale of the assets, such a process may weigh against a finding of fraudulent

Memo to Stephen M. Dorvee
June 20, 2003
Page 15

conveyance, and, if priority over subsequent judgment creditors is obtained, then the transfer
may arguably be immune from judicial invalidation. As related *supra*, such priority may be
achieved (1) under Georgia law, by domesticating the judgment and properly recording it in
the appropriate index, and (2) under Florida law,[9] by domesticating the judgment and, upon
expiration of the thirty-day waiting period, delivering the writ of execution to the appropriate
sheriff, as well as initiating any necessary[10] equitable proceeding. Although prescribed forms
of notice would have to then be given to the public, Garibaldi could purchase the assets if it is
the highest bidder at the execution sale.

### C. Combination of Execution and Assignment.

A third alternative may be available to achieve the protections of judicial process as
well as the certainty of Garibaldi being the ultimate recipient of the relevant assets. It should
be noted at the outset, however, that this alternative is untested, and that it goes beyond the
scope of what the courts have previously found to be a legitimate invocation of judgment
creditor priority.

Garibaldi, after domesticating the foreign judgment in the relevant jurisdictions,[11] could
seek the appropriate writs of execution from the courts. If they are returned *nulla bona* (i.e.,
unsatisfied), Garibaldi could then initiate a proceeding supplementary in Florida. Shortly
thereafter, Cluster could voluntarily agree to transfer the patent and choses in action to
Garibaldi in exchange for releasing the judgment in Florida and Georgia, and dismissing the
supplementary proceeding. Arguably, this transfer, while ensuring that Garibaldi is the
ultimate recipient of the assets, would also make Garibaldi the superior judgment creditor in

---

[9] It is unclear whether Garibaldi would be required or permitted to collect on the judgment domesticated in Florida, given Cluster's status as a Delaware corporation with its principal place of business in Georgia. Advice of local counsel regarding Florida rules pertinent to execution may be useful in determining the appropriateness of pursing such an action in that State.

[10] Although I was unable to locate a case directly on point, numerous courts and commentators noted in *dicta* that execution at law may be effective at obtaining a patent or chose in action when the judgment debtor *voluntarily* relinquishes it for execution and sale. It is unclear whether this method of transfer would be any less protected from judicial scrutiny that levying upon the assets through the appropriate equitable proceeding.

Memo to Stephen M. Dorvee
June 20, 2003
Page 16

both states—it would have priority in Georgia by virtue of its prior domestication of the foreign judgment, and in Florida, would have been the first judgment creditor to obtain a writ of execution and (if necessary) to initiate a supplementary proceeding.  The assets would then have been subject to a "valid lien" with priority over subsequent creditors at the time of the transfer, and, arguably, not susceptible to being deemed a fraudulent conveyance under the Uniform Fraudulent Transfer Act.  A prior valuation of the assets, however, may still be beneficial in ensuring that the assignment is not ultimately set aside.

---

[11]    See *supra* note 9.

**EXHIBIT "U" FOLLOWS**

Board of Directors
July 30th 2003

CONSENT IN LIEU OF A MEETING
OF
THE BOARD OF DIRECTORS
CLUSTER TECHNOLOGY CORPORATION

WHEREAS, the undersigned persons are the directors of the above-named corporation, hereinafter referred to as the "Corporation", and

WHEREAS, this consent is being executed in accordance with the provisions of Section 141(f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of directors may be taken by written consent setting for the actions taken and signed by all of the directors,

THE UNDERSIGNED, by execution hereof, hereby consent to the actions set forth below.

RESOLVED to issue irrevocable license to North American Medical Corporation for any or all patent technology rights as evidenced by patent number 6,152,950 "Apparatus For Therapeutic Treatment of Low Back Pain" as awarded to Cluster Technology Corp., November 28, 2000. This resolution is in keeping with the full manufacturing rights originally issued November 23, 2000 and specifically clarifies said rights as non-model specific.

FURTHER RESOLVED, that the executive officers of the Corporation are authorized and directed to take all action reasonably required to effectuate the foregoing resolution.

EFFECTIVE as of the day and year first above written.

David Williams
Director

Carlos Becerra
Director

Minute No. 6/03

**EXHIBIT "V" FOLLOWS**

**November 18, 2003**

### CONSENT IN LIEU OF MEETING OF
### THE BOARD OF DIRECTORS
### CLUSTER TECHNOLOGY CORPORATION

**WHEREAS,** the undersigned persons are all Directors of the above named Corporation and hereinafter referred to as the "Corporation" and hereby consent to the actions set forth below, and;

**WHEREAS,** this consent is being executed in accordance with the provisions of Section 141 (f) of the General Corporation Law of Delaware, which provides that any action which may be taken at a meeting of Directors may be taken by written consent setting forth the actions taken and signed by all the Directors.

**THE UNDERSIGNED,** by the execution hereof, hereby consent to the actions set forth below.

**RESOLVED,** that in order to satisfy the terms and conditions of the Security Agreement the Corporation entered into with Mr. Carlos Becerra dated 1st September, 2003 (minute No. 8/03) and in recognition of the fact that loans were primarily made to pay legal bills incurred by the Corporation and purchase equipment, material lease(s) on premises, and labor charges associated with the reintroduction of the manufacture of making of Polar Powder, the Corporation passes over all title and ownership of all Polar Powder product (finished or otherwise) equipment, machinery, lease(s) to Mr. Becerra or his assignee.

The value of these items are as per the attached list and in the sum of $263,988.33. Consequently by his signature below, Mr. Becerra accepts that the total sum referred to within the Settlement Agreement and Secured Promissory Note (originally $306,105.33) is reduced by $263,988.33 leaving a balance of $42,177 as at August 31, 2002.

**FURTHER RESOLVED,** that the Royalties due to the Corporation from Healthmark for every pack of Polar Powder manufactured and sold (see previous Corporation Minute No. 8/02 dated November 5, 2002, Minute No. 7/03 dated June 16, 2003) be continued to be paid to Mr. Becerra or his assignee until the remainder of all debt outstanding to Mr. Becerra has been satisfied in its entirety. It is noted by the Corporation that the balance still outstanding as at 31st October, 2003 for monies previously loaned or injected into the Cluster Corporation by Mr. Becerra since September 2000 amounts to $277,697:00.

EFFECTIVE as of the day and year first above written.

Mr. Carlos Becerra
Director, President & C.E.O

Mr. David Williams
Director & Acting Chairman

Dr. R. G. Sheppard
Director

Minute No. 9/03

**EXHIBIT "W" FOLLOWS**

## ASSIGNMENT OF US PATENT NO. 6,152,950 AND
## CHOSES IN ACTION FOR PATENT INFRINGEMENT

THIS AGREEMENT is effective this 22nd day of December, 2003, between Cluster Technology Corp., a Delaware corporation ("CLUSTER") and Grabaldi Holdings, LLC, a Florida limited liability corporation ("GRABALDI").

WHEREAS, CLUSTER owes a judgment to GRABALDI in the principle amount of four hundred sixteen thousand five hundred eight dollars and sixty four cents ($416,508.64) which, with interest, amounts to five hundred thirty two thousand two hundred ninety eight and four cents ($532,298.04) owed as of July 31, 2003;

WHEREAS, CLUSTER is the owner by assignment of US Patent No. 6,152,950 (the "'950 patent"), titled "Apparatus for Therapeutic Treatment of Low Back Pain," which issued on November 28, 2000, and is in force until March 21, 2018;

WHEREAS, CLUSTER has a potential cause of action against Axiom Worldwide, Inc., and other parties related thereto (collectively "Axiom") for the alleged continuing infringement of the '950 patent;

WHEREAS, there may exist other past, current, and future infringers of the '950 patent;

WHEREAS, GRABALDI is desirous of acquiring the chose of action for patent infringement that can be asserted by CLUSTER against Axiom and others, including the right to sue for past infringement of the '950 patent;

WHEREAS, GRABALDI is desirous of acquiring the entire right, title and interest in the '950 patent;

WHEREAS, CLUSTER is willing to assign its entire right, title, and interest in the '950 patent; and

WHEREAS, CLUSTER is willing to transfer all choses in action for past infringement of the '950 patent, and specifically any chose in action against Axiom,

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      In partial satisfaction of the debt owed to GRABALDI, CLUSTER hereby sells, assigns, and transfers to GRABALDI, its successors and assigns, the entire right, title and interest in US Patent No.6,152,950.

2.      In partial satisfaction of the debt owed to GRABALDI, CLUSTER hereby sells, assigns, and transfers to GRABALDI, its successors and assigns, all rights, choses of action, and

causes at law of CLUSTER to bring suit for past infringement of the '950 patent, including any chose of action for patent infringement that can be asserted by CLUSTER against Axiom.

3. GRABALDI agrees that CLUSTER is no longer liable for payment of maintenance fees of the '950 patent.

4. GRABALDI agrees to assume the liability for all legal expenses and agreements with counsel, for the past, current, and future actions alleging infringement of the '950 patent.

5. GRABALDI accepts transfer of the '950 patent and all choses in action for infringement thereof only as partial satisfaction of the debt owed it by CLUSTER.

6. CLUSTER agrees that it, its personnel and agents, will assist GRABALDI in litigating any infringement action, including providing any documents, witnesses, declarations, testimony, evidence, or other support necessary.

7. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.

8. This Agreement may not be amended or revised except by a writing signed by all parties hereto.

9. If any provision or portion of this Agreement is determined by any court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision or portion shall be deemed to be severed and the Agreement thus amended shall be enforceable to give effect to the intention of the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and agree to the terms above written.

On behalf of
CLUSTER TECHNOLOGY CORP.

By: _____

Its: _____

Date: Dec 22 - 2003

On behalf of
GRABALDI HOLDINGS, LLC.

By: Feuardo Clmin

Its: Mketr / Homber

Date: 01.22.04

1-23-04

01-23-2004

102653149

Form PTO-1595
(Rev. 10/02)
OMB No. 0651-0027 (exp. 6/30/2005)

U.S. DEPARTMENT OF COMMERCE
U.S. Patent and Trademark Office

Tab settings ⇒ ⇒ ⇒ ▼

To the Honorable Commissioner of Patents and Trademarks: ... hed original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies) |
|---|---|
| Cluster Technology Corp. | Name: Grabaldi Holdings, LLC. |
| 3350 Riverwood Parkway. Suite 1900 | Internal Address: N/A |
| Atlanta, GA 30339 | |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☑ No | |

3. Nature of conveyance:

☑ Assignment          ☐ Merger

☐ Security Agreement   ☐ Change of Name

☐ Other _____

Street Address: 436 NW 120th Dr.

Execution Date: 12/22/03

City: Coral Springs  State: FL  Zip: 33071

Additional name(s) & address(es) attached? ☐ Yes ☑ No

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is: N/A

A. Patent Application No.(s) N/A

B. Patent No.(s) 6,152,950

Additional numbers attached? ☐ Yes ☑ No

5. Name and address of party to whom correspondence concerning document should be mailed:

Name: Grabaldi Holdings, LLC.

Internal Address: N/A

Street Address: 436 NW 120th Dr.

City: Coral Springs  State: FL  Zip: 33071

6. Total number of applications and patents involved: 1

7. Total fee (37 CFR 3.41).............$ 40.00

☑ Enclosed

☐ Authorized to be charged to deposit account

8. Deposit account number:

N/A

2004 JAN 23 AM 10: 18  ASSIGNMENTS DIV  RECEIVED USPO

**DO NOT USE THIS SPACE**

9. Signature.

Carlos Becerra, President & CEO
Name of Person Signing

Signature

1/22/04
Date

Total number of pages including cover sheet, attachments, and documents: 3

Mail documents to be recorded with required cover sheet information to:
Commissioner of Patents & Trademarks, Box Assignments
Washington, D.C. 20231

01/23/2004 DBYRNE   00000133 6152950

01 FC:8021                    40.00 OP

**EXHIBIT "X" FOLLOWS**



# Scientific Advisory Board
## FOR NORTH AMERICAN MEDICAL CORPORATION

March 22, 2006

Dear Fellow Physicians:

I have dedicated my life and neurosurgical career to the research and advancement of medical treatments that I believe truly benefit the human condition. In doing so, I have performed extensive research and published over 250 medical papers in journals all over the world. Besides being cited as the "father of transcutaneous electrical nerve stimulation," I am also often named as a leading authority on non-invasive spinal treatment and decompression.

With this notoriety comes the difficult task of clarifying claimed associations with people or companies who create an impression of association with me, yet with whom I have no dealings whatsoever.

As the decompression market has proliferated in recent years, so have the companies building all sorts of back treatment devices. I believe many of these misrepresent their product by utilizing my studies to support their efficacy. Not only do I take moral issue with this practice, but I also believe it is important to make clear that this is not good science.

Currently, any manufacturer can claim their product is built to accomplish an outcome, but until they actually test their own device to prove that outcome, they can not honestly make that claim! And they cannot claim to have equipment which is providing effects similar to mine. I've even seen a device, the SpineMED™, which completely changes the biomechanics of the patient during treatment by tilting the pelvis to achieve a treatment angle- yet they are referencing my studies as performed on completely different designs, biomechanics and technology. I believe this to be grossly misrepresentative.

Since 2004, I have been chairing the Scientific Advisory Board for North American Medical Corporation and working with luminary doctors from orthopedic, physiatry, anesthesiology, and other specialties in organizing and implementing more research on the Accu-SPINA™ System and IDD Therapy® protocols. There is still much work to be done. And I am happy to be able to provide this leadership for a company that conducts itself with integrity in the marketplace.

Medical research today is a costly and arduous endeavor that takes true commitment. Consider carefully the companies that attempt to use our research and to sell you equipment on the basis of my work. The Accu-SPINA™ System is the ONLY model that is built upon and continues to improve upon my work. I have no financial interest in NAM but consult with only them because of their integrity.

Sincerely,

C. Norman Shealy, MD, PhD

**EXHIBIT "Y" FOLLOWS**

**Cluster Technology**
**5411Johns Road #116**
**Tampa, FL 33634**

## Resolution of the Board of Directors

Resolved that Alvin Mirman be and is hereby authorized to take any and all actions
necessary to remove James Gibson and Diane Levesque and appoint their successors
as authorized signors and representatives of the company for any of the banking transactions
of the company or any of its subsidiaries.

Be it further resolved that Frank Clark and David Collins are authorized to sign checks and
conduct other banking transactions on behalf of Cluster Technology.

Alvin Mirman
Chairman & Director of Cluster Technology, Inc

8/29/00
Date

**EXHIBIT "Z" FOLLOWS**

**Cluster Technology**
**5411Johns Road #116**
**Tampa, FL 33634**

## Resolution of the Board of Directors

The proposed herein attached resolution as a method to salvage Cluster from total liquidation after Gibson dismantled the Cluster and UPT going and growing enterprise is voted on and adopted immediately approved and adopted as noted. The board herein rights perpetual rights to Carlos Becerra and to any designated company of his choice for contracting by way of an assignment of manufacturing permits at a reduced wholesale value to allow Cluster to sell as if it were a distributor purchasing as an OEM. Perpetual permission is herein granted to use any method or technique to lower costs without creating an liability potential for patent infringement against Cluster's intellectual rights held in said patent or patents.

For a $1,000.00 one time fee Cluster herein issues absolute rights to use as reference the DRS product developed by Carlos Becera during his employment at PDS Cluster Technology Corporation and for which Becera was not paid his salary and bonuses. The board also agrees to convey the existing rights held by the company in his 510 FDA authority and make those available to Carlos Becerra designated fabrication or MFG company to cover any product reasonably Described as a "derivative of the DRS", as per Carlos Becerra's stipulation.

Alvin Mirman
Chairman & Director of Cluster Technology, Inc

8/29/00
Date

# EXHIBIT "AA" FOLLOWS

1

```
 1            IN THE CIRCUIT COURT OF

 2            JEFFERSON COUNTY, ALABAMA

 3

 4

 5  CASE NUMBER:  CV 00-3575

 6  CHRISTOPHER STEWART; HEALTHCHOICE

 7  CHIROPRACTIC, INC.,

 8       Plaintiff,

 9  vs.

10  UNIVERSAL PAIN TECHNOLOGY, INC., a

11  subsidiary of Cluster Technology Corp., et

12  al.,

13       Defendant.

14

15

16     VIDEO DEPOSITION OF CARLOS BECERRA

17       In accordance with Rule 5(d) of The

18  Alabama Rules of Civil Procedure, as

19  amended, effective May 15, 1988, I, MARGO

20  N. BRYAN, am hereby delivering to KEN

21  RILEY, the original transcript of the oral

22  testimony taken on June 25, 2004, at

23  10:50 a.m., along with exhibits.
```

103

```
 1        A.    Yes.   One was in January 20th,
 2   the other one is in February 15th.
 3        Q.    Okay.   Now, in here you note
 4   in the first paragraph that we have not
 5   sold or transferred our product rights or
 6   intellectual property of any kind.  So is
 7   it fair to say that as of February 15th,
 8   2001 that Cluster had not sold or
 9   transferred any product rights or
10   intellectual property of any kind?
11        A.    Correct.
12        Q.    Okay.  Now here it says nobody
13   has authority to speak for the company or
14   its subsidiary other than the undersigned
15   and that would be you?
16        A.    Correct.
17        Q.    All right.
18        A.    And it also says for Cluster
19   and UPT PDS corporation.  All right.
20   Okay.  Yes.
21        Q.    Okay.  All right.  It says we
22   are manufacturing and operating interim
23   management from our new base in Atlanta?
```

**EXHIBIT "BB" FOLLOWS**

 

*A public company, trading symbol CLTT*

North American Medical Corporation
3350 Riverwood Parkway, Suite 1900
Atlanta, Georgia 30305

November 23, 2000

This letter serves to confirm that Cluster Technology, Inc. (CLT) conveys and gives to North American Medical Corporation (NAM) full manufacturing rights of the DRS System, as previously held by Cluster's wholly owned manufacturing subsidiaries, being Professional Distribution Systems (PDS) and Universal Pain Technology (UPT). Cluster also hereby transfers to NAM for use and reference all approvals, testing, recognition, specifications, procedures, and testimonials and the like, provided that:

    1. All manufacturing, assembly, testing, and where requested training is carried out in accordance with procedures and quality control systems previously used by PDS and UPT.

    2. Any and all future design modifications and changes are documented in accordance with the recognized design quality control systems, utilized by PDS and UPT.

    3. NAM grants to Cluster Technology the authority to inspect NAM's procedures and manufacturing practices, at minimum of five days notice.

Signed on behalf of the
Board of Directors
Cluster Technology, Inc.

**EXHIBIT "CC" FOLLOWS**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ORIGINAL

IN RE:,
UNIVERSAL PAIN TECHNOLOGY
         DEBTOR,

VS.                              CASE NO.   00-14508-8GI
_____/


DEPONENT:        ALVIN MIRMAN

DATE:            FEBRUARY 27TH, 2001

PLACE:           FORIZ AND DOGALI, PA
                 600 N. WESTSHORE BLVD.
                 SUITE 502
                 TAMPA, FL 33609

TAKEN:           PURSUANT TO NOTICE

TIME:            BEGAN:  10:15 A.M.
                 ENDED:   5:25 P.M.

REPORTED BY:     PHILIP RYAN, RPR
                 NOTARY PUBLIC
                 STATE OF FLORIDA AT LARGE


*THE REPORTERS GROUP, INC.*

1    STATEMENT?

2              MS. GENSON:  UH-HUH.

3              THE WITNESS:  YES.

4    BY MR. WAHL:

5         Q.    HOW MUCH?

6         A.    $45,000 PER MACHINE.

7         Q.    NOW, IT'S MY UNDERSTANDING THAT THERE

8    IS NO CONTRACT, OR WRITTEN AGREEMENT BETWEEN THE

9    DEBTORS AND NORTH AMERICAN MEDICAL CORPORATION,

10   BASED ON YOUR PRIOR STATEMENT; IS THAT CORRECT?

11        A.    CORRECT.

12        Q.    THEN PURSUANT TO WHAT ARE YOU PAYING

13   NORTH AMERICAN MONEY FOR?

14        A.    WE HAVE A VERBAL AGREEMENT, NOT A

15   WRITTEN AGREEMENT.

16        Q.    AND WHAT IS THAT VERBAL AGREEMENT?.

17        A.    THAT WE WILL PAY HIM, YOU KNOW,

18   $45,000 PER MACHINE.

19        Q.    AND WHAT IS MR., WHAT SERVICES ARE

20   MR. BECERRA OR NORTH AMERICAN PROVIDING TO THE

21   DEBTORS?

22        A.    WELL, WE'RE STILL, YOU KNOW, THERE

23   ARE STILL SOME FINER POINTS THAT WE'RE WORKING

24   OUT.

25        Q.    WELL, WHAT ARE THE BASIC ONES?

*THE REPORTERS GROUP, INC.*

**EXHIBIT "DD" FOLLOWS**

ORIGINAL

1

AMERICAN ARBITRATION ASSOCIATE
COMMERCIAL ARBITRATION TRIBUNAL

CLUSTER TECHNOLOGY CORP.,
UNIVERSAL PAIN TECHNOLOGY, INC.,
NORTH AMERICAN MEDICAL CORPORATION,
CARLOS BECERRA, GRACE BECERRA
AND DAVID WILLIAMS,

     Claimants,

and                  AAA Case No.:  33311 324 03

JAMES GIBSON, JR., et al,

     Respondents.


DEPOSITION OF ALVIN MIRMAN


Counsel for Claimants:
    MR. CRAIG E. ROTHBURD, Esquire
    Eddy & Rothburd, P.A.
    Attorneys at Law
    808 West DeLeon Street
    Tampa, Florida  33606
    (Appeared by telephone.)

Counsel for Respondents:
    MR. MITCHELL C. ROBINER, Esquire
    Gardner Wilkes Shaheen
    Attorneys at Law
    401 East Jackson Street, Suite 2400
    Tampa, Florida  33602

Also Present:
    James Gibson, Jr., Respondent


Stenographically Reported by:
Mary Ann Smith
Registered Professional Reporter
October 4, 2004

13

1    A.    I have no idea.

2    Q.    Mr. Mirman, what I'm going to show you is going

3    to be marked as Respondents' Exhibit 2.  If you can take

4    a look at that and tell me if you have ever seen that

5    document.  It's dated November 23, 2000.

6         (Respondents' Exhibit No. 2 was marked for

7    identification.)

8    A.    I seem to recall something very similar to

9    this.  I'm not sure if it was this or a similar

10   document.

11   Q.    Can you describe the document that you think

12   was similar to this document?

13   A.    You know, I've wiped most of the things out of

14   my mind and I just don't -- you know, it's been too long

15   and too much has gone by to remember what has

16   transpired.

17   Q.    Okay.  But you're saying that this document

18   looks somewhat similar to another document?

19   A.    No.  I'm saying it could be this document or it

20   could be a similar document.  I just don't recall.

21   Q.    And you're talking about because of the terms

22   in it, not the way that the document looks with the

23   Cluster letterhead or anything like that?

24   A.    No, with the terms.

25   Q.    Do you recall ever discussing this document or

14

1     a similar document with Mr. Becerra?

2         A.    In the year 2000?

3         Q.    At any time?

4         A.    I mean, I'm sure we've had discussions at that

5     time about it, but nothing subsequently.

6         Q.    Okay.  Is that your signature at the bottom of

7     that page?

8         A.    It doesn't look like mine.  It could have been

9     my secretary's, but it doesn't look like mine.

10        Q.    Who was your secretary at that time?

11        A.    Barbara Deneaub.

12        Q.    Is that the type of document that Ms. Deneaub

13    would have signed for you back in --

14        A.    If I was very busy, it's conceivable.  I

15    just -- you know, I don't know.

16        Q.    So that was common practice for you to give her

17    the authority to sign?

18        A.    Yes.  She signed numerous things for me.

19        Q.    Okay.  Now, in December of 2000, you were

20    deposed by Quaker State Leasing in the bankruptcy case,

21    do you remember that?

22        A.    I remember being deposed.

23        Q.    And during that deposition, and I will show you

24    the actual testimony, but you testified to Quaker State

25    that Cluster had no arrangement with a third party at

**EXHIBIT "EE" FOLLOWS**

1

```
 1           IN THE CIRCUIT COURT OF
 2           JEFFERSON COUNTY, ALABAMA
 3
 4
 5  CASE NUMBER:  CV 00-3575
 6  CHRISTOPHER STEWART; HEALTHCHOICE
 7  CHIROPRACTIC, INC.,
 8       Plaintiff,
 9  vs.
10  UNIVERSAL PAIN TECHNOLOGY, INC., a
11  subsidiary of Cluster Technology Corp., et
12  al.,
13       Defendant.
14
15
16      VIDEO DEPOSITION OF CARLOS BECERRA
17       In accordance with Rule 5(d) of The
18  Alabama Rules of Civil Procedure, as
19  amended, effective May 15, 1988, I, MARGO
20  N. BRYAN, am hereby delivering to KEN
21  RILEY, the original transcript of the oral
22  testimony taken on June 25, 2004, at
23  10:50 a.m., along with exhibits.
```

41

1   the top it says Cluster Technology Corp?

2        A.    Yeah.

3        Q.    All right.  If you want to

4   find that.  It has the logo at the top.

5             MR. RITCHEY:  Where?  In

6   Defendants' Exhibit 2 or Defendants'

7   Exhibit 1?  I mean Plaintiffs' Exhibit 1

8   or 2?

9             MR. RILEY:  It's the group of

10  documents, 2.

11       A.    Okay.

12       Q.    Okay.  And this is a letter

13  that looks like confirms that Cluster

14  Technology conveys to North American full

15  manufacturing rights of the DRS system.

16  Is this what you were talking about when

17  there was an effort to manufacture and

18  market DRS on behalf of Cluster?

19       A.    No.  Originally, this is

20  November 23rd, so it obviously had to be a

21  little -- this is when it was beginning.

22  Mr. Mirman asked Dave Williams and I to

23  come up with a plan to salvage Cluster.

42

1        Q.    Okay.

2        A.    And so that was at the

3    beginning.  That probably happened over a

4    period of months.

5        Q.    Okay.  So would the rights,

6    the manufacturing rights, were they not

7    transferred on that date, November 23rd of

8    2000?

9        A.    Well, the rationale for this

10   if I may explain?

11       Q.    Sure.

12       A.    It would have been

13   inappropriate for me being that Cluster

14   was a public company to try to make a

15   product or salvage anything without having

16   rights because even though I didn't have

17   drawings and designs and all that still I

18   felt that, you know, we needed to, to have

19   some rights, not to be sued for

20   infringement or something like that.

21       Q.    Okay.

22       A.    So that was the reasoning for

23   that.

43

```
 1        Q.    All right.  Did North American

 2  ever acquire those rights?

 3        A.    No.

 4        Q.    All right.  And then I guess

 5  this contract to manufacture which is on

 6  the next page --

 7        A.    Uh-huh.

 8        Q.    -- that was never executed?

 9        A.    No.  It was executed.  I just

10  don't know when my copy signed isn't.

11  Melody Genson, whom I think you know

12  Melody Genson, because --

13              THE REPORTER:  Who?

14              THE WITNESS:  Melody Genson.

15              MR. RILEY:  Melody Genson.

16              THE WITNESS:  Genson, G-E-N I

17  think it's S-O-N, yeah.

18        A.    She was the bankruptcy

19  attorney that Mr. Mirman hired on the

20  board.  I believe you talked to her.

21        Q.    I have talked with her, yes

22  sir.

23        A.    Melody Genson at the time, she
```

# EXHIBIT "FF" FOLLOWS

American Court Reporting Company, Inc. email: kpatterson@acrga                4/4/2005

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


IN RE:              )
                    )   CASE NO. 05-63325-REB
CLUSTER TECHNOLOGY  )
CORPORATION,        )   CHAPTER 7
                    )
        Debtor.  )   JUDGE BRIZENDINE


                    - - -



        The 341 Meeting of Creditors, taken before

Gala M. Reznick, Certified Court Reporter and Notary

Public, commencing at 11:23 a.m., on this the 29th

day of March, 2005, at the Richard B. Russell

Federal Building, 75 Spring Street, Room 365,

Atlanta, Georgia.

American Court Reporting Company, Inc.        email: contactus@acrga.com                404-892-1331
00000000-0000-0000-0000-000000000000

American Court Reporting Company, Inc. email: kpatterson@acrga                    4/4/2005

Page 18

1    was an effort made by the bankers, the general
2    reaction was -- when they came back was, Look, we've
3    raised money for you in the past. You're still in
4    this battle, why on earth or how can we raise money
5    for you again when only two years ago we raised a
6    million and that seems to have disappeared? So,
7    again, unfortunately, the plan to actually
8    manufacture Polar Powder was aborted.
9         However, another company did provide us
10   the facility for manufacturing the powder. And they
11   were to pay a royalty, and did pay a royalty to
12   Cluster Technology for each pack manufactured and
13   sold. We were fairly optimistic that we were going
14   to get a fairly big market reasonably quickly. That
15   has not matured. And indeed it is -- being a cold
16   pack, it is one of those products that I think needs
17   to be in the market for a few years before we are
18   going to see anybody derive any good out of it.
19        Then in the summer of 2004 -- I move
20   forward because -- well, no. Let me come back to
21   2003. I think it's very important that the case
22   against Axiom resulted finally in a settlement
23   agreement. The reason being that the lawyers for
24   Cluster Technology withdrew some six or eight weeks
25   prior to the trial. We will see in the papers that

Page 19

1    there is possibly a case for malpractice that we're
2    considering there.
3         A settlement agreement was made with
4    Axiom, and judgment was, in fact, given in Axiom's
5    favor resulting -- and I can only call it a paper
6    judgment inasmuch as that whilst there was a
7    judgment in favor of Mr. Gibson and Mr. Exarhos, it
8    was only to be paid if there were -- if there were
9    to be any default as far as the judgment conditions
10   were concerned.
11        For a variety of reasons, and don't ask me
12   the depth of it, but it would appear that it was
13   felt that we did not comply with the conditions of
14   the settlement, and arbitration was applied for
15   under the terms of the settlement agreement. And
16   this was due for hearing in October of 2004.
17        Just prior to that, in June of 2004, North
18   American Medical at -- I won't say the request, but
19   certainly were being pushed by their own
20   distributors, very concerned that some of the
21   disparaging remarks that were being put out into the
22   marketplace by Axiom's representatives, and a taped
23   conversation was taken of the director, Mr. Exarhos,
24   regarding the position of Axiom vis-a-vis Cluster
25   and North American Medical.

Page 20

1         In October when the arbitration was to
2    have been heard, it was decided by Carlos Becerra
3    and myself that all we were doing now was pushing
4    money after money. We had a situation in the
5    marketplace where in my belief it wasn't a question
6    of people coming after Cluster Technology, but two
7    competitors, Axiom and North American Medical, being
8    in the battleground. And Cluster was just being
9    used for that purpose.
10        And in spite of probably three and a half,
11   four years of hard work, and a lot of money that was
12   being put in privately into trying to resurrect
13   Cluster, the decision was taken that we should
14   consider perhaps going into a Chapter 7 position.
15   And we sought legal advice on this again and decided
16   that that was the best course of action to put the
17   company to bed.
18      Q   Okay. Appreciate that.
19          Let's look at Schedule B real quick,
20   schedule of personal property. On this schedule you
21   included a few assets. Under item number 21 you
22   list the DRS trademark as a value of a dollar. Who
23   owns the trademark now?
24      A   I still believe it's Cluster Technology.
25      Q   Who owns all the intellectual property and

Page 21

1    the patents?
2       A   The patents are not owned by Cluster
3    Technology. The intellectual property rights,
4    drawings, and things like that, have always been
5    there with Cluster. But in saying that, I have to
6    say that a lot of the records were missing when
7    inventory and records were removed from Tampa in the
8    year 2000 after the Chapter 11 application.
9       Q   So you're saying there is a -- there is a
10   patent on this technology?
11      A   There is a patent on this, yes.
12      Q   And who owns that?
13      A   That is owned at this moment in time by a
14   company called Cambria 68.
15      Q   And who is that? And say it again. Spell
16   it.
17      A   They're a Florida company. Cambria 68.
18      Q   How do you spell it?
19      A   C-a-m-b-r-i-a, Cambria.
20      Q   Cambria 68?
21      A   Yes.
22      Q   And who are they?
23      A   They're a Florida company. That's all I
24   know of them.
25      Q   Do you know who the owners are?

American Court Reporting Company,    email: contactus@acrga.com              404-892-1331
00000000-0000-0000-0000-000000000000

Page 22

1   A   No.
2   Q   And you're saying they own the patents?
3   A   They purchased it from a company called
4   Grabaldi.
5   Q   Say the company name again.
6   A   Grabaldi, G-r-a-b-a-l-d-i.
7   Q   And what year was this?
8   A   That has been, I think, in the last few
9   months. Grabaldi actually were assigned the patents
10  back in 2003.
11  Q   Cluster sold the patents to --
12  A   Grabaldi. It wasn't so much sold. It was
13  in settlement of a judgment that Grabaldi held in
14  the sum of approximately $600,000 for one of the
15  what was the judgment creditors of Cluster in the
16  original Chapter 11.
17  Q   That was a settlement, 2003, approved by
18  the board?
19  A   Yes.
20  Q   Okay. And is that documented in the board
21  minutes you brought today?
22  A   Yes, it is. Yes, sir.
23      MR. HAYS: Mr. Ellis, do you have any
24  questions on the trademark assignment --
25      MR. ELLIS: I do.

Page 23

1       MR. HAYS: -- or the patents?
2       EXAMINATION
3   BY MR. ELLIS:
4   Q   You have just testified that you do not
5   know who consists of Cambria 68?
6   A   That's correct.
7   Q   Are you involved with North American -- I
8   think you testified was the corporate name -- North
9   American Holdings?
10  A   It's North American Medical, is the
11  company. I have no shareholding or involvement with
12  them, nor am I employed by them.
13  Q   Do you have a consulting agreement with
14  them?
15  A   No.
16  Q   No compensation whatsoever?
17  A   No.
18  Q   No affiliates may have any compensation
19  with them?
20  A   None.
21  Q   Do you know who the owner of North
22  American Medical is?
23  A   No.
24  Q   You had testified that the board of
25  directors approved a transaction where Grabaldi

Page 24

1   received a settlement of a judgment?
2   A   Yes.
3   Q   Do you know who held that judgment?
4   A   Originally, the company that held it was
5   Quaker State, which is in the original Chapter 11.
6   They are listed as a judgment preferred creditor,
7   the sum of around $600,000. My understanding --
8   Q   All right. Go ahead.
9   A   No. That's --
10  Q   Well, do you know how it got from Quaker
11  State to Grabaldi?
12  A   They purchased it, I presume.
13  Q   Do you have personal knowledge of that
14  transaction?
15  A   No.
16  Q   Do you know who might have personal
17  knowledge of that transaction?
18  A   The owners of Grabaldi.
19  Q   Do you know who the owners are?
20  A   And I think possibly Melody Jensen, who
21  was the bankruptcy attorney at the time.
22  Q   Do you know who the owners of Grabaldi
23  are?
24  A   No. You are talking of current owners?
25  Q   Let's go back at the time of the

Page 25

1   transaction. You're under oath, so --
2   A   Yes, of course. I do understand that.
3   Q   And I want to make clear that evasive
4   answers, it's not -- you know, could be problematic.
5       MR. GEESLIN: There's nothing evasive
6   about his answers thus far.
7       THE WITNESS: I hope I'm not evasive,
8   and I do not intend to be.
9   BY MR. ELLIS:
10  Q   Okay. The owners of Grabaldi -- you are
11  on the board that made the decision to settle at the
12  time Grabaldi owned this judgment that was purchased
13  from Quaker State; is that correct?
14  A   That's correct, yeah.
15  Q   And you're saying that that board
16  decision --
17  A   Say that again. Sorry. Would you reword
18  that again.
19  Q   You had testified that there was a
20  decision by the board, or the board approved a
21  transaction, a settlement agreement where property
22  of Cluster Technology Corporation was transferred to
23  Grabaldi at some time in 2003?
24  A   Yes.
25  Q   And those are reflected in the corporate